## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SYNTHES USA, LLC,                                        )
SYNTHES USA PRODUCTS, LLC and          )
SYNTHES USA SALES, LLC,                           )
                                                                         )
     Plaintiffs,                                              )
                                                                         )
    v.                                                              )          C.A. No. 11-652-LPS
                                                                         )
GLOBUS MEDICAL, INC.,                              )
                                                                         )
    Defendant.                                            )          REDACTED – PUBLIC VERSION
                                                                         )

### PLAINTIFFS' APPENDIX TO OPENING BRIEFIN SUPPORT
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF
### NO ANTICIPATION BY THE KOZAK AND MICHELSON REFERENCES

OF COUNSEL:
Matthew J. Becker
Jeremy C. Lowe
Edward M. Mathias
Tara R. Rahemba
AXINN, VELTROP & HARKRIDER LLP
90 State House Square, 9th Floor
Hartford, CT 06103
(860) 275-8100

Diane C. Ragosa
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200

Dated:   February 13, 2013

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiffs*

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,066 | 08/03/2012 | 7,875,076 | 20330.0003.RX076 | 8125 |

46165        7590        10/12/2012
SYNTHES
1302 WRIGHTS LANE EAST
WEST CHESTER, PA 19380

| EXAMINER |
|---|
| REIP, DAVID OWEN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/12/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| Transmittal of Communication to Third Party Requester *Inter Partes* Reexamination | Control No. 95/002,066 | Patent Under Reexamination 7875076 |
|---|---|---|
| | Examiner DAVID O. REIP | Art Unit 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

┌──────── (THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS) ────────┐

      NDQ Special Reexam Group
      1000 Louisiana Street
      Fifty-Third Floor
      Houston, TX 77002

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

U.S. Patent and Trademark Office
PTOL-2070 (Rev. 07-04)

Paper No. 20120913

| ***ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION*** | Control No. 95/002,066 | Patent Under Reexamination 7875076 |
|---|---|---|
| | Examiner DAVID O. REIP | Art Unit 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):  ☐ PTO-892   ☒ PTO/SB/08   ☐Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

    ☒ An Office action is attached with this order.

    ☐ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

U.S. Patent and Trademark Office
PTOL-2063 (08/06)

Paper No.  20120913

Application/Control Number: 95/002,066                                    Page 2
Art Unit: 3993

### *DECISION ON REQUEST FOR INTER PARTES REEXAMINATION*

The present request for *inter* partes reexamination establishes a reasonable

likelihood that third party requester ("3PR") will prevail with respect to claims 1-16 of

United States Patent Number 7,875,076 (Mathieu et al, hereinafter "the '076 patent").


### *References Cited in Request*

A total of six references, both alone and in certain combinations, have been

asserted in the Request as providing teachings relevant to the claims of the '076 patent.

The references are as follows:

U.S. Pat. No. 5,397,364 to Kozak et al.  – "Kozak"

EP 1 103 236 to Fraser – "Fraser"

WO 01/95837 to Michelson – "Michelson '837"

WO 99/38463 to Zdeblick – "Zdeblick"

U.S. Pat. No. 4,599,086 to Doty – "Doty"

U.S. Pat. No. 6,558,423 to Michelson – "Michelson '423"


### **Identification of Every Claim for Which Reexamination is Requested**

The six references cited above are discussed in the Request and asserted to

render unpatentable claims 1-16 of the '076 patent. The Request include explanations

that seek to establish a reasonable likelihood that the 3PR will prevail with respect to at

least one of the patent claims in light of the six references cited above and the proposed

Application/Control Number: 95/002,066                                        Page 3
Art Unit: 3993

combinations. The explanations in the Request are addressed below under

subheadings designating each one as a numbered "Ground".

### Reasonable Likelihood to Prevail (RLP) on the Issue of Patentability

The claims for which reexamination is requested will be utilized to show whether

the above-cited references, taken together with the explanation provided by 3PR, are

found to establish, or not to establish, that there is a reasonable likelihood that the

requester will prevail with respect to at least one of the patent claims.

### Ground 1

### 103(a) rejection over Kozak

It is NOT agreed that the request has made an RLP showing that claims 1, 3-5,

7, 8, 12, 13 and 16 of the '076 patent are unpatentable based upon the teachings of

Kozak alone.

As reiterated by the Supreme Court, the framework for the objective analysis for

determining obviousness under 35 U.S.C. 103 is stated in *Graham v. John Deere Co.*,

383 U.S. 1, 148 USPQ 459 (1996). *See KSR International Co. v. Teleflex, Inc.*, 550

U.S. 398, 82 USPQ2d 1385 (2007). Obviousness is a question of law based on the

underlying factual inquiries. The factual inquiries enunciated by the Court are as

follows:

(A) Determining the scope and content of the prior art;

(B) Ascertaining the differences between the claimed invention and the prior art;

Application/Control Number: 95/002,066                                        Page 4
Art Unit: 3993

and

(C) Resolving the level of ordinary skill in the pertinent art.

See MPEP 2141 et seq.  When ascertaining the differences between the claimed

invention and the prior art, consideration must be given to the claimed invention as a

whole and the entirety of the prior art teachings, including disclosures that would teach

away from the claimed invention.  See MPEP 2141.02.

The teachings of Kozak alone, as set forth in the request on pages 19-23 and

118-124, fail to make an RLP showing for claim 1 for at least the following reasons:

1) Claim 1 recites, "first and second bone screws each having a head and a

shank, the first bone screw being sized and configured to extend through the first

borehole **and into the upper endplate**, the second bone screw being sized and

configured to extend through the second borehole **and into the lower endplate**"

(hereinafter, this limitation, wherein a first screw angles upward toward the upper

vertebra and a second screw angles downward toward the lower vertebra, will be

referred to as the "diverging screws configuration").  In the Fig. 25, double screw

embodiment of Kozak, both angled bores 97' and 97" are angled toward <u>one</u> vertebra,

e.g. the "lower" vertebra –

"Alternatively, two bone screws can be provided to anchor the device to one of the

vertebrae.  Such a device is illustrated in Fig. 25 showing an anterior spacer body 95' having a

central guide bore 96 and two angled bores 97' and 97".  The two angled bores 97' and 97" are

configured to receive a corresponding bone screw 98 therethrough.  The bores 97' and 97" are

preferably (but not necessarily) oriented at different angles so that the two bone screws 98 can

engage the vertebra without conflict" (Kozak at 10:56-65).

 3PR cites to only a portion of the last line of the paragraph above, "The bores 97'

and 97" are preferably (but not necessarily) oriented at different angles," and then uses

said portion as the basis for alleging that Kozak suggests that "the second bone screw

could be angled such that it penetrates the adjacent endplate of the upper vertebra"

(Request p. 123).  Considering Kozak alone, i.e. not in combination with a secondary

reference, the examiner does not agree that said portion of Kozak is a teaching that

suggests, with respect to the Fig. 25 double screw embodiment, the obviousness of

modifying one of the angled bores, e.g. bore 97', so that the first and second bone

screws are configured into said diverging screws configuration.  To the contrary, Kozak

only suggests orienting the two bone screws at different angles "so that the bone

screws 98 can engage *the vertebra* [i.e. the lower vertebra only] without conflict."  A

secondary reference is needed to provide a teaching of anchoring an intervertebral

implant into both the vertebral bodies above and below the implant using a diverging

screws configuration.  3PR makes only a footnote reference (request p. 124) to three

references which are alleged to provide a basis for 3PR's statement that "anchoring an

intervertebral implant to both the upper and lower vertebrae was common in the prior

art" (request p. 124, lines 1-2).  It is noted that one of the three footnoted references, i.e.

6,709,456, is a patent to "Percutaneous Mitral Annuloplasty with Hemodynamic

Monitoring," and thus is unrelated to securement of intervertebral implants.  The other

two footnoted references, i.e. WO '785 and Heggeness et al '180, appear to be

references directed to intervertebral implants.  Nonetheless, a 103 rejection of the

above discussed "diverging screws configuration" limitation of claim 1 based on

consideration of Kozak alone, with only a footnote reference to what may or may not be

"common in the art," does not have a reasonable likelihood of prevailing.

　　　2)  Claim 1 also recites, "a plate operatively coupled to the body, *the plate*

*having a plate top surface located generally on the upper plane and a plate lower*

*surface located generally on the lower plane* when the plate is coupled to the body

*so that the body has a first height extending between the upper surface and the*

*lower surface and the plate has a second height extending between the plate top*

*surface and the plate lower surface, the second height being generally equal to*

*the first height*" (emphasis added).  3PR cites to Figs. 1 and 25 to support their

conclusion that Kozak teaches a plate operatively coupled to the body, said plate having

the limitations as claimed.  However, with respect to the embodiment of Fig. 1, it is

apparent that the upper surface (end face 56) of plate 55 is clearly offset from the plane

defined by the upper surface 30 of body 29.  See the "step-down" at notch 40.

Assuming symmetry, the lower surface (end face 56) of plate 55 would correspondingly

be offset from the plane defined by the lower surface 30 of body 29.  Thus, the height of

the plate 55 is clearly less than the height of the body 29.  Looking to the embodiment of

Fig. 25, a substantially similar analysis holds true.  That is, given the showing of a

significant bevel (unlabeled in Fig. 25, but labeled 31 in Fig. 1), the height dimension of

the plate 95' is clearly less than the height of the body (i.e. the body "height" being the

distance between the respective planes defined by the flat upper and lower surfaces

(unlabeled in Fig. 25, but labeled 30 in Figs. 1 and 6)).  Therefore, Kozak does NOT

teach an implant having a plate coupled to a body, wherein the plate's top and lower

surfaces are located generally <u>on</u> the respective upper and lower planes of the body

when the plate is coupled to the body, and thus correspondingly does NOT teach an

implant wherein the second height (i.e. height of the plate) is generally <u>equal</u> to the first

height (i.e. the height of the body).  Further, 3PR has not argued that it would have been

obvious to enlarge the plates (55, 95') so that the height of the plates would be

generally equal to the height of bodies onto which the plates are coupled.  Therefore, a

103 rejection of the above discussed "plate height vs. body height" limitation of claim 1

based on consideration of Kozak alone does not have a reasonable likelihood of

prevailing.

Correspondingly, since each of claims 3-5, 7, 8, 12, 13 and 16 ultimately depend

from claim 1, an RLP showing has NOT been made for claims 3-5, 7, 8, 12, 13 and 16

for at least the same reasons as claim 1.


### Ground 2

### 103(a) rejection over Kozak in view of Michelson '837

It is NOT agreed that the request has made an RLP showing that claim 2 of the

'076 patent is unpatentable based upon the teachings of Kozak in view of Michelson

'837.

Claim 2 depends on claim 1.  The RLP showing for claim 2 relies upon and

incorporates by reference the analysis for claim 1.  See page 25 of the request.  As

discussed above in Ground 1, Kozak fails to teach a plate having all the limitations as

claimed.  Further, since Michelson '837 does not teach a plate operatively coupled to a

body, the request fails to apply Michelson '837 to the plate limitations of claim 1 that

Kozak fails to teach.  Therefore, the request does not make it clear how the teachings of

Kozak and Michelson '837 apply to every limitation in claim 2, which incorporates

limitations from claim 1.  For these reasons, the request has NOT made a RLP showing

that Kozak in view of Michelson '837 teaches every limitation in claim 2 in accordance

with 35 U.S.C. 103(a).  Accordingly, reexamination is not granted for claim 2 based

upon the proposed rejection of Ground 2.


### Ground 3

### *103(a) rejection over Kozak in view of Doty*

It is NOT agreed that the request has made a RLP showing that claims 10, 11

and 16 of the '076 patent is unpatentable based upon the teachings of Kozak in view of

Doty.  Claims 10 and 16 each depend on claim 1, and claim 11 depends on claim 10.

The RLP showing for claims 10, 11 and 16 relies upon and incorporates by reference

the analysis for claim 1.  See page 27 of the request.  The analysis for claim 1,

however, fails to apply Kozak or Doty to teach the "first and second bone screws each

having a head and a shank, the first bone screw being sized and configured to extend through the

first borehole and into the upper endplate, the second bone screw being sized and configured to

extend through the second borehole and into the lower endplate to anchor the intervertebral

implant to the upper and lower vertebrae and the heads of the first and second bone screws being

positioned between the upper and lower planes" limitations of claim 1.  As discussed above

in Ground 1, Kozak fails to teach said "diverging screws configuration."  Further, the

request fails to clearly apply Doty to the limitations of claim 1 that Kozak fails to teach.

Therefore, the request does not make it clear how the teachings of Kozak and Doty

apply to every limitation in claims 10, 11 and 16, which incorporate limitations from

claim 1.  For these reasons, the request has NOT made a RLP showing that Kozak in

view of Doty teaches every limitation in claims 10, 11 and 16 in accordance with 35

U.S.C. 103(a).  Accordingly, reexamination is not granted for claims 10, 11 and 16

based upon the proposed rejection of Ground 3.


### Ground 4

### *103(a) rejection over Kozak in view of Michelson '423*

It is NOT agreed that the request has made an RLP showing that claim 15 of the

'076 patent is unpatentable based upon the teachings of Kozak in view of Michelson

'423.

Claim 15 depends on claim 1.  The RLP showing for claim 15 relies upon and

incorporates by reference the analysis for claim 1.  See page 30 of the request.  As

discussed above in Ground 1, Kozak fails to teach a plate having all the limitations as

claimed.  Further, since Michelson '423 does not teach a plate operatively coupled to a

body, the request fails to apply Michelson '423 to the plate limitations of claim 1 that

Kozak fails to teach.  Therefore, the request does not make it clear how the teachings of

Kozak and Michelson '423 apply to every limitation in claim 15, which incorporates

limitations from claim 1. For these reasons, the request has NOT made a RLP showing

that Kozak in view of Michelson '423 teaches every limitation in claim 15 in accordance

with 35 U.S.C. 103(a). Accordingly, reexamination is not granted for claim 15 based

upon the proposed rejection of Ground 4.


### Ground 5

### *103(a) rejection over Kozak in view of Fraser*

It is agreed that the request has made an RLP showing that claims 1-14 and 16

of the '076 patent are unpatentable based upon the teachings of Kozak in view of

Fraser.

With respect to claims 1-14 and 16, an RLP showing of the factual inquiries for

an obviousness analysis have been presented in the request. See request, pgs. 31-41

and 147-187, and CC-E claim chart. It is noted that Fraser teaches an intervertebral

implant having a plate slidingly engaged with the anterior face of the implant (Fig. 1).

Viewing Fig. 2, plate 20 has a top surface (i.e. the flat portion between tabs 42') located

generally on the upper plane of body 10 and a lower surface (i.e. the flat portion

between tabs 36' and 38') located generally on the lower plane 10. Plate 20 also has

screw openings that allow bone screws that are passed therethrough to engage the

vertebral bodies both above and below the implant. Thus, Fraser provides the

"diverging screws configuration" and the "plate height vs. body height" teachings that

are missing in Kozak, as discussed in Ground 1.

Application/Control Number: 95/002,066                                    Page 11
Art Unit: 3993

## Ground 6

### *103(a) rejection over Kozak and Fraser in view of Michelson '837*

It is agreed that the request has made an RLP showing that claim 2 of the '076 patent is unpatentable based upon the teachings of Kozak, Fraser and Michelson '837.

With respect to claim 2, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request. See request, pgs. 41-43 and 188-191, and CC-F claim chart.

## Ground 7

### *103(a) rejection over Kozak and Fraser in view of Doty*

It is agreed that the request has made an RLP showing that claims 10, 11 and 16 of the '076 patent are unpatentable based upon the teachings of Kozak, Fraser and Doty.

With respect to claims 10, 11 and 16, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request. See request, pgs. 44-47 and 192-199, and CC-G claim chart.

## Ground 8

### *103(a) rejection over Kozak and Fraser in view of Michelson '423*

It is agreed that the request has made an RLP showing that claim 15 of the '076 patent is unpatentable based upon the teachings of Kozak, Fraser and Michelson '423.

With respect to claim 15, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request. See request, pgs. 47-49 and 199-204, and CC-H claim chart.

## Ground 9

### 103(a) rejection over Kozak in view of Zdeblick

It is agreed that the request has made an RLP showing that claims 1, 3-5, 7, 8, 12, 13 and 16 of the '076 patent are unpatentable based upon the teachings of Fraser in view of Zdeblick.

With respect to claims 1, 3-5, 7, 8, 12, 13 and 16, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request. See request, pgs. 49-59 and 205-237, and CC-I claim chart.

## Ground 10

### 103(a) rejection over Kozak and Zdeblick in view of Michelson '837

It is agreed that the request has made an RLP showing that claim 2 of the '076 patent is unpatentable based upon the teachings of Kozak and Zdeblick in view of Michelson '837.

With respect to claim 2, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request. See request, pgs. 59-61 and 237-241, and CC-J claim chart.

## Ground 11

### *103(a) rejection over Kozak and Zdeblick in view of Doty*

It is agreed that the request has made an RLP showing that claims 10, 11 and 16 of the '076 patent are unpatentable based upon the teachings of Kozak and Zdeblick in view of Doty.

With respect to claims 10, 11 and 16, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request.  See request, pgs. 61-64 and 241-248, and CC-K claim chart.

## Ground 12

### *103(a) rejection over Kozak and Zdeblick in view of Michelson '423*

It is agreed that the request has made an RLP showing that claim 15 of the '076 patent is unpatentable based upon the teachings of Kozak and Zdeblick in view of Michelson '423.

With respect to claim 15, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request.  See request, pgs. 65-67 and 248-252, and CC-L claim chart.

## Ground 13

### *103(a) rejection over Fraser*

Application/Control Number: 95/002,066                                  Page 14
Art Unit: 3993

It is NOT agreed that the request has made an RLP showing that claims 1-14

and 16 of the '076 patent are unpatentable based upon the teachings of Fraser alone.

The teachings of Fraser alone, as set forth in the request on pages 67-73 and

253-277, fail to make an RLP showing for claim 1 for at least the following reasons:

The Fraser reference being brought in by 3PR (EP 1 103 236) comprises

substantially the same disclosure as the Fraser publication (2002/0082597) that was

applied and fully considered during the prosecution of the application of the application

that became the '076 patent.  For example, Figs. 1-11 of Fraser '597 are "informal"

drawings of the same implant as shown in the "formal" Figs. 1-11 of Fraser '236.

Correspondingly, the respective written disclosures are substantially similar.  Therefore,

the claim 1 limitations of "first and second boreholes positioned between the upper and

lower planes" and "the heads of the first and second bone screws positioned between

the upper and lower planes" have already been considered with respect to Fraser, albeit

in the context of anticipation.  In the requested "new light" reconsideration of Fraser

under 35 USC 103, 3PR cites to the structure of Fraser wherein the attached plate 20

has four plate extensions or tabs (36', 38', 40' and 42'), each tab having a borehole (36,

38, 40 and 42, respectively) for insertion of bone screws therethrough.  3PR also cites

to the Fraser disclosure, "in other embodiments, the tabs are flexible or readily bent with

respect to the remainder of the plate 20" (Fraser '236 at 0017, last full sentence).  3PR

then argues for obviousness, stating "Therefore, the tabs could easily be bent, which

would move the boreholes and bone screw heads medially with respect to the implant

body.  With the tabs bent enough, the entire bone screw head could be positioned fully

Application/Control Number: 95/002,066                                    Page 15
Art Unit: 3993

between the upper and lower planes of the implant body, utilizing the most superior and

inferior points on the upper and lower surface of the implant body to define the planes"

(Request p. 263).

Returning to Fraser '236 at [0017] – "Continuing to refer to FIG. 3, tabs 38' and

40' are shown angled with respect to the remainder of the plate 20 so that screws 46

and 48 are angled with respect to the medial plane "P" of the body 10. The angle

formed by the tab(s) and plate, as well as by the screws(s) and medial plane, is

designated as "α" and is determined by a particular situation and a patient's anatomy.

Preferably, the angle "α" is at least about 15°; preferably, the angle is not more than

60°. For most applications, the angle "α" is about 20°." Given the above disclosure and

in view of Fig. 3, one of ordinary skill in the art would be able to ascertain that in order

for the boreholes and screw heads to be "positioned between the upper and lower

planes" as recited in claim 1, the tabs would need to be bent at an angle "α" of 90° or

greater. At α = 90°, the tabs would be substantially parallel with the medial plane P of

the implant body 10, and the screw shafts would be substantially perpendicular to the

medial plane P and parallel with the outer surface of the vertebral bodies when the

implant is placed in the operative position as shown in Fraser Fig. 8…a clearly

inoperative position for the screws. Thus, since one of ordinary skill in the art would not

have considered it obvious to bend the tabs to an inoperative "α" angle of 90° or

greater, 3PR's proposed rejection of claim 1 as being obvious in view of Fraser does not

have a reasonable likelihood of prevailing.

Correspondingly, since each of claims 2-14 and 16 ultimately depend from claim 1, an RLP showing has NOT been made for claims 2-14 and 16 for at least the same reasons as claim 1.


### *Ground 14*

### *103(a) rejection over Fraser in view of Michelson '837*

It is NOT agreed that the request has made an RLP showing that claim 2 of the '076 patent is unpatentable based upon the teachings of Fraser in view of Michelson '837.

Claim 2 depends on claim 1. The RLP showing for claim 2 relies upon and incorporates by reference the analysis for claim 1. See page 74 of the request. As discussed above in Ground 13, Fraser fails to teach a plate and bone screws having all the limitations as claimed. The request cites to Michelson '837 for a teaching of teeth on the surface of an implant body, but the request fails to apply Michelson '837 to the plate and bone screw limitations of claim 1 that Fraser fails to teach. Therefore, the request does not make it clear how the teachings of Fraser and Michelson '837 apply to every limitation in claim 2, which incorporates limitations from claim 1. For these reasons, the request has NOT made a RLP showing that Fraser in view of Michelson '837 teaches every limitation in claim 2 in accordance with 35 U.S.C. 103(a). Accordingly, reexamination is not granted for claim 2 based upon the proposed rejection of Ground 14.

Application/Control Number: 95/002,066                                              Page 17
Art Unit: 3993

### Ground 15

### 103(a) rejection over Fraser in view of Doty

It is NOT agreed that the request has made an RLP showing that claims 10, 11 and 16 of the '076 patent are unpatentable based upon the teachings of Fraser in view of Doty.

Claims 10 and 16 depends on claim 1, and claim 11 depends on claim 10. The RLP showing for claims 10, 11 and 16 relies upon and incorporates by reference the analysis for claim 1. See page 77 of the request. As discussed above in Ground 13, Fraser fails to teach a plate and bone screws having all the limitations as claimed. The request cites to Doty "to more explicitly describe the materials of the implant body and plate and the positioning of the bone screw heads relative to the implant body" (Request p. 77). However, the request fails to apply Doty to the plate and bone screw limitations of claim 1 that Fraser fails to teach. Therefore, the request does not make it clear how the teachings of Fraser and Doty apply to every limitation in claims 10, 11 and 16, which incorporate limitations from claim 1. For these reasons, the request has NOT made a RLP showing that Fraser in view of Doty teaches every limitation in claims 10, 11 and 16 in accordance with 35 U.S.C. 103(a). Accordingly, reexamination is not granted for claims 10, 11 and 16 based upon the proposed rejection of Ground 15.

### Ground 16

### 103(a) rejection over Fraser in view of Michelson '423

Application/Control Number: 95/002,066                                      Page 18
Art Unit: 3993

It is NOT agreed that the request has made an RLP showing that claim 15 of the

'076 patent is unpatentable based upon the teachings of Fraser in view of Michelson

'423.

Claim 15 depends on claim 1.  The RLP showing for claim 15 relies upon and

incorporates by reference the analysis for claim 1.  See page 80 of the request.  As

discussed above in Ground 13, Fraser fails to teach a plate and bone screws having all

the limitations as claimed.  The request cites to Michelson '423 "to more explicitly

describe the boreholes in the plate being internally threaded and the heads of the bone

screws being externally threaded" (Request p. 80).  However, the request fails to apply

Michelson '423 to the plate and bone screw limitations of claim 1 that Fraser fails to

teach.  Therefore, the request does not make it clear how the teachings of Fraser and

Michelson '423 apply to every limitation in claim 15, which incorporates limitations from

claim 1.  For these reasons, the request has NOT made a RLP showing that Fraser in

view of Michelson '423 teaches every limitation in claim 15 in accordance with 35

U.S.C. 103(a).  Accordingly, reexamination is not granted for claim 15 based upon the

proposed rejection of Ground 16.


### Ground 17

### 103(a) rejection over Fraser in view of Zdeblick

It is agreed that the request has made an RLP showing that claims 1-14 and 16

of the '076 patent are unpatentable based upon the teachings of Fraser in view of

Zdeblick.

Application/Control Number: 95/002,066                                    Page 19
Art Unit: 3993

With respect to claims 1-14 and 16, an RLP showing of the factual inquiries for

an obviousness analysis have been presented in the request.  See request, pgs. 81-92

and 290-329, and CC-Q claim chart.


### Ground 18

#### 103(a) rejection over Fraser and Zdeblick in view of Michelson '837

It is agreed that the request has made an RLP showing that claim 2 of the '076

patent is unpatentable based upon the teachings of Fraser and Zdeblick in view of

Michelson '837.

With respect to claim 2, an RLP showing of the factual inquiries for an

obviousness analysis have been presented in the request.  See request, pgs. 92-94 and

329-334, and CC-R claim chart.


### Ground 19

#### 103(a) rejection over Fraser and Zdeblick in view of Doty

It is agreed that the request has made an RLP showing that claims 10, 11 and 16

of the '076 patent are unpatentable based upon the teachings of Fraser and Zdeblick in

view of Doty.

With respect to claims 10, 11 and 16, an RLP showing of the factual inquiries for

an obviousness analysis have been presented in the request.  See request, pgs. 95-98

and 334-342, and CC-S claim chart.

Application/Control Number: 95/002,066                                    Page 20
Art Unit: 3993

## Ground 20

### 103(a) rejection over Fraser and Zdeblick in view of Michelson '423

It is agreed that the request has made an RLP showing that claim 15 of the '076

patent is unpatentable based upon the teachings of Fraser and Zdeblick in view of

Michelson '423.

With respect to claim 15, an RLP showing of the factual inquiries for an

obviousness analysis have been presented in the request.  See request, pgs. 98-101

and 342-346, and CC-T claim chart.

## Ground 21

### 103(a) rejection over Zdeblick

It is agreed that the request has made an RLP showing that claims 1, 3-5, 8, 12,

13 and 16 of the '076 patent are unpatentable based upon the teachings of Zdeblick.

With respect to claims 1, 3-5, 8, 12, 13 and 16, an RLP showing of the factual

inquiries for an obviousness analysis have been presented in the request.  See request,

pgs. 101-107 and 346-363, and CC-U claim chart.

## Ground 22

### 103(a) rejection over Zdeblick in view of Michelson '837

It is agreed that the request has made an RLP showing that claim 2 of the '076

patent is unpatentable based upon the teachings of Zdeblick in view of Michelson '837.

Application/Control Number: 95/002,066                                  Page 21
Art Unit: 3993

With respect to claim 2, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request.  See request, pgs. 107-109 and 363-366, and CC-V claim chart.


## Ground 23

### 103(a) rejection over Zdeblick in view of Doty

It is agreed that the request has made an RLP showing that claims 10, 11 and 16 of the '076 patent are unpatentable based upon the teachings of Zdeblick in view of Doty.

With respect to claims 10, 11 and 16, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request.  See request, pgs. 109-113 and 367-372, and CC-W claim chart.


## Ground 24

### 103(a) rejection over Zdeblick in view of Michelson '423

It is agreed that the request has made an RLP showing that claim 15 of the '076 patent is unpatentable based upon the teachings of Zdeblick in view of Michelson '423.

With respect to claim 15, an RLP showing of the factual inquiries for an obviousness analysis have been presented in the request.  See request, pgs. 113-115 and 373-377, and CC-X claim chart.

Application/Control Number: 95/002,066                                    Page 22
Art Unit: 3993

## Conclusion

For the reasons given above, the information presented in the request for *inter partes* reexamination shows that there is a reasonable likelihood that the requester would prevail with respect to the following proposed rejections:

Grounds 5-12 and 17-24.

Accordingly, claims 1-16 of the '076 patent will be reexamined.

For the reasons given above, the information presented in the request for *inter partes* reexamination fails to show that there is a reasonable likelihood that the requester would prevail with respect to the following proposed rejections:

Grounds 1-4 and 13-16.

## Extensions of Time

Extensions of time under 37 CFR 1.136(a) will **not** be permitted in *inter partes* reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to the patent owner ("PO") in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that *inter partes* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937).  PO extensions of time in *inter partes* reexamination proceedings are provided for in 37 CFR 1.956.  Extensions of time are not available for 3PR comments, because a comment period of 30 days from service of PO's response is set by statute.  35 U.S.C. 314(b)(3).

Application/Control Number: 95/002,066                                    Page 23
Art Unit: 3993

## *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR

1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the '076 patent throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP § 2686 and 2686.04.


## *Service of Papers*

Any paper filed by either the patent owner or the third party requester ***must be***

***served*** on the other party in the reexamination proceeding in the manner provided by

37 CFR 1/248.  See 37 CFR 1.903 and MPEP 2666.06.

Application/Control Number: 95/002,066                                    Page 24
Art Unit: 3993

**All** correspondence relating to this *inter partes* reexamination proceeding should

be directed:


By Mail to:           Mail Stop *Inter Partes* Reexam
                      Attn: Central Reexamination Unit
                      Commissioner of Patents
                      United States Patent & Trademark Office
                      P.O. Box 1450
                      Alexandria, VA 22313-1450

By FAX to:            (571) 273-9900
                      Central Reexamination Unit

By hand:              Customer Service Window
                      Randolph Building
                      401 Dulany St.
                      Alexandria, VA 22314

By EFS-Web:

     Registered users of EFS-Web may alternatively submit such correspondence via
the electronic filing system EFS-Web, at

     https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

     EFS-Web offers the benefit of quick submission to the particular area of the
Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft
scanned" (i.e., electronically uploaded) directly into the official file for the reexamination
proceeding, which offers parties the opportunity to review the content of their
submissions after the "soft scanning" process is complete.

Application/Control Number: 95/002,066                                Page 25
Art Unit: 3993

     Any inquiry concerning this communication or earlier communications from the

examiner, or as to the status of this proceeding, should be directed to the Central

Reexamination Unit at telephone number (571) 272-7705.

                            /David O. Reip/
                            Patent Reexamination Specialist
                            Art Unit 3993
                            Central Reexamination Unit


                            Conferee /MWP/
                            Conferee /JGF/

Receipt date: 08/03/2012                                         95002066 - GAU: 3993

Doc code: IDS                                                        PTO/SB/08a (01-10)
Doc description: Information Disclosure Statement (IDS) Filed          Approved for use through 07/31/2012. OMB 0651-0031
                                                                     U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number |
| | Filing Date | 2012-08-03 |
| | First Named Inventor | 7,875,076 |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 20330.0003.RX076 |

| | | U.S.PATENTS | | | | Remove |
|---|---|---|---|---|---|---|

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 5397364 | | 1995-03-14 | Kozak et al. | |
| | 2 | 4599086 | | 1986-07-08 | Doty, James R. | |
| | 3 | 6558423 | B1 | 2003-05-06 | Michelson, Gary K. | |

If you wish to add additional U.S. Patent citation information please click the Add button.     Add

| | | U.S.PATENT APPLICATION PUBLICATIONS | | | | Remove |
|---|---|---|---|---|---|---|

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

| | | FOREIGN PATENT DOCUMENTS | | | | | Remove |
|---|---|---|---|---|---|---|---|

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 1103236 | EP | B1 | 2006-08-23 | Fraser, Robert | | ☒ |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /DR/

| Receipt date: 08/03/2012 | Application Number | | 95002066 - GAU: 3993 |
|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | | 2012-08-03 |
| | First Named Inventor | 7,875,076 | |
| | Art Unit | | |
| | Examiner Name | | |
| | Attorney Docket Number | | 20330.0003.RX076 |

| | 2 | 99/38463 | WO | | 1999-08-05 | Zdeblick et al. | | ☐ |
|---|---|---|---|---|---|---|---|---|
| | 3 | 01/95837 | WO | A1 | 2001-12-20 | Michelson, Gary K. | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button    Add

| **NON-PATENT LITERATURE DOCUMENTS** | | | | Remove |
|---|---|---|---|---|
| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | | T5 |
| | 1 | | | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button    Add

| **EXAMINER SIGNATURE** | | | |
|---|---|---|---|
| Examiner Signature | /David Reip/ | Date Considered | 10/01/2012 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /DR/

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /DR/

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,066 | 08/03/2012 | 7,875,076 . | 20330.0003.RX076 | 8125 |

46165        7590        10/12/2012

SYNTHES
1302 WRIGHTS LANE EAST
WEST CHESTER, PA 19380

| EXAMINER |
|---|
| REIP, DAVID OWEN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/12/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

A0629

| **Transmittal of Communication to Third Party Requester** *Inter Partes* **Reexamination** | Control No. 95/002,066 | Patent Under Reexamination 7875076 |
|---|---|---|
| | Examiner DAVID O. REIP | Art Unit 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

┌──── (THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS) ────┐

      NDQ Special Reexam Group
      1000 Louisiana Street
      Fifty-third Floor
      Houston, TX 77002

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| OFFICE ACTION IN INTER PARTES REEXAMINATION | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/002,066 | 7,875,076 |
| | Examiner | Art Unit |
| | DAVID O. REIP | 3993 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II. SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-16</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2.  ☐ Claims _____ have been canceled.

3.  ☐ Claims _____ are confirmed. [Unamended patent claims]

4.  ☐ Claims _____ are patentable. [Amended or new claims]

5.  ☒ Claims <u>1-16</u> are rejected.

6.  ☐ Claims _____ are objected to.

7.  ☐ The drawings filed on _____    ☐ are acceptable    ☐ are not acceptable.

8.  ☐ The drawing correction request filed on _____ is:    ☐ approved.   ☐ disapproved.

9.  ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
       ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No <u>95002066</u>.

10. ☐ Other _____

## *INTER PARTES REEXAMINATION*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Ground 5 -- 3PR proposed rejections of claims 1-14 and 16 under 35 U.S.C.

103(a) as being obvious over Kozak in view of Fraser.  In the Decision on Request, an

RLP showing was made for claims 1-14 and 16.  Accordingly, 3PR's proposed

rejections of claims 1-14 and 16 as cited above are **adopted** for reasons set forth in the

request for reexamination, on pgs. 31-41 and 147-187, and claim chart CC-E, which are

hereby incorporated by reference.


Ground 6 -- 3PR proposed rejection of claim 2 under 35 U.S.C. 103(a) as being

obvious over Kozak and Fraser in view of Michelson '837.  In the Decision on Request,

an RLP showing was made for claim 2.  Accordingly, 3PR's proposed rejection of claim

2 as cited above is **adopted** for reasons set forth in the request for reexamination, on

pgs. 41-43 and 188-191, and claim chart CC-F, which are hereby incorporated by

reference.

Application/Control Number: 95/002,066                                        Page 3
Art Unit: 3993

Ground 7 -- 3PR proposed rejections of claims 10, 11 and 16 under 35 U.S.C.

103(a) as being obvious over Kozak and Fraser in view of Doty.  In the Decision on

Request, an RLP showing was made for claims 10, 11 and 16.  Accordingly, 3PR's

proposed rejections of claims 10, 11 and 16 as cited above are **adopted** for reasons set

forth in the request for reexamination, on pgs. 44-47 and 192-199, and claim chart CC-

G, which are hereby incorporated by reference.


Ground 8 -- 3PR proposed rejection of claim 15 under 35 U.S.C. 103(a) as being

obvious over Kozak and Fraser in view of Michelson '423.  In the Decision on Request,

an RLP showing was made for claim 15.  Accordingly, 3PR's proposed rejection of

claim 15 as cited above is **adopted** for reasons set forth in the request for

reexamination, on pgs. 47-49 and 199-204, and claim chart CC-H, which are hereby

incorporated by reference.


Ground 9 -- 3PR proposed rejection of claims 1, 3-5, 7, 8, 12, 13 and 16 under

35 U.S.C. 103(a) as being obvious over Kozak in view of Zdeblick.  In the Decision on

Request, an RLP showing was made for claims 1, 3-5, 7, 8, 12, 13 and 16.  Accordingly,

3PR's proposed rejections of claims 1, 3-5, 7, 8, 12, 13 and 16 as cited above are

**adopted** for reasons set forth in the request for reexamination, on pgs. 49-59 and 205-

237, and claim chart CC-I, which are hereby incorporated by reference.

Application/Control Number: 95/002,066                                              Page 4
Art Unit: 3993

Ground 10 -- 3PR proposed rejection of claim 2 under 35 U.S.C. 103(a) as being obvious over Kozak and Zdeblick in view of Michelson '837. In the Decision on Request, an RLP showing was made for claim 2. Accordingly, 3PR's proposed rejection of claim 2 as cited above is **adopted** for reasons set forth in the request for reexamination, on pgs. 59-61 and 237-241, and claim chart CC-J, which are hereby incorporated by reference.

Ground 11 -- 3PR proposed rejections of claims 10, 11 and 16 under 35 U.S.C. 103(a) as being obvious over Kozak and Zdeblick in view of Doty. In the Decision on Request, an RLP showing was made for claims 10, 11 and 16. Accordingly, 3PR's proposed rejections of claims 10, 11 and 16 as cited above are **adopted** for reasons set forth in the request for reexamination, on pgs. 61-64 and 241-248, and claim chart CC-K, which are hereby incorporated by reference.

Ground 12 -- 3PR proposed rejection of claim 15 under 35 U.S.C. 103(a) as being obvious over Kozak and Zdeblick in view of Michelson '423. In the Decision on Request, an RLP showing was made for claim 15. Accordingly, 3PR's proposed rejection of claim 15 as cited above is **adopted** for reasons set forth in the request for reexamination, on pgs. 65-67 and 248-252, and claim chart CC-L, which are hereby incorporated by reference.

Application/Control Number: 95/002,066                                      Page 5
Art Unit: 3993

Ground 17 -- 3PR proposed rejections of claims 1-14 and 16 under 35 U.S.C.

103(a) as being obvious over Fraser in view of Zdeblick.  In the Decision on Request,

an RLP showing was made for claims 1-14 and 16.  Accordingly, 3PR's proposed

rejections of claims 1-14 and 16 as cited above are **adopted** for reasons set forth in the

request for reexamination, on pgs. 81-92 and 290-329, and claim chart CC-Q, which are

hereby incorporated by reference.


Ground 18 -- 3PR proposed rejection of claim 2 under 35 U.S.C. 103(a) as being

obvious over Fraser and Zdeblick in view of Michelson '837.  In the Decision on

Request, an RLP showing was made for claim 2.  Accordingly, 3PR's proposed

rejection of claim 2 as cited above is **adopted** for reasons set forth in the request for

reexamination, on pgs. 92-94 and 329-334, and claim chart CC-R, which are hereby

incorporated by reference.


Ground 19 -- 3PR proposed rejections of claims 10, 11 and 16 under 35 U.S.C.

103(a) as being obvious over Fraser and Zdeblick in view of Doty.  In the Decision on

Request, an RLP showing was made for claims 10, 11 and 16.  Accordingly, 3PR's

proposed rejections of claims 10, 11 and 16 as cited above are **adopted** for reasons set

forth in the request for reexamination, on pgs. 95-98 and 334-342, and claim chart CC-

S, which are hereby incorporated by reference.

Ground 20 -- 3PR proposed rejection of claim 15 under 35 U.S.C. 103(a) as

being obvious over Fraser and Zdeblick in view of Michelson '423. In the Decision on

Request, an RLP showing was made for claim 15. Accordingly, 3PR's proposed

rejection of claim 15 as cited above is **adopted** for reasons set forth in the request for

reexamination, on pgs. 98-101 and 342-346, and claim chart CC-T, which are hereby

incorporated by reference.


Ground 21 -- 3PR proposed rejection of claims 1, 3-5, 8, 12, 13 and 16 under 35

U.S.C. 103(a) as being obvious over Zdeblick. In the Decision on Request, an RLP

showing was made for claims 1, 3-5, 8, 12, 13 and 16. Accordingly, 3PR's proposed

rejections of claims 1, 3-5, 8, 12, 13 and 16 as cited above are **adopted** for reasons set

forth in the request for reexamination, on pgs. 101-107 and 346-363, and claim chart

CC-U, which are hereby incorporated by reference.


Ground 22 -- 3PR proposed rejection of claim 2 under 35 U.S.C. 103(a) as being

obvious over Zdeblick in view of Michelson '837. In the Decision on Request, an RLP

showing was made for claim 2. Accordingly, 3PR's proposed rejection of claim 2 as

cited above is **adopted** for reasons set forth in the request for reexamination, on pgs.

107-109 and 363-366, and claim chart CC-V, which are hereby incorporated by

reference.

Application/Control Number: 95/002,066                                    Page 7
Art Unit: 3993

Ground 23 -- 3PR proposed rejections of claims 10, 11 and 16 under 35 U.S.C.

103(a) as being obvious over Zdeblick in view of Doty. In the Decision on Request, an

RLP showing was made for claims 10, 11 and 16. Accordingly, 3PR's proposed

rejections of claims 10, 11 and 16 as cited above are **adopted** for reasons set forth in

the request for reexamination, on pgs. 109-113 and 367=372, and claim chart CC-W,

which are hereby incorporated by reference.


Ground 24 -- 3PR proposed rejection of claim 15 under 35 U.S.C. 103(a) as

being obvious over Zdeblick in view of Michelson '423. In the Decision on Request, an

RLP showing was made for claim 15. Accordingly, 3PR's proposed rejection of claim

15 as cited above is **adopted** for reasons set forth in the request for reexamination, on

pgs. 113-115 and 373-377, and claim chart CC-X, which are hereby incorporated by

reference.


### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will **not** be permitted in *inter partes*

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an

applicant" and not to the patent owner ("PO") in a reexamination proceeding.

Additionally, 35 U.S.C. 314(c) requires that *inter partes* reexamination proceedings "will

be conducted with special dispatch" (37 CFR 1.937). PO extensions of time in *inter*

*partes* reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time

Application/Control Number: 95/002,066                                          Page 8
Art Unit: 3993

are not available for 3PR comments, because a comment period of 30 days from

service of PO's response is set by statute.  35 U.S.C. 314(b)(3).


## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR

1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the '076 patent throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP § 2686 and 2686.04.


## Service of Papers

Any paper filed by either the patent owner or the third party requester *must be*

*served* on the other party in the reexamination proceeding in the manner provided by

37 CFR 1/248.  See 37 CFR 1.903 and MPEP 2666.06.

Application/Control Number: 95/002,066                                        Page 9
Art Unit: 3993

**All** correspondence relating to this *inter partes* reexamination proceeding should

be directed:

By Mail to:        Mail Stop *Inter Partes* Reexam
                   Attn: Central Reexamination Unit
                   Commissioner of Patents
                   United States Patent & Trademark Office
                   P.O. Box 1450
                   Alexandria, VA 22313-1450

By FAX to:         (571) 273-9900
                   Central Reexamination Unit

By hand:           Customer Service Window
                   Randolph Building
                   401 Dulany St.
                   Alexandria, VA 22314

By EFS-Web:

        Registered users of EFS-Web may alternatively submit such correspondence via
the electronic filing system EFS-Web, at

        https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

        EFS-Web offers the benefit of quick submission to the particular area of the
Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft
scanned" (i.e., electronically uploaded) directly into the official file for the reexamination
proceeding, which offers parties the opportunity to review the content of their
submissions after the "soft scanning" process is complete.

        Any inquiry concerning this communication or earlier communications from the

examiner, or as to the status of this proceeding, should be directed to the Central

Reexamination Unit at telephone number (571) 272-7705.

                                        /David Reip/
                                        Patent Reexamination Specialist

Application/Control Number: 95/002,066                                    Page 10
Art Unit: 3993

Art Unit 3993
Central Reexamination Unit


Conferee /MWP/


Conferee /JGF/

*Search Notes*

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 95/002,066 | 7875076 |
| Examiner | Art Unit |
| DAVID O. REIP | 3993 |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| NONE | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| NONE | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | DATE | EXMR |
|---|---|---|
| patent file reviewed | 9/5/2012 | DR |
| | | |
| | | |
| | | |
| | | |
| | | |

Part of Paper No.  20120913

A0641

# A642-A663

# REDACTED

US005397364A

# United States Patent [19]

## Kozak et al.

[11] **Patent Number:** 5,397,364

[45] **Date of Patent:** Mar. 14, 1995

[54] **ANTERIOR INTERBODY FUSION DEVICE**

[75] Inventors: Jeffrey Kozak, Houston, Tex.; Larry Boyd, Memphis, Tenn.

[73] Assignee: Danek Medical, Inc., Memphis, Tenn.

[21] Appl. No.: 134,049

[22] Filed: Oct. 12, 1993

[51] Int. Cl.$^6$ ............................................. A61F 2/44
[52] U.S. Cl. ........................................ 623/17; 606/61
[58] Field of Search ............................... 623/17, 11, 16

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,759,766 | 7/1988 | Buettner-Janx et al. | 623/17 |
| 4,772,287 | 9/1988 | Ray et al. | 623/17 |
| 4,863,476 | 9/1989 | Shepperd | 623/17 |
| 4,878,915 | 11/1989 | Brantigan | 623/17 |
| 4,892,545 | 1/1990 | Day et al. | 623/17 |
| 4,904,261 | 2/1990 | Dove et al. | 623/17 |
| 4,917,704 | 4/1990 | Frey et al. | 623/17 |
| 4,932,975 | 6/1990 | Main et al. | 623/17 |
| 4,936,848 | 6/1990 | Bagby | 623/17 |
| 5,002,576 | 3/1991 | Fuhrmann et al. | 623/17 |
| 5,147,404 | 9/1992 | Downey | 623/17 |
| 5,192,327 | 3/1993 | Brantigan | 623/17 |

### FOREIGN PATENT DOCUMENTS

WO90/00037  1/1990  WIPO .
WO92/14423  9/1992  WIPO .

*Primary Examiner*—David Isabella
*Attorney, Agent, or Firm*—Woodard, Emhardt, Naughton, Moriarty & McNett

[57] **ABSTRACT**

An interbody fusion device includes a pair of lateral spacers and a pair of central spacers, each sized for percutaneous introduction through a disc resection portal in the disc annulus. Each of the lateral spacers includes opposing side faces defining a channel therein, while each of the central spacers includes arms at their opposite ends configured to be received within a channel of a corresponding lateral spacer. The arms and channels are interlocking to prevent separation of the components once assembled within the intradiscal space. The assembly of the central and lateral spacers defines a cavity therebetween for insertion of bone graft material. The central and lateral spacers are configured so that the bone graft cavity is oriented over the weakest, but most vascular and biologically active, bone of the vertebral body, while the lateral spacers are situated adjacent the disc annulus and over the strongest vertebral bone.

**18 Claims, 9 Drawing Sheets**



U.S. Patent

Mar. 14, 1995

Sheet 1 of 9

5,397,364



POSTERIOR

ANTERIOR

*Fig. 1*

**U.S. Patent**          Mar. 14, 1995          Sheet 2 of 9          **5,397,364**



*Fig. 2*

*Fig. 2A*

*Fig. 3*

*Fig. 4*

U.S. Patent

Mar. 14, 1995

Sheet 3 of 9

5,397,364



POSTERIOR

ANTERIOR

*Fig. 5*

U.S. Patent

Mar. 14, 1995

Sheet 4 of 9

5,397,364



*Fig. 6*

*Fig. 7*

*Fig. 11*

*Fig. 8*

*Fig. 9*

*Fig. 12*

*Fig. 10*

*Fig. 13*

U.S. Patent

Mar. 14, 1995

Sheet 5 of 9

5,397,364



*Fig. 14*

*Fig. 16*

*Fig. 17*

*Fig. 18*



Fig. 15

Fig. 19

Fig. 20

Fig. 21

U.S. Patent

Mar. 14, 1995

Sheet 6 of 9

5,397,364





*Fig. 23*

*Fig. 22*



*Fig. 24*





*Fig. 28*

5,397,364

1

## ANTERIOR INTERBODY FUSION DEVICE

### BACKGROUND OF THE INVENTION

This invention relates to spinal implants for use as anterior fixation devices, and to an implant which is to be placed into the intervertebral space left after the removal of a damaged spinal disc to assist in promoting interbody fusion.

A major cause of persistent, often disabling, back pain can arise by disruption of the disc annulus, chronic inflammation of the disc, or relative instability of the vertebral bodies surrounding a given disc, such as might occur due to a degenerative disease. In the more severe, disabling cases, some form of mechanical limitation to the movement of vertebrae on either side of the subject disc is necessary. In the more severe cases, the disc tissue is irreparably damaged, thereby necessitating removal of the entire disc. However, when the disc nucleus is removed without subsequent stabilization, the same disabling back pain often recurs due to persistent inflammation and/or instability.

Various approaches have been developed to stabilize the adjacent vertebral bodies following excision of the disc material. In one approach, two adjacent vertebra are fused posterio-laterally, according to a standard technique, by rigid plates engaged at their ends to respective vertebrae by way of screws. However, it has been found that posterior fusion with rigid plates can be associated with pseudoarthrosis and implant loosening and/or failure.

Another approach involves the use of posterio-lateral fusion and rigid posterior instrumentation, as described above, with the addition of an interbody graft or implant placed from the posterior approach. Although a significant improvement in fusion rate can be achieved with this approach, scarring of the spinal nerves can occur which may lead to pain or neurologic deficit.

In yet another approach, anterior grafts are implemented. Three general types of anterior devices are presently known. In one type, the entire vertebral body is replaced by an implant that spans the vertebral and two surrounding intradiscal spaces. This approach is frequently used where the vertebral body is also damaged by way of a tumor, a fracture and the like. In another approach, only the disc is replaced by a prosthetic disc. In this approach, the object is not fusion between the vertebrae at the instrumented level, but rather replacement of the disc mechanical features by an implant.

A third approach, to which the present invention is more particularly directed, concerns a device adapted to promote fusion or arthrodesis across the intradiscal space. In the upper lumbar spine, bone grafts can be placed within the disc and the surrounding vertebrae can be stabilized with a plate placed on the lateral vertebral body using screws projecting into the bodies. This approach is not possible in the lower lumbar disc spaces due to the regional vascular anatomy. Unfortunately, more than 90% of the lumbar fusions are performed in the lower lumbar region. Therefore, there exists a need for a device to stabilize adjacent vertebrae, such as in the lower lumbar region, which device is primarily confined within the given disc space.

While a few devices of this type are known (such as the device of Dove shown in U.S. Pat. No. 4,904,261), there remains a need for an anterior lumbar interbody fusion device that will improve the fusion rate between

2

the adjacent vertebrae, while also preventing disc interspace collapse due to end plate cavitation, for instance. There is also a need for a fusion device that is safe and effective and still consistent with traditional surgical arthrodesis practice.

In connection with the development of the interbody, fusion device of the present invention, Applicants have ascertained certain design principals that should be met for a safe and effective device. One important principal is that the load transmitted between adjacent vertebrae should be on the strongest part of the vertebral body. One problem with some prior art fusion devices, and even some prosthetic disc devices, is that a large portion of the load is reacted against the weakest part of the vertebral body which can lead to cavitation of the device into the surrounding vertebral endplates with subsequent collapse of the intradiscal space and even damage to the vertebra itself.

Further, a preferred interbody fusion device should fit the patient's intradiscal anatomy and restore, as close as possible, the proper anatomic relationship of the disc, pedicle, nerve root and facet joint in order to avoid future physiological problems. Restoration of the normal disc height will also return the disc annulus to tension, reducing annular bulge or prolapse and promoting interspace stability. At the same time, the device should not shield the lumbar spine from all of the stresses normally borne by the spine, since it has been found that reduction of normal stress on the vertebrae can result in loss of bone mass and strength.

Finally, the interbody fusion device should provide enough interspace rigidity to eliminate the need for external fixation or rigid fixation plates. With these goals in mind, Applicants have developed the anterior interbody fusion device and method of the present invention.

### SUMMARY OF THE INVENTION

The present invention contemplates an interbody fusion device configured for insertion into the intradiscal space following resection of the disc material through a portal in the disc annulus. The device includes a pair of lateral spacers formed in a generally semicircular configuration and occupying less than half of the area of the intradiscal space. Each of the lateral spacers defines a channel in opposing and interiorly facing side faces. The device further includes a pair of central spacers, each configured at their respective ends for engaging the channels in the lateral spacers. The channels and ends of the central spacers are configured for interlocking engagement, such as a dovetail, so that the central spacers can be slidably inserted and removed only along the length of the channel. In other words, the interlocking feature between the lateral and central spacers maintains a predetermined and fixed lateral separation between the lateral spacers so that the lateral spacers are disposed adjacent the disc annulus and, more significantly, over the region of the vertebral body having the highest strength and load bearing capability.

Each component of the interbody fusion device, the lateral and central spacers, is sized for insertion through a single portal in the disc annulus. However, when assembled within the intradiscal space, the fusion device occupies the entire space, leaving only a central cavity between the spacers for the insertion of the bone graft material. This central cavity is situated over the weak-

A0674

5,397,364

3  4

est, but most vascular and biologically active, bone of the vertebral body. Clamping means, such as screws, are used to maintain the spacers in their assembled configuration within the intradiscal space.

The lateral spacers are provided with threaded bores in their anterior faces to receive the clamping screws. In addition, the bores accept an insertion rod that is used to guide the lateral spacers into the intradiscal space, and that is eventually used to spread the lateral spacers apart within the space. Once separated, the central spacers are inserted using a guide rod engaging a guide bore in each spacer. In this manner, the lateral and central spacers are assembled and interlocked like the pieces of a three-dimensional puzzle. Bone graft material is preferably inserted after the posterior central spacer has been positioned and before insertion of the anterior central spacer.

Alternative embodiments of the invention contemplate a fusion device having only one central spacer, and a device that accepts a number of bone screws to anchor the device to an adjacent vertebra. The invention further contemplates instruments for the insertion and assembly of the device components. In one particular aspect, rack and pinion driven spreader bars are used to spread the lateral spacers within the intradiscal space.

One important object of the present invention is to provide a fusion device that can restore or maintain the normal geometry of the intradiscal space, such as disc height and sagittal angle. Another object resides in the multiple component aspect of the device that permits the introduction of components that by themselves can be inserted through a typical disc resection portal, but when assembled within the intradiscal space occupy substantially the entire space.

A further object is to provide a device that is self-stabilizing within the disc space by providing convex surfaces to engage the concave vertebral body end-plates.

Yet another object of the fusion device of the present invention is realized in that the multiple component aspect of the device permits the creation of a bone graft cavity at the most biologically and vascularly active area of the vertebral body, thereby encouraging strong and rapid fusion. Furthermore, the load bearing components of the device are situated over the strongest bone of the vertebrae.

Other objects, as well as certain benefits, achieved by the present invention will be readily discerned on consideration of the following written description and accompanying figures directed to the invention.

## DESCRIPTION OF THE FIGURES

FIG. 1 is a top perspective view of a preferred embodiment of the anterior interbody fusion device of the present invention.

FIG. 2 is a top view of a lumbar vertebra with the interbody fusion device of FIG. 1 in position on the vertebral body.

FIG. 2A is a representation of the vertebral body showing the regions of varying bone strength in the body.

FIG. 3 is an A-P view of the interbody fusion device shown in FIG. 1 as disposed between two lumbar vertebrae.

FIG. 4 is a view in the sagittal plane of the interbody fusion device oriented between adjacent vertebrae.

FIG. 5 is a top perspective cross-sectional view of the inter body fusion device shown in FIG. 1 taken along line 5—5 as viewed in the direction of the arrows.

FIG. 6 is a top perspective view of a lateral spacer component of the fusion device shown in FIG. 1.

FIG. 7 is an end view of the lateral spacer component shown in FIG. 6.

FIG. 8 is a bottom perspective view of the posterior spacer component of the fusion device shown in FIG. 1.

FIG. 9 is an end view of the posterior spacer component shown in FIG. 8.

FIG. 10 is a top view of the posterior spacer component shown in FIG. 8.

FIG. 11 is a bottom perspective view of the anterior spacer component of the fusion device shown in FIG. 1.

FIG. 12 is an end view of the anterior spacer component shown in FIG. 8.

FIG. 13 is a top view of the anterior spacer component shown in FIG. 8.

FIG. 14 is a top perspective view showing the placement of the lateral spacer components of the interbody fusion device shown in FIG. 1, as representative of a step in the method of implanting the device.

FIG. 15 is a top partial cross-sectional view showing a lateral spacer component of the interbody fusion device depicted in FIG. 14 with a spreader rod positioned in the device.

FIGS. 16–18 are top perspective views showing further steps of the insertion and assembly of the interbody fusion device.

FIG. 19 is a top elevational partial cross-sectional view of the fixation screw used to couple the components of the device, along with the driving tool used to insert the screw.

FIG. 20 is a side elevational view of the interbody fusion device shown in FIG. 6, illustrating the uniform thickness of the device.

FIG. 21 is a side elevational view of an alternative configuration of an interbody fusion device similar to that shown in FIG. 20 with sagittal face angulation.

FIG. 22 is a bottom perspective view of an anterior spacer component modified from the component depicted in FIG. 11.

FIG. 23 is an end view of the anterior spacer component shown in FIG. 22.

FIG. 24 is a view in the sagittal plane of an interbody fusion device arranged between two vertebrae in which the device includes the modified anterior spacer component depicted in FIGS. 22 and 23.

FIG. 25 is a bottom perspective view of an anterior interbody fusion device similar to the device depicted in FIG. 24, except using two anchoring screws.

FIG. 26 is a front perspective view of an alternative embodiment of an anterior interbody fusion device according to the present invention utilizing a single central spacer.

FIG. 27 is a top perspective view of a further embodiment of the invention in which a bone graft material insert is shaped for disposition between two lateral spacers of the device.

FIG. 28 is a top perspective view of instrumentation for insertion of the interbody fusion device of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

For the purpose of promoting an understanding of the principles of the invention, reference will now be

5,397,364

5                                                                    6

made to the embodiments illustrated in the drawings and specific language will be used to describe the same. It will nevertheless be understood that no limitation of the scope or the invention is thereby intended, such alterations and further modifications in the illustrated device, and such further applications of the principles of the invention as illustrated therein being contemplated as would normally occur to one skilled in the art to which the invention relates.

In accordance with one embodiment of the invention, an interbody fusion device 20 is depicted in FIG. 1. Generally, the fusion device 20 is a four component device. The device 20 includes a pair of lateral spacers 21, a posterior central spacer 22 and an anterior central spacer 23, the central spacers of which are engaged to the lateral spacers to hold them apart. A pair of fixation screws 24 are provided for locking the entire assembly together to form the completed fusion device 20. The fully assembled device 20 defines a cavity 25 between the lateral and central spacers, which cavity is adapted to receive bone graft material therein.

For example, the device 20 is shown situated between adjacent lumbar vertebrae $L_4$ and $L_5$ in FIGS. 2–4. More specifically, in FIG. 2, the device 20 is shown oriented against the vertebral body B. The cavity 25 defined by the components of the device 20 is filled with a bone graft material G. The graft material G could be cancellous bone or bone chips as is known in the art, or a suitable bone graft substitute material. As shown in FIGS. 3 and 4, the interbody fusion device 20 maintains the adjacent vertebrae L at the appropriate intradiscal distance. The bone graft material G fills the entire cavity 25 between the adjacent vertebrae, and over time fuses the two vertebrae together.

A comparison between FIGS. 2 and 2A can illustrate one important feature of the present invention. In FIG. 2A, the vertebral body B is represented by its regions of bone strength. It has been discovered that the central kidney-shaped portion $B_1$ of the vertebral body B comprises mostly the weak cancellous bone. An annular kidney-shaped region $B_2$ around the central portion contains stronger bone, while the ring apophysis $B_3$ has the strongest bone of the vertebral body. With this in mind, the present invention strives to load those regions of the vertebral body B that have the strongest load-bearing capability. For example, the entire fusion device 20 assumes a generally annular kidney-shape, corresponding to the annular kidney-shape of the stronger bone $B_2$ and $B_3$ in the vertebral body B. This overall shape of the device 20 is achieved by the lateral spacers 21 having each a partial lens shape, while the posterior spacer 22 and anterior spacer 23 have an exterior contour generally corresponding to the central portions of the stronger vertebral body bone. The bone graft material G in the cavity 25 is generally positioned over the weakest portion $B_1$ of the vertebral body B. However, this portion $B_1$ is also known to be highly vascular and biologically active, so that it is an excellent location for bone graft incorporation and fusion.

Further details of the interbody fusion device 20 are shown in the cross-sectional view of the FIG. 5. In accordance with the present invention, the components are interlocking to increase the strength and rigidity of the assembled device 20, while implementing a construction that is easy to assemble to the close confines of a spinal surgical procedure. One problem with prior art devices that consist of but a single piece is that these devices are not readily adapted for modern anterior fusion techniques. In the early history of anterior fusion, a 15 inch incision was made through the abdomen and the relatively large single piece fusion components were implanted through that incision. Now, anterior fusion is preferably accomplished through a much smaller 1.5–2 inch incision without splitting any of the abdominal muscles. In a typical procedure, the surgeon will make an incision of this size to permit visualization of approximately 45° of the disc annulus. Newer disc resection techniques are readily adapted to incisions of this limited size. However, until Applicants' invention, no interbody fusion device was known by Applicants which provided load-sharing over such a significant portion of the vertebral body, yet which is still capable of being inserted through the small discectomy incisions.

Thus, the interlocking components of the fusion device 20 have been configured for ease of insertion and ease of assembly. As can be seen in FIGS. 1 and 5–6, each lateral spacer 21 is fanned by a body 29 having opposite end plate faces 30. These end place faces 30 are configured to contact the end plates of the adjacent vertebral bodies. Preferably, the area of each of the end plate surfaces 30 is approximately ⅛ of the total area occupied by the complete fusion device 20.

In a specific embodiment, the end plate faces 30 can include a porous biocompatible coating. In one specific embodiment, the lateral spacers 21, as well as the other components of the device, may be composed of titanium coated with a hydroxapatite coating. This coating can promote fusion between each of the lateral spacers 21 and the corresponding vertebral bodies B. Each of the end plate faces 30 includes a beveled edge 31 around the perimeter of the lateral spacer 21. The beveled edge 31 facilitates insertion between adjacent vertebrae and serves the obvious function of reducing trauma to surrounding tissue that might follow a device having sharp edges.

The body 29 of the lateral spacer 21 includes an interlock channel 24 defined in one side face 33 of the body, as shown most clearly in FIG. 6. The interlocking channel 34 has an end face 35 that is angled from the posterior to the anterior end of the device 20. The interlock channel 34 further includes opposite beveled walls 36 which are angled toward each other from the closed end to the open end of the channel, as readily seen in FIG. 7. These walls 36 are oriented to include an angle A, which in one specific embodiment is 45°.

The body 29 of each lateral spacer 21 further includes a screw bore 37 defined in the anterior face of the body 29. This screw bore 37 terminates at its base in a threaded bore 38 which is adapted to engage one of the fixation screws 24 shown in FIG. 1. The screw bore 37 also includes a head recess 39 which permits the head of the fixation screw to reside enshrouded within the body 20. The anterior face of each of the lateral spacers 29 also includes a spacer notch 40 defined in the body at the end of the interlock channel 34 and immediately adjacent the screw bore 37, as shown most clearly in FIG. 6.

The particular features of each lateral spacer 21 are adapted for interlocking engagement with each of the central spacers 22 and 23. First, describing the posterior central spacer 22, it can be seen in FIGS. 5 and 8–10, that the posterior central spacer 22 includes a spacer body 45 having a pair of dovetail arms 47 projecting from the sides of the body. The dovetail arms 47 include opposite angled faces 48 which are configured to be engaged within the interlock channel 34 of each of the lateral

5,397,364

7

spacers 21. Thus, each of the angled faces 48 defines an included angle approximately equal to the angle A at which the beveled walls 36 of the channel 34 are oriented.

Each of the dovetail arms 47 includes a curved end face 49 which is configured to mate with the curved end wall 35 of the interlock channel 34 in each lateral spacer 21. It can be seen from FIGS. 5 and 10 that the end face 49 of the dovetail arms 47 are also angled complimentary with the angle of the end wall 35 in the lateral spacers 21. Each of the dovetail arms 47 further includes an interior extension 50 to fill nearly half of the length of the interlock channel 34 in the lateral spacers bodies 29. Finally, the posterior spacer body 45 defined a central guide bore 51 therein which is used during assembly of the device, as will be described in more detail herein.

It can be seen, particularly from FIG. 5, that the posterior central spacer 22 is positioned with each of the dovetail arms 47 oriented into a respective interlock channel 34 in each of the lateral spacers 21. The posterior spacer 22 is moved along each of the channels until the end face 49 of each of the dovetail arms 47 contacts the end wall 35 of each of the interlock channels 34. The complimentary angular portions of the interlock channels 34 and the dovetails arms 47 prevent lateral separation between the components. That is, the posterior spacer body 22 maintains the lateral distance between each of the lateral spacers 21 when the interbody fusion device 20 is oriented between adjacent vertebrae.

A further component of the fusion device 20 is the anterior central spacer 23, which is shown in detail in FIGS. 4 and 11–13. In particular, the anterior central spacer 23 includes a spacer body 55 having a pair of posteriorly directed arms 57 extending therefrom. Each of the arms 57 includes opposite angled faced 58 which, like the dovetail arms 47 of the posterior spacer, are configured to engage within the interlock channels 34 in the lateral spacers 21. Each of the posterior arms 57 includes an end face 59 which directly abuts the end of each of the anterior extensions 50 of the dovetail arms 47 for the posterior central spacer 22. Thus, when both anterior and posterior spacers are engaged within the lateral spacer interlock channels 34, the two central spacers are firmly pressed into contact with each other.

The anterior spacer body 55 also includes an inner posteriorly directed face 60 adjacent each of the arms 57. This face 60 contacts a portion of the spacer notches 40 in each of the lateral spacers 21, in order to maintain the anterior spacer in position. The anterior spacer body 55 further includes a pair of notches 62 defined in the sides of the body and oriented along the anterior portion of the posterior directed arms 57. In the assembled configuration, these notches 62 align with the corresponding head recesses 39 in the lateral spacer bodies 29. The notches 62 in the anterior central spacer 23 combine with the head recesses 39 to form a generally circular recess to receive the head of a fixation screw 24 therein. Finally, the anterior spacer body 55 includes a central bore 64, which is aligned with the bore 51 in the posterior central spacer 22 when the device is being assembled.

As previously indicated, the interbody fusion device 20 of the present invention includes several components, each of which is small enough to be implanted through a typical anterior disc resection portal. More particularly, the area of each of the end faces of the components is substantially less than the area of the

8

intradiscal space or annular region. For example, the area of the endplate face 30 of each of the lateral spacers 21 is less than half of the annular area. The end faces 46 of the posterior central spacer 22 and the end faces 56 of the anterior central spacer 23 occupy an area that is significantly less than the annular area (see, for example, FIG. 2). This minimal surface area and size of each of the components making up the interbody fusion device 20 means that the device can be used in minimally invasive procedures.

Thus, in one method of implanting the device, a standard anterior discectomy and distraction is performed. After the disc nucleus has been removed, the vertebral end plates can be prepared in a known fashion. Once the end plates of the adjacent vertebrae have been prepared, a pair of lateral spacers 21 can be inserted into the surgical site, with the adjacent vertebrae being separately distracted to permit proper location of each of the lateral spacers 21.

In one embodiment, introduction of each lateral spacer 21 is accomplished by way of a spreader rod 80, shown in FIG. 14. The details of the spreader rod 80 can be discerned from FIG. 15. In particular, it is seen that the spreader rod 80 includes a locator pin 81, which extends into the screw bore 37 of the lateral spacer body 29. The spreader rod 80 can also include a pusher stop 82 which has a diameter larger than the threaded bore but which is adapted to fit within the head recess 39 of the lateral spacer 21. The spreader rod 80 can then be used to manipulate and push the lateral spacers 21 into a proper position between the adjacent vertebrae. Preferably, the two lateral spacers 21 are initially inserted immediately side by side and even with their respective side faces 33 in direct contact. Once the spacers are generally arranged overlapping the vertebral body, the spacers 21 are separated by moving the spreader rods 80 apart using a separate spreader bar (not shown). The spreader bar can be configured to graft the ends of each of the spreader rods 80 external to the patient to push the bars apart, and thereby separate the lateral spacers 21 by an appropriate dimension.

Once the lateral spacers 21 are properly oriented, the posterior central spacer 22 is introduced into the patient. A guide rod 85 is provided for advancing the posterior central spacer 22 into proper position. In one specific embodiment, the guide rod 85 can be threaded to engage similar threads in the guide bore 51 of the posterior spacer 22. The spacer body is supported at the end of the guide rod 85, which is then used to advance and manipulate the posterior central spacer into position with its dovetail arms 47 oriented within the interlocking channels 34 of each of the lateral spacers 21. Some manipulation of the posterior central spacer 22 is generally required to position the dovetail arms 47 properly within each of the interlock channels 34. Thus, it is of some benefit to utilize a guide rod 85 that has some capability for gripping or engaging the central spacer.

Once the posterior spacer 22 is in position, the guide rod 85 can be unscrewed from the guide bore 51 of the posterior body 45 and removed from the patient. The guide rod 85 can then be threaded into the similarly threaded bore 64 in the anterior spacer 23, to facilitate introduction of the anterior central spacer 23. In one alternative, the guide rod 85 can be maintained in position in connection with the guide bore 51 of the posterior spacer body 45 and the anterior central spacer 22 advanced separately along the guide rod 85 into its

9

proper position. A separate pusher would be required to gradually push the anterior spacer body 55 along the rod until it is oriented in its proper interlocking position. In this instance, the bore 64 in the anterior central spacer 23 would be unthreaded and be larger than the rod 85.

Prior to locating the anterior central spacer 23, the bone graft or bone graft substitute can be introduced into the cavity 25, which at that time is defined simply by the two lateral spacers 21 and the posterior spacer 22. Sufficient graft material should be introduced to completely fill the cavity 25, but still permit introduction of the anterior central spacer 23 to complete the device 20. Alternatively, the entire device can be assembled and the bone graft material introduced between the device and an adjacent vertebrae while the vertebrae are distracted. Yet another option is to complete the assembly and insert the bone graft G through the bore 64 in the anterior spacer 23.

Once the interlocking components of the fusion device 20 are in position between the adjacent vertebrae, the guide rod 85 and the spreader rods 80 can be removed. The entire assembly is clamped together by way of the fixation screws 24. As shown in FIGS. 5 and 19, each of the fixation screws includes a screw threaded portion 70 adapted to engage the threaded bore 38 of each of the lateral spacers 21. These screws also include a guide portion 71 which guides the screw into the screw bores 37. The head 72 of each screw is sized to be received within the head recess 39 in the lateral spacers 21. Each of the screws 24 includes a pin bore 73 extending into the screw from the head 72. Concentric with the pin bore is a driving tool recess 74, which in one specific embodiment, is a hex shaped recess. The pin bore 73 and driving tool recess 74 are configured to be engaged by a driving tool 90, which is used to insert the fixation screws 24, as shown in FIGS. 18 and 19.

The driving tool 90 includes a locator pin 91 which is adapted to be inserted into the pin bore 83. The pin 91 can be slightly bent so it "holds" the screw 24 on the tool when the pin extends into the bore 73. The tool 90 also includes a driving head 92 which in this specific embodiment is a hex head to be received within the driving tool recess 74. The driving tool 90 is thus used to guide each of the fixation screws 24 into the screw bores 37 and to tighten the screws into the bore to completely clamp each of the components of the device together.

The anterior interbody fusion device 20 of the present invention is a multi-component device adapted for insertion through the standard anterior disc resection portal. The device 20 is a static device, which means that the interdiscal spacing does not change with motion of the spine. It is therefore important that the dimensions of the device be proper when inserted in order to maintain the correct anatomical relationship of the patient's spine. It is thus contemplated that each of the lateral spacers 11 can be offered in a number of sizes to account for the intradiscal dimension, as well as the annular kidney-shaped region of stronger bone in the vertebral body at each level of the lumbar spine.

In one specific embodiment, each lateral spacer has a length of somewhat over 1 inch (25 mm) in the A-P direction and is formed at an outer radius of about 0.556 inches (14 mm), so that the lateral width of the spacer is about 0.588 inches (15 mm). In this same specific embodiment, the lateral spacer 20 is about 0.344 inches (8.5

10

mm) thick to correlate to the thickness of the patient intradiscal space. The lateral separation of each of the lateral spacers 21 is maintained by the posterior and anterior central spacers 22 and 23. Each of these spacers has a width between its interlocking arms of about 0.787 inches (20 mm) in the specific embodiment. As with the lateral spacers 21, each of the central spacers 22 and 23 can be provided in a number of sized, specifically with variations in the width between the lateral arms or legs of the spacers. Again, it is understood that the various dimensions of each of the spacer components of the device 20 is dictated by the particular anatomy of the vertebrae at the specific level, configured so that the device contacts the strongest bone of the vertebral body B.

Moreover, the geometry of an appropriate fusion device can incorporate a fixed sagittal angle to maintain the patient's proper lordotic curvature once the device is implanted. As shown in FIG. 20, the device 21 has a fixed width W between end plate faces 30. Alternatively, a device 21' as shown in FIG. 21 can be provided in which the opposite end plate faces 30' diverge anteriorly at an angel A to approximate the sagittal angle, or lordosis, between two vertebrae.

It is expected that the bone graft material G housed within the interbody fusion device will fuse to the adjacent vertebrae. Bone cement or bone growth enhancing materials may be introduced with the graft material to enhance the initial and ultimate fusion of the vertebrae. In addition, it is anticipated, at least in one use of the present invention, that the disc annulus would be retained substantially intact, with the exception of an introduction portal in its anterior face. The disc annulus will exert a natural tension against the fusion device to provide stability to the disc space and to help maintain the device in its proper position for fusion.

In some instances, greater initial fixation of the interbody fusion device to the vertebrae may be desirable. Greater fixation of the device can be accomplished using a modified anterior central spacer 95 shown in FIGS. 22 and 23. The spacer 95 is identical in most respects to the anterior spacer 22 described above. Like the prior spacer 22, the anterior spacer 95 includes a bore 96 extending through the front face of the spacer, which bore is aligned for use with a guide rod 85 for insertion of the spacer. However, the alternative anterior spacer 95 includes an angled bore 97 that intersects the guide bore 96 at an angle. This angled bore is configured to receive an anchoring bone screw 98 there through, which screw is ultimately threaded into a vertebra. FIG. 24 illustrates such a construct with the bone screw 98 partially threaded into the L5 vertebra. The bone screw provides additional anchorage for the fusion device, which can speed the fusion process between the bone graft material G and the vertebrae.

Alternatively, two bone screws can be provided to anchor the device to one of the vertebrae. Such a device is illustrated in FIG. 25 showing an anterior spacer body 95' having a central guide bore 96 and two angled bores 97' and 97''. The two angled bores 97' and 97'' are configured to receive a corresponding bone screw 98 therethrough. The bores 97' and 97'' are preferably (but not necessarily) oriented at different angles so that the two bone screws 98 can engage the vertebra without conflict.

The interbody fusion device of the previously described preferred embodiments utilizes two central spacers, such as posterior spacer 22 and anterior spacer

5,397,364

11

23 shown in FIG. 1. In an alternative embodiment, depicted in FIG. 26, only a single central spacer is utilized. Specifically, the interbody fusion device 120 of FIG. 26 includes a pair of lateral spacers 21 as previously described. However, instead of a posterior and an anterior central spacer, the device 120 includes a single midline central spacer 122 formed by a body 123 spanning between the lateral spacers and by elongated dovetail arms 124 formed at the opposite ends of the body 123. Each of the dovetail arms 124 is configured to be slidably received within the interlock channels 34 of the lateral spacers. Each of the arms 124 includes a posterior portion 125, configured to contact the end walls 35 (FIG. 6) of the lateral spacers. The arms further include an anterior portion 126 against which the fixation screws 24 act to hold the assembly together.

The body 123 of the midline central spacer 122 includes a guide bore 128 defined therethrough which is used as described above to guide the in situ insertion of the spacer 122 between the two lateral spacers 21. The fusion device 120 is thus assembled in a manner similar to the previous device 20, except that only one central spacer is inserted. Bone graft material is preferably placed between the separated lateral spacers 21 prior to and after insertion of the midline central spacer 122, to completely fill the cavity defined by the interbody fusion device 120. Alternatively, the central spacer 122 can be configured so that the body 123 is situated at the anterior or posterior face of the lateral spacers 21, as shown in FIG. 25, for example. When configured in this manner, the arms 124 of the spacer would not include anterior and posterior portions 125 and 126, but would include but a single extension that would traverse the entire length of the interlocking channel 34 from the anterior face to the end wall 35.

In yet another embodiment of the invention, a fusion device 130 includes a pair of modified lateral spacers 132. These lateral spacers do not include the dovetail interlocking channel 34 of the prior described spacers. The spacers 132 are, however, provided with guide bores 134 in their anterior face to receiving an insertion rod 80 (FIG. 14) used to insert and spread the lateral spacers 132 within the intradiscal space. The fusion device 130 includes a bone graft insert 136 shaped to be received within the intradiscal space between the separated lateral spacers 132. The device 130 is maintained in its assembled configuration by the natural tension of the disc annulus surrounding the components. Alternatively, the bone graft insert 136 can be shaped to include dovetail arms, in the manner of the central spacers 22 and 23, for engagement with interlocking channels 34 of lateral spacers 21.

Insertion instrumentation has been previously described to accomplish the piecemeal construction of the assembled interbody fusion device through a minimally invasive portal. A further embodiment of insertion instrumentation is illustrated in FIG. 28, and more particularly a spreader assembly 100. The spreader assembly 100 provides a means for spreading the lateral spacers 21 apart within the disc space and to that extent is intended as a substitute for manually manipulated spreader rods 80 previously described, while still locating off of similar spreader rods.

Specifically, the spreader assembly 100 includes a pair of spreader bars 101 which engage at their ends with spreader rod portions 102. The spreader rod portions 102 are configured similar to the end of the rods 80 for reception within the screw bores 37 of the lateral

12

spacers 21. Two spreader bars, $101_R$ and $101_L$ are provided, each of which are bent at an obtuse angle distal from the spreader rod portions 102. The opposite end of each of the bent bars $101_R$ and $101_L$ is mounted to a respective guide body 103 or 104.

Mounted to and projecting from the left guide body 104 is a guide rod 106, and mounted to the right guide body is an advancement rack 108. The advancement rack 108 extends through a rectangular bore defined in the left guide body 104 so that the guide body 104 can slide over the rack. The guide rod 106 terminates without engaging the right guide body 103 to acts as a stop or limit to the relative movement of the left guide body 104 toward the right body 103. The advancement rack 108 includes a number of teeth 109, configured in the form of a rack and pinion system, to engage teeth 112 of a pinion gear 111. A knob 113 is provided for rotating the pinion gear 111 to advance the rack 108 relative to the guide rod 106. As the rack 108 moves relative to the rod 106, it pushes the right guide body 103 (to which the rack is connected) away from the left guide body 104 (to which the rod is connected).

In the illustrated embodiment, the pinion gear 111 includes teeth 112 around the entire circumference of the gear, which means that some of the teeth will contact the toothless surface of the guide rod 106. Alternatively, the pinion gear 111 can include teeth around only a portion of the gear's circumference. Since the lateral spacers 21 need only be separated enough to permit introduction of the two central spacers, the relative travel between the two spreader bars $101_R$ and $101_L$, and likewise the guide bodies 103 and 104, is limited. As a consequence, the amount of travel of the rack 108 and the corresponding rotation of the pinion gear 111 are also limited. In the preferred embodiment, about one-half rotation of the pinion gear 111 accomplishes the necessary separation of the two lateral spacers 21, so that the teeth 112 need only extend about half way around the gear.

Once the rack and pinion have been properly manipulated to separate the two lateral spacers 21, the posterior central spacer 22 can be introduced by way of the guide rod 85. The bend in the two spreader bars 101 provided clearance to manipulate the central spacer 22 and rod 85 between the bars. The anterior central spacer 23 can be assembled in a similar mariner, after which the spreader assembly 100 is removed from the surgical site.

While the invention has been illustrated and described in detail in the drawings and foregoing description, the same is to be considered as illustrative and not restrictive in character, it being understood that only the preferred embodiments have been shown and described and that all changes and modifications that come within the spirit of the invention are desired to be protected.

What is claimed is:

1. An interbody fusion device configured for introduction into an intradiscal space defined by a disc annulus between two adjacent vertebrae, the intradiscal space defining a predetermined area relative to the adjacent vertebrae, the interbody fusion device comprising:

a pair of lateral spacers, each having opposite endplate faces adapted to contact each of the adjacent vertebrae when said lateral spacers are within the intradiscal space, and each having a side face defining a channel therein; and

a first central spacer having opposite faces oriented toward each of the adjacent vertebrae when said

5,397,364

13

first central spacer is within the intradiscal space, and further having opposite ends, each of said opposite ends configured to be slidably received within said channel in a corresponding one of said lateral spacers,

wherein said pair of lateral spacers and said first central spacer are sized for individual introduction into the intradiscal space for assembly within the intradiscal space with said opposite ends of said first central spacer engaged within said channel in said corresponding one of said lateral spacers.

2. The interbody fusion device of claim 1, wherein said endplate faces of each of said pair of lateral spacers and said opposite faces of said first central spacer each define an area that is substantially less than the area of the intradiscal space.

3. The interbody fusion device of claim 1, wherein said first central spacer is elongated with a length between said opposite ends, said length being sized such that said lateral spacers are adjacent the disc annulus when said first central spacer is assembled with each of said pair of lateral spacers.

4. The interbody fusion device of claim 1, further comprising:

an elongated second central spacer having second opposite faces oriented toward each of the adjacent vertebrae and second opposite ends configured to be slidably received within said channel in a corresponding one of said lateral spacers, and

wherein when said second central spacer is assembled with said lateral spacers and said first central spacer within the intradiscal space a cavity is defined by said side face of each of said lateral spacers and said first and second central spacers, said cavity sized for introduction of bone graft material therein.

5. The interbody fusion device of claim 4, wherein: said channel in each of said lateral spacers has a channel length;

said first central spacer has a first pair of arms defined at each of said opposite ends, said first pair of arms configured to be slidably received within said channel in a corresponding one of said lateral spacers to extend along a first portion of said channel length;

said second central spacer has a second pair of arms defined at each of said second opposite ends, said second pair of arms configured to be slidably received within said channel in a corresponding one of said lateral spacers to extend along a remaining portion of said channel length; and

each of said first pair of arms contacts a corresponding one of said second pair of arms within said channel in a corresponding one of said lateral spacers to maintain a predetermined spacing between said first and second central spacers thereby defining said cavity.

6. The interbody fusion device of claim 5, wherein: said channel in each of said lateral spacers has an end wall at one end of said channel length and an opening at an opposite end of said channel length for introduction of the corresponding first and second arms of said first and second central spacers; and

said device further includes clamping means at said opposite end of said channel length for clamping said corresponding first and second arms within a corresponding channel, said clamping means bearing against said second central spacer to clamp said

14

second pair of arms against said first pair of arms and said first pair of arms against said end wall of said corresponding channel.

7. The interbody fusion device of claim 6, wherein: each of said lateral spacers defines a threaded bore adjacent said channel; and

said clamping means includes a threaded fastener having an enlarged head at one end for engaging said first central spacer when said fastener is threaded into said bore.

8. The interbody fusion device of claim 5, wherein: said channel in each of said lateral spacers and each of said first and second pair of arms are configured for interlocking engagement to prevent removal of the corresponding axis from the corresponding channels in any direction other than along said channel length.

9. The interbody fusion device of claim 8, wherein said channel in each of said lateral spacers is a dovetail channel and each of said first and second pair of arms is configured as a dovetail.

10. The interbody fusion device of claim 1, wherein: said channel in each of said lateral spacers has a channel length; and

said first central spacer includes an elongated arm at each of said opposite ends, each of said arms being configured to be slidably received within said channel and each having a length substantially equal to said channel length.

11. The interbody fusion device of claim 10, wherein said elongated arm at each of said opposite ends of said first central spacer includes a posterior portion disposed between said central spacer and one end of said channel and an anterior portion disposed between said central spacer and the opposite end of said channel.

12. The interbody fusion device of claim 10, wherein: said channel in each of said lateral spacers has an end wall at one end of said channel length and an opening at an opposite end of said channel length for introduction of the corresponding arm at said opposite ends of said first central spacer; and

said device further includes clamping means at said opposite end of said channel length and bearing against said first central spacer for clamping said corresponding arm against said end wall of said corresponding channel.

13. The interbody fusion device of claim 12, wherein: each of said lateral spacers defines a threaded bore adjacent said channel; and

said clamping means includes a threaded fastener having an enlarged head at one end for engaging said first central spacer when said fastener is threaded into said bore.

14. The interbody fusion device of claim 10, wherein: said channel in each of said lateral spacers and said arm at said opposite ends of said first central spacer are configured for interlocking engagement to prevent removal of the corresponding arms from the corresponding channels in any direction other than along said channel length.

15. The interbody fusion device of claim 14, wherein said channel in each of said lateral spacers is a dovetail channel and said arm at each of said opposite ends of said first central spacer is configured as a dovetail.

16. A device for introducing an interbody fusion device into an intradiscal space defined by a disc annulus between two adjacent vertebrae, in which the interbody fusion device includes a pair of lateral spacers

5,397,364

**15**

adapted to contact each of the adjacent vertebrae and a central spacer for mating engagement with the central spacers within the intradiscal space, each of the pair of lateral spacers and central spacer sized for individual introduction into the intradiscal space for assembly therein,

said device comprising:

a pair of spreader rods, one for each of said pair of lateral spacers, each having means for engaging a respective one of said lateral spacers, and each sized to extend outside the patient when engaging said lateral spacers disposed within the intradiscal space; and

**16**

means for manipulating said pair of spreader rods outside the patient to move said lateral spacers apart within the intradiscal space.

**17**. The device of claim **16**, wherein said means for manipulating includes a rack and pinion gear assembly engaged between said pair of spreader bars so that rotation of said pinion gear along said rack causes said pair of spreader bars to move apart.

**18**. The interbody fusion device of claim **1**, wherein: said first central spacer defines a bore therethrough, said bore having an axis angled toward an adjacent vertebra when said first central spacer is disposed within the intradiscal space; and

said device further comprises a bone screw sized for introduction through said bore in said central spacer to engage the adjacent vertebra and thereby anchor said first central spacer to the vertebra.

* * * * *

| LIST OF REFERENCES CITED BY APPLICANT | ATTY DOCKET NO. 708716-999994 | APPLICATION NO. 10/923,534 |
|---|---|---|
| (Use several sheets if necessary) | APPLICANT Mathieu et al. | |
| | FILING DATE August 19, 2004 | GROUP 3738 |

## U.S. PATENT DOCUMENTS

| *EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A01 | US 2003/0125739/A1 | 07/2003 | Bagga et al. | | | |
| | A02 | US 2002/0111680 A1 | 08/2002 | Michelson | | | |
| | A03 | US 2002/0106393 | 08/2002 | Bianchi et al. | | | |
| | A04 | US 2002/0105113 A1 | 01//2002 | Michelson | | | |
| | A05 | US 2002/0091447 | 07/2002 | Shimp et al. | | | |
| | A06 | US 2002/0029084 | 03/2002 | Paul et al. | | | |
| | A07 | US 2001/005796 A1 | 06/2001 | Zdeblick et al. | | | |
| | A08 | US 2001/0041941 | 11/2001 | Boyer II et al. | | | |
| | A09 | US 2001/0041941 | 11/2001 | Boyer II et al. | | | |
| | A10 | US 2001/0039456 | 11/2001 | Boyer II et al. | | | |
| | A11 | US 2001/0039456 | 11/2001 | Boyer II et al. | | | |
| | A12 | US 2001/0031254 | 10/2001 | Bianchi et al. | | | |
| | A13 | US 2001/0016777 | 08/2001 | Biscup | | | |
| | A14 | US 2001/0010021 | 07/2001 | Boyd et al. | | | |
| | A15 | US 2001/0001129 | 05/2001 | McKay et al. | | | |
| | A16 | 6,761,739 | 07/2004 | Shepard | | | |
| | A17 | 6,638,310 | 10/2003 | Lin et al. | | | |
| | A18 | 6,569,201 | 05/2003 | Moumene et al. | | | |
| | A19 | 6,468,311 | 10/2002 | Boyd et al. | | | |
| | A20 | 6,458,158 | 10/2002 | Anderson et al. | | | |
| | A21 | 6,270,528 | 08/2001 | McKay | | | |
| | A22 | 6,264,695 | 07/2001 | Stoy | | | |
| | A23 | 6,261,586 | 07/2001 | McKay | | | |
| | A24 | 6,258,125 | 07/2001 | Paul et al. | | | |
| | A25 | 6,258,125 | 07/2001 | Paul et al. | | | |
| | A26 | 6,245,108 B1 | 06/2001 | Biscup | | | |
| | A27 | 6,241,769 B1 | 06/2001 | Nicholson et al. | | | |
| | A28 | 6,206,922 B1 | 03/2001 | Zdeblick et al. | | | |
| | A29 | 6,206,347 | 03/2001 | Anderson et al. | | | |
| | A30 | 6,193,756 | 02/2001 | Studer et al. | | | |
| | A31 | 6,156,070 | 12/2000 | Incavo et al. | | | |
| | A32 | 6,143,033 | 11/2000 | Paul et al. | | | |
| | A33 | 6,143,030 | 11/2000 | Schroder | | | |
| | A34 | 6,129,763 | 10/2000 | Chauvin et al. | | | |
| | A35 | 6,123,731 | 09/2000 | Boyce et al. | | | |
| | A36 | 6,123,731 | 09/2000 | Boyce et al. | | | |

NYJD: 1557344.1

A0682

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A37 | 6,110,482 | 08/2000 | Khouri et al. | | | | |
| A38 | 6,096,081 | 08/2000 | Grivas et al. | | | | |
| A39 | 6,090,998 | 07/2000 | Grooms et al. | | | | |
| A40 | 6,080,193 | 06/2000 | Hochshuler et al. | | | | |
| A41 | 6,080,158 | 06/2000 | Lin | | | | |
| A42 | 6,045,580 | 04/2000 | Scarborough et al. | | | | |
| A43 | 6,045,579 | 04/2000 | Hochshuler et al. | | | | |
| A44 | 6,039,762 | 03/2000 | McKay | | | | |
| A45 | 6,033,438 | 03/2000 | Bianchi et al. | | | | |
| A46 | 6,033,405 | 03/2000 | Winslow et al. | | | | |
| A47 | 6,025,538 | 02/2000 | Yaccarino, III | | | | |
| A48 | 6,013,853 | 01/2000 | Athanasiou et al. | | | | |
| A49 | 5,989,289 | 11/1999 | Coates et al. | | | | |
| A50 | 5,984,967 | 11/1999 | Zdeblick et al. | | | | |
| A51 | 5,981,828 | 11/1999 | Nelson et al. | | | | |
| A52 | 5,980,522 | 11/1999 | Koros et al. | | | | |
| A53 | 5,976,187 | 11/1999 | Richelsoph | | | | |
| A54 | 5,972,368 | 10/1999 | McKay | | | | |
| A55 | 5,968,098 | 10/1999 | Winslow | | | | |
| A56 | 5,944,755 | 08/1999 | Stone | | | | |
| A57 | 5,922,027 | 07/1999 | Stone | | | | |
| A58 | 5,910,315 | 06/1999 | Stevenson et al. | | | | |
| A59 | 5,904,719 | 05/1999 | Errico et al. | | | | |
| A60 | 5,902,338 | 05/1999 | Stone | | | | |
| A61 | 5,899,939 | 05/1999 | Boyce et al. | | | | |
| A62 | 5,895,426 | 04/1999 | Scarborough et al. | | | | |
| A63 | 5,888,227 | 03/1999 | Cottle | | | | |
| A64 | 5,888,224 | 03/1999 | Beckers et al. | | | | |
| A65 | 5,888,222 | 03/1999 | Coates et al. | | | | |
| A66 | 5,885,299 | 03/1999 | Winslow et al. | | | | |
| A67 | 5,876,452 | 03/1999 | Athanasiou et al. | | | | |
| A68 | 5,865,849 | 02/1999 | Stone | | | | |
| A69 | 5,785,710 | 07/1998 | Michelson | | | | |
| A70 | 5,782,915 | 07/1998 | Stone | | | | |
| A71 | 5,776,199 | 07/1998 | Michelson | | | | |
| A72 | 5,776,198 | 07/1998 | Rabbe et al. | | | | |
| A73 | 5,776,198 | 07/1998 | Rabbe et al. | | | | |
| A74 | 5,776,197 | 07/1998 | Rabbe et al. | | | | |
| A75 | 5,776,197 | 07/1998 | Rabbe et al. | | | | |
| A76 | 5,776,194 A | 07/1998 | Mikol et al. | | | | |
| A77 | 5,766,253 | 06/1998 | Brosnahan, III | | | | |
| A78 | 5,735,905 | 04/1998 | Parr | | | | |
| A79 | 5,728,159 | 03/1998 | Stroever et al. | | | | |
| A80 | 5,702,455 | 12/1997 | Saggar | | | | |
| A81 | 5,702,453 | 12/1997 | Rabbe et al. | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| A82 | 5,702,453 | 12/1997 | Rabbe et al. | | | |
| A83 | 5,702,451 | 12/1997 | Biedermann et al. | | | |
| A84 | 5,702,449 | 12/1997 | McKay | | | |
| A85 | 5,683,463 | 11/1997 | Godefroy et al. | | | |
| A86 | 5,683,394 | 11/1997 | Rinner | | | |
| A87 | 5,676,699 | 10/1997 | Gogolewski | | | |
| A88 | 5,609,637 | 03/1997 | Biedermann et al. | | | |
| A89 | 5,609,636 | 03/1997 | Kohrs et al. | | | |
| A90 | 5,609,635 | 03/1997 | Michelson | | | |
| A91 | 5,607,474 | 03/1997 | Athanasiou et al. | | | |
| A92 | 5,571,192 | 11/1996 | Schönhöffer | | | |
| A93 | 5,571,190 | 11/1996 | Ulrich et al. | | | |
| A94 | 5,569,308 | 11/1996 | Sottosanti | | | |
| A95 | 5,556,430 | 09/1996 | Gendler | | | |
| A96 | 5,554,191 | 09/1996 | Lahille et al. | | | |
| A97 | 5,549,679 | 08/1996 | Kuslich | | | |
| A98 | 5,534,030 | 07/1996 | Navarro et al. | | | |
| A99 | 5,522,899 | 06/1996 | Michelson | | | |
| A100 | 5,514,180 | 05/1996 | Heggeness et al. | | | |
| A101 | 5,507,818 | 04/1996 | McLaughlin | | | |
| A102 | 5,489,308 | 02/1996 | Kuslich et al. | | | |
| A103 | 5,458,638 | 10/1995 | Kuslich et al. | | | |
| A104 | 5,439,684 | 08/1995 | Prewett et al. | | | |
| A105 | 5,423,817 | 06/1995 | Lin | | | |
| A106 | 5,405,391 | 04/1995 | Hednerson et al. | | | |
| A107 | 5,348,788 | 09/1994 | White | | | |
| A108 | 5,314,476 | 05/1994 | Prewett et al. | | | |
| A109 | 5,298,254 | 03/1994 | Prewett et al. | | | |
| A110 | 5,284,655 | 02/1994 | Bogdansky et al. | | | |
| A111 | 5,281,226 | 01/1994 | Davydov et al. | | | |
| A112 | 5,211,664 | 05/1993 | Tepic et al. | | | |
| A113 | 5,211,664 | 05/1993 | Tepic et al. | | | |
| A114 | 5,192,327 | 03/1993 | Brantigan | | | |
| A115 | 5,112,354 | 05/1992 | Sires | | | |
| A116 | 5,084,051 | 01/1992 | Törmälä et al. | | | |
| A117 | 5,084,051 | 01/1992 | Tormala et al. | | | |
| A118 | 5,062,850 | 11/1991 | MacMillan et al. | | | |
| A119 | 5,057,049 | 10/1991 | Campbell | | | |
| A120 | 5,026,373 | 06/1991 | Ray et al. | | | |
| A121 | 4,994,084 | 02/1991 | Brennan | | | |
| A122 | 4,961,740 | 10/1990 | Ray et al. | | | |
| A123 | 4,950,296 | 08/1990 | McIntyre | | | |
| A124 | 4,936,851 | 06/1990 | Fox et al. | | | |
| A125 | 4,858,603 | 08/1989 | Clemow et al. | | | |
| A126 | 4,717,115 | 01/1988 | Schmitz | | | |

| | | | | | CLASS | SUBCLASS | | |
|---|---|---|---|---|---|---|---|---|
| A127 | 4,678,470 | 07/1987 | Nashef et al. | | | | | |
| A128 | 4,627,853 | 12/1986 | Campbell et al. | | | | | |
| A129 | 4,512,038 | 04/1985 | Alexander et al. | | | | | |
| A130 | 4,501,269 | 02/1985 | Bagby | | | | | |
| A131 | 4,135,506 | 01/1979 | Ulrich | | | | | |
| A132 | 2,621,145 | 12/1952 | Sano | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | YES | NO |
| | B01 | CA 2317791 A1 | 08/1999 | | | | | |
| | B02 | DE 299 13 208 U1 | 09/1999 | Germany | | | X | |
| | B03 | DE 195 04 867 C1 | 02/1996 | Germany | | | X | |
| | B04 | DE 44 23 257 A1 | 01/1996 | Germany | | | X | |
| | B05 | DE 44 09 392 A1 | 09/1995 | Germany | | | X | |
| | B06 | DE 42 42 889 A1 | 06/1994 | Germany | | | X | |
| | B07 | DE 39 33 459 A1 | 04/1991 | Germany | | | X | |
| | B08 | DE 30 42 003 A1 | 07/1982 | Germany | | | X | |
| | B09 | EP 1051133 B1 | 10/2000 | EPO | | | | |
| | B10 | EP 0968692 A1 | 01/2000 | EPO | | | X | |
| | B11 | EP 0966930 | 12/1999 | EPO | | | X | |
| | B12 | EP 0906065 B1 | 01/2004 | EPO | | | | |
| | B13 | EP 0639351 A2 | 02/1995 | EPO | | | X | |
| | B14 | EP 0639351 A3 | 03/1995 | EPO | | | X | |
| | B15 | EP 0577178 A1 | 01/1994 | EPO | | | X | |
| | B16 | EP 0517030 A2 | 12/1992 | EPO | | | X | |
| | B17 | EP 0517030 A3 | 04/1993 | EPO | | | X | |
| | B18 | EP 0517030 B1 | 09/1996 | EPO | | | X | |
| | B19 | EP 0505634 A1 | 09/1992 | EPO | | | X | |
| | B20 | EP 0505634 B1 | 08/1997 | EPO | | | X | |
| | B21 | FR 2 753 368 | 03/1998 | France | | | X | |
| | B22 | FR 2 697 996 | 05/1994 | France | | | X | |
| | B23 | FR 2 700 947 | 08/1994 | France | | | X | |
| | B24 | FR 2 552 659 | 04/1985 | France | | | X | |
| | B25 | GB 2 148 122 A | 05/1985 | Great Britain | | | X | |
| | B26 | SU 1465040 A1 | 03/1989 | Russia | | | X | |
| | B27 | WO 01/95837 A1 | 12/2001 | PCT | | | | |
| | B28 | WO 01/93742 A2 | 12/2001 | PCT | | | | |
| | B29 | WO 01/93742 A3 | 12/2001 | PCT | | | | |
| | B30 | WO 01/56497 A2 | 08/2001 | PCT | | | | |
| | B31 | WO 01/56497 A3 | 08/2001 | PCT | | | | |
| | B32 | WO 00/74607 A1 | 12/2000 | PCT | | | X | |
| | B33 | WO 00/66045 A1 | 11/2000 | PCT | | | X | |
| | B34 | WO 00/66045 A | 11/2000 | PCT | | | | |
| | B35 | WO 00/66044 A1 | 11/2000 | PCT | | | | |
| | B36 | WO 00/59412 | 10/2000 | PCT | | | X | |

NYJD: 1557344

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B37 | WO 00/41654 A2/A3 | 07/2000 | PCT | | | | X | |
| B38 | WO 00/40177 | 07/2000 | PCT | | | | X | |
| B39 | WO 00/30568 | 06/2000 | PCT | | | | X | |
| B40 | WO 00/07528 | 02/2000 | PCT | | | | X | |
| B41 | WO 00/07527 | 02/2000 | PCT | | | | X | |
| B42 | WO 99/38463 | 08/1999 | PCT | | | | | |
| B43 | WO 99/56675 | 11/1999 | PCT | | | | X | |
| B44 | WO 99/38461 | 08/1999 | PCT | | | | X | |
| B45 | WO 99/38463 A2 | 08/1999 | PCT | | | | | |
| B46 | WO 99/38463 A3 | 08/1999 | PCT | | | | | |
| B47 | WO 99/32055 | 07/1999 | PCT | | | | X | |
| B48 | WO 99/29271 | 06/1999 | PCT | | | | X | |
| B49 | WO 98/55052 | 12/1998 | PCT | | | | X | |
| B50 | WO 98/56319 | 12/1998 | PCT | | | | X | |
| B51 | WO 98/56433 | 12/1998 | PCT | | | | X | |
| B52 | WO 98/17209 | 04/1998 | PCT | | | | X | |
| B53 | WO 97/39693 A1 | 10/1997 | PCT | | | | | |
| B54 | WO 97/25941 | 07/1997 | PCT | | | | X | |
| B55 | WO 97/25945 | 07/1997 | PCT | | | | X | |
| B56 | WO 97/20526 | 06/1997 | PCT | | | | X | |
| B57 | WO 96/39988 | 12/1996 | PCT | | | | X | |
| B58 | WO 95/21053 | 08/1995 | PCT | | | | X | |
| B59 | WO 92/01428 | 02/1992 | PCT | | | | X | |
| B60 | WO 88/10100 | 12/1988 | PCT | | | | X | |
| B61 | WO 88/03417 | 05/1988 | PCT | | | | X | |

| **OTHER REFERENCES** *(Including Author, Title, Date, Pertinent Pages, Etc.)* | |
|---|---|
| C01 | |
| C02 | |
| C03 | |

| EXAMINER | DATE CONSIDERED |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with **MPEP 609**; Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

NYJD: 1557344.

| *Notice of References Cited* | Application/Control No. 10/923,534 | Applicant(s)/Patent Under Reexamination MATHIEU ET AL. | | |
|---|---|---|---|---|
| | Examiner Bruce E. Snow | Art Unit 3738 | Page 1 of 1 | |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-2004/0210314 | 10-2004 | Michelson, Gary K. | 623/017.16 |
| | B | US-6,342,074 | 01-2002 | Simpson, Nathan S. | 623/17.11 |
| | C | US-4,904,261 | 02-1990 | Dove et al. | 623/17.16 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 10032005

Sheet 1 of 1

| | ATTY. DOCKET NO. 708716-999994 | APPLICATION NO. 10/923,534 |
|---|---|---|
| **LIST OF REFERENCES CITED BY APPLICANT** (Use several sheets if necessary) | APPLICANT Mathieu et al. | |
| | FILING DATE August 19, 2004 | GROUP 3738 |

## U.S. PATENT DOCUMENTS

| *EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A01 | 6231610 | 5/15/01 | Geisler | | | |
| | A02 | 6235059 | 5/22/01 | Benezech et al. | | | |
| | A03 | 6364880 | 4/2/02 | Michelson | | | |
| | A04 | 6423063 | 7/23/02 | Bonutti | | | |
| | A05 | | | | | | |
| | A06 | | | | | | |
| | A07 | | | | | | |
| | A08 | | | | | | |
| | A09 | | | | | | |
| | A10 | | | | | | |
| | A11 | | | | | | |
| | A12 | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | YES | NO |
| | B01 | | | | | | | |
| | B02 | | | | | | | |
| | B03 | | | | | | | |
| | B04 | | | | | | | |
| | B05 | | | | | | | |
| | B06 | | | | | | | |
| | B07 | | | | | | | |
| | B08 | | | | | | | |
| | B09 | | | | | | | |

## OTHER REFERENCES *(Including Author, Title, Date, Pertinent Pages, Etc.)*

| | | |
|---|---|---|
| | C01 | |
| | C02 | |
| | C03 | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with **MPEP 609**; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A0688

| | | | |
|---|---|---|---|
| **Notice of References Cited** | Application/Control No.<br><br>10/923,534 | Applicant(s)/Patent Under Reexamination<br>MATHIEU ET AL. | |
| | Examiner<br><br>Bruce E. Snow | Art Unit<br><br>3738 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2002/0082597 | 06-2002 | FRASER, ROBERT | 606/61 |
| * | B | US-2005/0033433 | 02-2005 | Michelson, Gary K. | 623/017.11 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

Sheet 1 of 1

# LIST OF REFERENCES CITED BY APPLICANT
### (Use several sheets if necessary)

| ATTY. DOCKET NO. | APPLICATION NO. |
|---|---|
| 708716-999994 | 10/923,534 |

| APPLICANT | |
|---|---|
| Mathieu et al. | |

| FILING DATE | ART UNIT |
|---|---|
| August 19, 2004 | INTERVERTEBRAL IMPLANT |

## U.S. PATENT DOCUMENTS

| *Examiner Initials | | Document Number | Date mm/dd/yy | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A01 | 6984234 | 1/10/2006 | Bray | |
| | A02 | | | | |
| | A03 | | | | |
| | A04 | | | | |
| | A05 | | | | |
| | A06 | | | | |
| | A07 | | | | |
| | A08 | | | | |
| | A09 | | | | |
| | A10 | | | | |
| | A11 | | | | |
| | A12 | | | | |

## FOREIGN PATENT DOCUMENTS

| *Examiner Initials | | Foreign Patent Document Country Code, Number, Kind Code (if known) | Date mm/dd/yy | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T |
|---|---|---|---|---|---|---|
| | B01 | | | | | |
| | B02 | | | | | |
| | B03 | | | | | |
| | B04 | | | | | |
| | B05 | | | | | |
| | B06 | | | | | |
| | B07 | | | | | |
| | B08 | | | | | |
| | B09 | | | | | |
| | B10 | | | | | |
| | B11 | | | | | |
| | B12 | | | | | |

NYJD-1645992v1

| EXAMINER | DATE CONSIDERED |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| FORM PTO 1449 (*modified*) | | ATTY DOCKET NO. 001227.0930 | | APPLICATION NO. 11/751,757 | |
|---|---|---|---|---|---|
| U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | APPLICANT **Claude Mathieu et al.** | | | |
| LIST OF REFERENCES CITED BY APPLICANT(S) (Use several sheets if necessary) | | FILING DATE 05/22/2007 | | GROUP 3738 | |

U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | | 5,800,433 | Sept. 1, 1998 | Benzel et al. | 606 | 61 | May 31, 1996 |
| | | 6,984,234 | Jan. 10, 2006 | Bray | 606 | 69 | Apr. 21, 2003 |
| | | 2002/0147450 | Oct. 10, 2002 | LeHuec et al. | 606 | 61 | Nov. 6, 2001 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES/NO/ OR ABSTRACT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

OTHER DOCUMENT(S) (Including Author, Title, Date, Pertinent Pages, Etc.)

| |
|---|
| |
| |
| |
| |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

Sheet _1_ of _1_

FORM PTO 1449 (*modified*)

| | ATTY DOCKET NO.<br>**001227.0930** | APPLICATION NO.<br>**11/751,757** |
|---|---|---|
| U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | APPLICANT<br>**Claude MATHIEU** | |
| LIST OF REFERENCES CITED BY APPLICANT(S)<br>(Use several sheets if necessary) | FILING DATE<br>**May 22, 2007** | GROUP<br>**3738** |

U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | | 5,888,223 | March 30, 1999 | Bray, Jr. | | | |
| | | 6,235,059 | May 22, 2001 | Benezech et al. | | | |
| | | 2002/0022843 | Feb. 21, 2002 | Michelson | | | |
| | | 2002/0099376 | July 25, 2002 | Michelson | | | |
| | | 2002/0169508 | Nov. 14, 2002 | Songer et al. | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES/NO/ OR ABSTRACT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

OTHER DOCUMENT(S) (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | | |
| | | |
| | | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant: | Claude Mathieu *et al.* | Confirmation No.: | 7730 |
| Application No.: | 12/574,222 | Art Unit: | 3738 |
| Filed: | 10/06/2009 | Examiner: | Snow, Bruce Edward |
| Attorney Docket No: | 001227/1791 | | |
| For: | INTERVERTEBRAL IMPLANT | | |

## AMENDMENT IN RESPONSE TO OFFICE ACTION DATED APRIL 2, 2010

**Mail Stop AMENDMENT**
Commissioner for Patents
PO Box 1450
Alexandria, Virginia  22313-1450

Sir:

In response to the Non-Final Office Action of the United States Patent and Trademark Office, dated April 2, 2010, Applicants respectfully submit the following revisions and remarks:

**Amendments to the Specification** begin on page 2 of this Amendment

**Amendments to the Claims** begin on page 3 of this Amendment

**Remarks** begin on page 7 of this Amendment

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## AMENDMENTS TO THE SPECIFICATION

Please amend the first paragraph of the specification as follows:

[0001]     This application is a continuation of U.S. patent application No. 11/751,757, now

U.S. Patent No. 7,618,456, filed May 22, 2007, which is a continuation of U.S. patent application

No. 10/923,534, now U.S. Patent No. 7,232,464, filed August 19, 2004, which is a continuation

of International Application No. PCT/CH02/00099, filed February 19, 2002.  The entire contents

of these applications are expressly incorporated herein by reference thereto.

2

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## AMENDMENTS TO THE CLAIMS

1.  (Currently Amended)  An intervertebral implant for insertion between an upper
vertebra having an upper endplate and a lower vertebra having a lower endplate, the implant
comprising:

a body having a first lateral side surface, a second lateral side surface, a posterior face, an
anterior face, an upper surface and a lower surface, the upper and lower surfaces being sized and
configured to contact the upper and lower endplates, respectively, of the upper and lower
vertebrae, the upper surface defining an upper plane and the lower surface defining a lower
plane;

a plate operatively coupled to the body, the plate having a plate top surface located
generally on the upper plane and a plate lower surface located generally on the lower plane when
the plate is coupled to the body so that the body has a first height extending between the upper
surface and the lower surface and the plate has a second height extending between the plate top
surface and the plate lower surface, the second height being generally equal to the first height,
first and second boreholes passing through the plate, the first and second boreholes positioned
between the upper and lower planes; and

first and second bone screws each having a head and a shank, the first bone screw being
sized and configured to extending through the first borehole and into the upper endplate, and the
second bone screw being sized and configured to extending through the second borehole and into

3

NY 72788568v1

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

the lower endplate to anchor the intervertebral implant to the upper and lower vertebrae and the

heads of the first and second bone screws positioned between the upper and lower planes.

　　　　2.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the implant

includes a plurality of teeth.

　　　　3.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the plate contacts

the anterior face of the body.

　　　　4.　　　　(Previously Presented)　　　　The implant of claim 3, wherein the anterior face of

the body includes a recess for receiving the plate.

　　　　5.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the plate is entirely

contained between the endplates of the upper and lower vertebrae when the implant is inserted

between the upper and lower vertebrae.

　　　　6.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the body and the

plate are pre-assembled so that the body and the plate are inserted between the upper and lower

vertebrae as a single unit.

　　　　7.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the implant

includes a vertical center plane, the first and second fasteners being laterally divergent from the

vertical center plane.

　　　　8.　　　　(Previously Presented)　　　　The implant of claim 1, wherein the body comprises

a horizontal center plane and the plate is disposed substantially perpendicular to the horizontal

center plane.

4

NY 72788568v1

A0696

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

9.    (Previously Presented)    The implant of claim 1, wherein the body comprises a horizontal center plane and the plate is displaceable in a direction substantially perpendicular to the horizontal center plane.

10.    (Previously Presented)    The implant of claim 1, wherein the body is formed from a first biocompatible material and the plate is formed from a second biocompatible material, the second biocompatible material being different than the first biocompatible material.

11.    (Previously Presented)    The implant of claim 10, wherein the plate is made from a biocompatible metal and the body is made from a biocompatible plastic.

12.    (Previously Presented)    The implant of claim 1, wherein the body comprises a horizontal center plane and the first and second fastener holes have an axis angled from about twenty-five degrees (25º) to about seventy degrees (70º) with respect to the horizontal center plane.

13.    (Currently Amended)    The implant of claim 12, wherein the axis is angled from about thirty-five degrees (35º) to about fifty-five degrees (55[[0]]º) with respect to the horizontal center plane.

14.    (Previously Presented)    The implant of claim 1, wherein the plate is slidably displaceable with respect to the body.

15.    (Previously Presented)    The implant of claim 1, wherein the first and second fasteners are bone screws and wherein the first and second fastener holes formed in the plate are

NY 72788568v1

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

internally threaded and the heads of the bone screws are externally threaded for engaging the

internally threaded holes.

16.   (Previously Presented)      The implant of claim 1, wherein the plate further

comprises a horizontal center midplane, the head of the first fastener being located between the

top surface of the plate and the horizontal center midplane and the head of the second fastener

being located between the bottom surface of the plate and the horizontal center midplane.

6

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## REMARKS

After entry of this Amendment, the pending claims are: claims 1-16.  The Office Action,

dated April 2, 2010, has been carefully considered.  Independent claim 1 and dependent claim 13

have been amended.  No new matter has been added.  Reconsideration and allowance of the

pending claims in view of the above Amendments and the following remarks is respectfully

requested.

In the Office Action, dated April 2, 2010, the Examiner:

- rejected claims 1-16 on the ground of nonstatutory obviousness-type double
  patenting as being unpatentable over claims 1-32 of U.S. Patent No. 7,232,464
  and claims 1-8 of U.S. Patent No. 7,618,456;

- rejected claims 1-16 under 35 U.S.C. 101 for being directed to nonstatutory
  subject matter;

- objected to claim 13 for containing one or more informalities;

- rejected claims 1-14 and 16 under 35 U.S.C. 102(a) as being anticipated by U.S.
  Published Patent Application No. 2002/0082597 to Fraser ("Fraser"); and

- rejected claim 15 under 35 U.S.C. 103(a) as being unpatentable over Fraser.

Applicants respectfully traverse these rejections.

## INFORMATION DISCLOSURE STATEMENT FILED CONCURRENTLY HEREWITH

The Examiner's attention is directed to co-pending U.S. Patent Application No.

11/199,599.  Relevant portions of the on-going prosecution are submitted via an Information

Disclosure Statement.  Appropriate acknowledgement is respectfully requested.

7

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## INFORMATION DISCLOSURE STATEMENT FILED ON OCTOBER 6, 2010

Appropriate acknowledgement of the Information Disclosure Statement filed on October 6, 2010 is respectfully requested.  In accordance with MPEP 609.02 entitled Information Disclosure Statements in Continued Examinations or Continuing Applications, which states

"When filing a continuing application that claims benefit under 35 U.S.C. 120 to a parent application … it will not be necessary for the applicant to submit an information disclosure statement in the continuing application that lists the prior art cited by the examiner in the parent application **unless the applicant desires the information to be printed on the patent issuing from the continuing application** … The examiner of the continuing application will consider information which has been considered by the Office in the parent application."

Applicants wish for the cited references to be listed on any issuing patent resulting from the present application.  Thus copies of all IDS citations submitted in the parent application were included in the present application.  These references have already been reviewed by the Examiner during prosecution of the parent application.  Appropriate acknowledgement is respectfully requested so that the information will be printed on any patent issuing from the present application.

8

NY 72788568v1

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## NONSTATUTORY OBVIOUSNESS-TYPE DOUBLE PATENTING REJECTION

Claims 1-16 were rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-32 of U.S. Patent No. 7,232,464 and claims 1-8 of U.S. Patent No. 7,618,456. A timely filed terminal disclaimer in compliance with 37 C.F.R. 1.321(c) or 1.321(d) will be filed to overcome the nonstatutory double patenting rejection, if still necessary, when claims 1-16 are deemed allowable but for the obviousness-type double patenting rejection.

## 35 U.S.C. 101

Claims 1-16 were rejected as being directed to non-statutory subject matter. Specifically, independent claim 1 was rejected for claiming that the bone screws extend into the upper and lower endplates, which positively claims the endplates. Independent claim 1 has been amended to recite, *inter alia*, "first and second bone screws each having a head and a shank, the first bone screw being sized and configured to extend through the first borehole and into the upper endplate, the second bone screw being sized and configured to extend through the second borehole and into the lower endplate to anchor …" As such, it is believed that this rejection is overcome. Withdrawal of this rejection is respectfully requested.

## CLAIM OBJECTION

Dependent claim 13 was objected to for reciting 35-50 degrees instead of 35-55 degrees. Applicants respectfully submit that appropriate correction has been made. Withdrawal of this objection is respectfully requested.

9

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## INDEPENDENT CLAIM 1

Referring to Figs. 5 and 6, a preferred embodiment of the invention of independent claim 1 is directed to an intervertebral implant for insertion between an upper vertebra having an upper endplate and a lower vertebra having a lower endplate. The intervertebral implant includes a body 10, a plate 8 and a plurality of bone screws 20 for securing the implant to the adjacent vertebral bodies.

The body 10 includes an upper surface 1, a lower surface 2, a first lateral side surface 3, a second lateral side surface 4, an anterior face 5 and a posterior face 6. The upper surface 1 and the lower surface 2 are sized and configured to contact the upper and lower endplates, respectively. *The upper surface 1 defines an upper plane while the lower surface 2 defines a lower plane.*

The plate 8 is operatively coupled to the body 10. The plate 8 includes a plate top surface located generally on the upper plane and a plate lower surface located generally on the lower plane when the plate 8 is coupled to the body 10 so that the body 10 has a first height extending between the upper surface 1 and the lower surface 2 and the plate 8 has a second height extending between the plate top surface and the plate lower surface, *the second height being generally equal to the first height. The plate 8 further includes first and second boreholes 9 located between the upper and lower planes.*

The first and second bone screws 20 each have a head 21 and a shank 22, the first bone screw 20 is sized and configured to extend through the first borehole 9 and into the upper vertebra while the second bone screw 20 is sized and configured to extend through the second

10

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

borehole 9 and into the lower vertebra. ***The heads 21 of the first and second bone screws 20 are located between the upper and lower planes***.

In the outstanding Office Action, the Examiner rejected independent claim 1 as being anticipated by Fraser.  Referring to Figs. 1-3 and 8, Fraser discloses a fusion cage including a body 10 for insertion between adjacent vertebral bodies.  The body 10 includes an anterior face 12, a posterior face 14, a superior face 16 and an inferior face 18.  The cage further includes a plate 20 matable with the anterior face 12 of the body 10.  The plate 20 includes a plurality of plate extensions or tabs 36', 38', 40' and 42' having bone screw holes 36, 38, 40 and 42, respectively.  The tabs 36', 38', 40' and 42' and the remainder of the plate 20 can all lie in the same plane, or one or more of the tabs 36', 38', 40' and 42' can be angled with respect to the remainder of the plate 20 or one or more of the other tabs 36', 38', 40' and 42'.  That is, the tabs 36', 38', 40' and 42' may be angled with respect to the remainder of the plate 20 so that screws 46, 48 may be angled with respect to the medial plane "P" of the body 10.   In use, screws 46 and 48 are disposed through the holes in tabs 40' and 38', respectively, such that the head of each screw engages the respective tab to inhibit passage of the head through the aperture in the tab.

The point of the Fraser disclosure is the incorporation of the plate extensions or tabs 36', 38', 40' and 42' to enable angulation of the bone screws.  For example, the specification notes that "[t]he angle formed by the tab(s) and plate, as well as by the screw(s) and medial plane…can range from 15° degree to 60°, for most applications the angle …is about 20°."  The specification further notes that the tabs could be "flexible or readily bent with respect to the remainder of the plate 20."  Fraser at [0024] and [0026].  This bending or angulation is accomplished by the tabs

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

or plate extensions 36', 38', 40' and 42' extending beyond the top and bottom surfaces of the plate

20.  It is this extension and flexibility that enables a surgeon to angle the tabs appropriately.



### FRASER DOES NOT DISCLOSE, TEACH OR SUGGEST ALL OF THE CLAIMED LIMITATIONS OF INDEPENDENT CLAIM 1

Independent claim 1 is directed to an intervertebral implant for insertion between an

upper vertebra having an upper endplate and a lower vertebra having a lower endplate, and

recites, *inter alia*, as follows:

> a body having … an upper surface and a lower surface, the upper and
> lower surfaces being sized and configured to contact the upper and lower
> endplates, respectively, of the upper and lower vertebrae, the upper surface
> defining an upper plane and the lower surface defining a lower plane; a plate
> operatively coupled to the body, **the plate having a plate top surface located
> generally on the upper plane and a plate lower surface located generally on
> the lower plane when the plate is coupled to the body so that the body has a
> first height extending between the upper surface and the lower surface and
> the plate has a second height extending between the plate top surface and the
> plate lower surface, the second height being generally equal to the first
> height,** first and second boreholes passing through the plate, **the first and second
> boreholes positioned between the upper and lower planes**; and first and second
> bone screws each having a head and a shank … **the heads of the first and second**

12

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

**bone screws positioned between the upper and lower planes**.  (Emphasis added).

As an initial matter, the pending rejection of independent claim 1 as being anticipated by Fraser is in error because Fraser does not disclose, teach or suggest all the features of the claimed invention.  Specifically, Fraser fails to disclose an intervertebral implant including a body and a plate coupled to the body wherein the body includes an upper surface and a lower surface, the upper surface defining an upper plane and the lower surface defining a lower plane.  The plate further including first and second boreholes passing through the plate wherein the first and second boreholes are positioned between the upper and lower planes such that the heads of the first and second bone screws are positioned between the upper and lower planes.  *That is, independent claim 1 requires the first and second boreholes passing through the plate to be positioned between the upper and lower planes as defined by the body, and requires the heads of the first and second bone screws to be positioned between the upper and lower planes as defined by the body.*

In contrast, Fraser discloses a body 10 and a plate 20 wherein the plate 20 includes a plurality of plate extensions or tabs 36', 38', 40' and 42' having bone screw holes 36, 38, 40 and 42, respectively.  The tabs 36', 38', 40' and 42' extend from the top and bottom surfaces of the plate 20.  As such, when the bone screws 46, 48 are inserted thru the bone screw holes 36, 38, 40 and 42 formed in the tabs 36', 38', 40' and 42', respectively, the bone screws 46, 48 lie above the upper plane of the body 10 and below the lower plane of the body 10.

*That is, in Fraser, as schematically illustrated in Fig. 3, reproduced below with annotations, the bone screw holes 36, 38, 40 and 42 formed in the plate 20 are not positioned*

13

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

*between the upper and lower planes of the body 10 when the plate 20 is coupled to the body 10*.

Rather, in Fraser, the bone screw holes 36, 38, 40 and 42 are formed in plate extensions or tabs

36', 38', 40' and 42' that extend from the top and bottom surfaces of the plate 20 so that when the

plate 20 is coupled to the body 10, the bone screw holes 36, 38, 40 and 42, and hence the heads

of the bone screws 46, 48 inserted therein, are not positioned between the upper and lower planes

(i.e., the bone screw holes 36, 38, 40 and 42 in Fraser and, hence, the heads of the bone screws

46, 48 inserted therein, are not located between the upper plane and the lower plane as defined

by the upper and lower surfaces of the body).



FIG. 3

Similarly, as schematically illustrated in Fig. 8, reproduced below with annotations, the

bone screw holes 36, 38, 40 and 42 formed in the plate 20, and hence the heads of the bone

14

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

screws 46, 48, are not positioned between the upper and lower planes of the body 10 when the

plate 20 is coupled to the body 10.



Upper Plane

Lower Plane

Heads of the bone screws still are
not positioned between the upper
and lower planes of the body when
the plate is coupled to the body.

*FIG.8*

   In addition, the specification of Fraser makes it clear that the embodiment of Fig. 8

includes the plate extensions or tabs 36', 38', 40' and 42' extending from the top and bottom

surfaces of the plate 20.  According to Fraser's specification, "FIG. 8 depicts a portion of the

spine following placement of the fusion cage of FIG. 1."  Fraser at [0016].  Also, "FIG. 3 is a

side view of the fusion cage of FIG. 1 with bone screws."  Fraser at [0011].  Further, "FIG. 2 is a

view of the anterior face of the fusion cage of FIG. 1."  Fraser at [0010].  Thus, Figs. 2, 3, and 8

15

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

illustrate the very same fusion cage of Fig. 1.  As can very clearly be seen in Figs. 2 and 3, tabs 36', 38', 40' and 42' extend beyond the top and bottom surfaces of the plate 20.  Thus, the heads of the bone screws 46, 48, are not positioned between the upper and lower planes of the body 10 when the plate 20 is coupled to the body 10 and the screws are in an assembled configuration.

Moreover, the pending rejection of independent claim 1 as being anticipated by Fraser is in error because Fraser fails to disclose an intervertebral implant including a body and a plate coupled to the body wherein the body includes an upper surface and a lower surface, the upper surface defining an upper plane and the lower surface defining a lower plane.  The plate further including first and second boreholes passing through the plate wherein the first and second boreholes are positioned between the upper and lower planes such that the heads of the first and second bone screws are positioned between the upper and lower planes.  The plate including a plate top surface located generally on the upper plane and a plate lower surface located generally on the lower plane when the plate is coupled to the body so that the body has a first height extending between the upper surface and the lower surface and the plate has a second height extending between the plate top surface and the plate lower surface, the second height being generally equal to the first height.  The heads of the first and second bone screws positioned between the upper and lower planes.  *That is, independent claim 1 requires, inter alia, a body having an upper surface and a lower surface defining a first height and a plate having a plate top surface and a plate lower surface defining a second height, wherein first and second bone screw holes are positioned between the plate top surface and the plate lower surface.  The second height being generally equal to the first height.*

16

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

Fraser discloses a body 10 and a plate 20 wherein the plate 20 includes a plurality of plate extensions or tabs 36', 38', 40' and 42' having bone screw holes 36, 38, 40 and 42, respectively.  Thus, in order for the bone screw holes 36, 38, 40 and 42, and hence the heads of the bone screws 46, 48, to be positioned between the plate top surface and the plate lower surface, as required by pending independent claim 1, the tabs 36', 38', 40' and 42' must define the plate top surface and the plate lower surface.  As such, the height of the plate in Fraser must include the tabs 36', 38', 40' and 42'.  Accordingly, Fraser fails to disclose that the plate top surface is located generally on the upper plane and the plate lower surface is located generally on the lower plane.  In addition, Fraser fails to disclose that the height of the plate, which extends between the plate top surface and the plate lower surface, is generally equal to the height of the body, which extends between the upper surface and the lower surface of the body.  ***That is, in Fraser in order for the heads of the bone screws to be positioned between the plate top surface and the plate lower surface, the height of the plate must be substantially greater than the height of the body since the height of the plate must include the height of the tabs.***

Accordingly, it is respectfully submitted that Fraser does not disclose, teach or suggest all of the limitations of independent claim 1.  Thus, it is respectfully submitted that independent claim 1 is allowable over Fraser.  Withdrawal of this rejection and allowance of independent claim 1 is respectfully requested.

Furthermore, as claims 2-16 all depend from independent claim 1, it is submitted that these claims are equally allowable.  Withdrawal of these rejections and allowance of claims 2-16 is also respectfully requested.

17

Application No. 12/574,222
Amendment filed June 8, 2010
Response to Office Action dated April 2, 2010

## CONCLUSION

Based upon the above-listed amendments and remarks, Applicants respectfully submit that the present application, including claims 1-16, is in condition for allowance and such action is respectfully requested.

No fee is believed due for this submission.  If, however, the Commissioner determines otherwise, the Commissioner is authorized to charge any fees which may now or hereafter be due in this application to Deposit Account No. 19-4709.

In the event that there are any questions, or should additional information be required, please contact Applicant's attorney at the number listed below.

Respectfully submitted,

Date:   June 8, 2010 _____

/Giuseppe Molaro/
_____
Giuseppe Molaro
Registration No. 52,039

_____
For: Brian M. Rothery
Registration No. 35,340

Attorney for Applicants
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York  10038
(212) 806-6114

18

NY 72788568v1

A0710

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/199,599 | 08/08/2005 | Beat Lechmann | 001227.0198 | 3095 |

69095          7590          04/01/2009
STROOCK & STROOCK & LAVAN, LLP
180 MAIDEN LANE
NEW YORK, NY 10038

| EXAMINER |
|---|
| SCHNEIDER, LYNNSY M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 4118 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/01/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

A0711

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 11/199,599 | LECHMANN ET AL. |
| | **Examiner** | **Art Unit** | |
| | LYNNSY SCHNEIDER | 4118 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☒ Responsive to communication(s) filed on <u>09 January 2008</u>.

2a)☐ This action is **FINAL**.     2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

4)☒ Claim(s) *1-5,7-16,18-20,22 and 24-46* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-5,7-16,18-20,22 and 24-46* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

## Application Papers

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>08 August 2005</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>11/7/2005, 12/12/2007, 1/31/2008, 2/4/2008, 2/17/2009.</u>

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

**Application No.**

## DETAILED ACTION

This office action is responsive to the amendment filed on 1/9/2008. As directed by the amendment: claims 1, 2, 4, 5, 7-16, 18-20, 24, 25, and 27-41 have been amended, claims 6, 17, 21, and 23 have been cancelled  and claims 43-46 have been added.  Thus, claims 1-5, 7-16, 18-20, 22, and 24-46 are presently pending in this application.

### *Claim Rejections - 35 USC § 112*

1.     The following is a quotation of the first paragraph of 35 U.S.C. 112:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

2.     Claim 42 is rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the enablement requirement.  The claim(s) contains subject matter which was not described in the specification in such a way as to enable one skilled in the art to which it pertains, or with which it is most nearly connected, to make and/or use the invention. Claim 42 recites the limitation that the longitudinal elements are tension chorded between steps b and c.  The disclosure contains the term "tension chord", but it is unclear what tension chord means.  For examination purposes, tension chord will be interpreted to mean the front plate and screw assembly as disclosed in paragraph 0033 of the disclosure.

3.     The following is a quotation of the second paragraph of 35 U.S.C. 112:

Application/Control Number: 11/199,599                                    Page 3
Art Unit: 4118

> The specification shall conclude with one or more claims particularly pointing out and distinctly
> claiming the subject matter which the applicant regards as his invention.

4.      Claims 16, 32, 33, 39, and 40 are rejected under 35 U.S.C. 112, second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which applicant regards as the invention.

5.      Claim 16 recites the limitation "the partial boreholes".  There is insufficient

antecedent basis for this limitation in the claim.

6.      Claim 32 recites the limitation "the internal thread".  There is insufficient

antecedent basis for this limitation in the claim.

7.      Claim 33 recites the limitation "the conicity".  There is insufficient antecedent

basis for this limitation in the claim.

8.      A broad range or limitation together with a narrow range or limitation that falls

within the broad range or limitation (in the same claim) is considered indefinite, since

the resulting claim does not clearly set forth the metes and bounds of the patent

protection desired.  See MPEP § 2173.05(c).  Note the explanation given by the Board

of Patent Appeals and Interferences in *Ex parte Wu*, 10 USPQ2d 2031, 2033 (Bd. Pat.

App. & Inter. 1989), as to where broad language is followed by "such as" and then

narrow language.  The Board stated that this can render a claim indefinite by raising a

question or doubt as to whether the feature introduced by such language is (a) merely

exemplary of the remainder of the claim, and therefore not required, or (b) a required

feature of the claims.  Note also, for example, the decisions of *Ex parte Steigewald*, 131

USPQ 74 (Bd. App. 1961); *Ex parte Hall*, 83 USPQ 38 (Bd. App. 1948); and *Ex parte*

*Hasche*, 86 USPQ 481 (Bd. App. 1949).  In the present instance, claim 39 recites the

broad recitation "a load thread angle of 11° to 14°", and the claim also recites, "more

specifically of 12° to 13°" which is the narrower statement of the range/limitation.

9.      Claim 40 recites the broad recitation "a pitch angle ranging from 6° to 10°", and

the claim also recites, "more specifically from 7° to 9°" which is the narrower statement

of the range/limitation.


### *Claim Rejections - 35 USC § 102*

10.     The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.

11.     Claims 1, 3, 4, 10, 13, 14, 26-29, 35, and 41 are rejected under 35 U.S.C. 102(a)

as being anticipated by Fiere et al. (Pat. No. US 7,172,627 B2).

Fiere et al. disclose an intervertebral implant 1 (figure 1) comprising:

a three-dimensional body 4 (figure 1) having an upper side 12 (figure 2) and an

underside 13 (figure 2) suitable for abutting to the end plates of two adjacent vertebral

bodies (col. 3, lines 11-15), a left side surface 9 (figure 1) and a right side surface 8

(figure 1), a front surface 6 (figure 1) and a rear surface 7 (figure 1), a horizontal middle

plane T (figure 2) between the upper side 12 and the underside 13, and a vertical

middle plane extending from the front surface to the rear surface, the three-dimensional

body 4 further comprising a front plate 17 (figure 1) mounted to the front side 6 of the

three-dimensional body 4 (figure 2), the front plate 17 including a first borehole top 18

and a second borehole bottom 18 (figure 1) having openings, first and second fixation

elements 19 being anchorable within the first and second boreholes (figure 3); and a

securing plate 20 (figure 1) fastened substantially parallel to the front plate 17 (figure 1)

in such a manner that the first and second boreholes 18 of the front plate 17 and the

first and second fixation elements 19 are covered at least partly by the securing plates

20 (col. 3, lines 30-38).  The securing plate 20 has a central borehole (illustrated in

figure 1 below).  The front plate 17 has a central borehole 24 (figure 1) for

accommodating a fastening agent 22 (figure 1).  The front plate 17 is disposed vertically

relative to the horizontal middle plane T (figure 2).  The side surfaces 6, 8, and 9 and

upper and under sides 12 and 13 are constructed convexly (figures 1 and 2).  The first

and second boreholes 18 of the front plate have a smooth inner wall (figure 1).  The

upper side and under side of the body 4 are provided with tooth-like structures 14

(figure 2).  The body 4 is constructed as a hollow body and includes casing surfaces 6,

8, and 9 which are provided with perforations 23 (figure 1).  The first and second fixation

elements 19 include a head, a tip, a shaft, and an axis (figure 1).  The heads are in

contact with the securing plate 20 which is fastened at the front plate 17 (col. 3, lines

30-38).  The heads taper conically toward the shafts (Fig. 2).  The first and second

fixation elements 19 are constructed as bone screws, the shafts of which are provided

with a thread (Fig. 3) capable of self-drilling and self-cutting.

Fiere also discloses a method for implanting an intervertebral implant between

two adjacent vertebral bodies, the method comprising the steps of:

(a) introducing the intervertebral implant 1, having a three-dimensional body 4, a front

plate 17, and one or more boreholes 18, between two adjacent vertebral bodies 2 and 3

(col. 4, lines 27-39);

(b) attaching longitudinal fixation elements 19 and 22 with heads through the boreholes

18 of the front plate 17 and borehole 23 of the three-dimensional body 4 and into the

vertebral bodies 2 and 3 (col. 4, lines 35-39); tension chording fixation elements 19 and

front plate 17 (figure 3) and

(c) attaching a securing plate 20 with a fastening agent over the heads of the

longitudinal fixation elements 19 to the front plate 17, such that the heads of the

longitudinal fixation elements are captured between the front plate 17 and the securing

plate 20 wherein the longitudinal fixation elements 19 are secured against being shifted

relative to the intervertebral implant (col. 3, lines 30-38).


### Claim Rejections - 35 USC § 103

12.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

13.     Claim 2 is rejected under 35 U.S.C. 103(a) as being unpatentable over Fiere et

al. in view of LeHuec et al. (Pub. No. US 2002/0147450 A1).

        Regarding claim 2, Fiere et al. disclose the claimed invention, but is silent to the

mechanism by which the securing plate is fastened to the front plate.

LeHuec et al. teaches a securing plate 32 (figures 5 and 6) that is similar to the securing plate of the Fiere et al. reference.  Securing plate 32 is fastened to the front plate by means of a clip connection, as illustrated in figure 6 for the purpose of preventing the securing plate from becoming dislodged from plate 7 (paragraph 0050)

It would have been obvious to one skilled in the art at the time the invention was made to modify the securing plate of the Fiere et al. reference to be fastened to the front plate by a clip connection as taught by LeHuec et al. for the purpose of preventing the securing plate from becoming dislodged from the front plate (paragraph 0050), while still allowing it to perform the function of rotating to cover the screw heads as disclosed in col. 2, lines 30-38 of the Fiere et al. reference.

14.    Claims 11, 12, 18-20, 22, 24, 30, and 44-46 are rejected under 35 U.S.C. 103(a) as being unpatentable over Fiere et al. in view of Fraser (Pub. No. US 2002/0193880 A1).

Regarding claim 11, Fiere et al. discloses the claimed invention except for the front plate being disposed in the three-dimensional body, such that it can be shifted vertically relative to the middle plane.

Fraser teaches that the front plate 20 can be mated to the body 10 to allow movement with respect to each other in the superior/inferior (vertical) direction (paragraph 0022).

It would have been obvious to one skilled in the art at the time the invention was made to modify the front plate of the Fiere et al. reference to be able to move vertically relative to the middle plane, as taught by Fraser, for the purpose of allowing movement

between the plate and the body (paragraph 0022), thereby providing the patient with a wider range of motion.

Regarding claims 12 and 24, Fiere et al. discloses the claimed invention, but is silent to the material of the front plate being different from that of the three-dimensional body, the front plate being metallic and the three-dimensional body consisting partly of a material which is transparent to x-rays.

Fraser teaches that the front plate 20 can be made of titanium and that the body 10 can be made of carbon fiber or any other radiolucent material (paragraphs 0020 and 0021).

It would have been obvious to one having ordinary skill in the art at the time the invention was made to construct the front plate of a metallic material so that the surgeon can visualize the location of the plate during insertion, and to construct the three-dimensional body to consist partly of a material which is transparent to x-rays so that the surgeon can still visualize the endplates of the adjacent vertebrae after insertion.

Regarding claim 22, Fiere et al. discloses the claimed invention, but is silent to the material of the three-dimensional body consisting of a plastic which has not been reinforced.

It would have been obvious to one having ordinary skill in the art at the time the invention was made to fabricate the three the three-dimensional body out of a plastic which has not been reinforced, since it has been held to be within the general skill of a worker in the art to select a known material on the basis of its suitability for the intended use as a matter of obvious design choice.  In re Leshin, 125 USPQ 416.

Application/Control Number: 11/199,599                                    Page 9
Art Unit: 4118

Regarding claims 18-20, 30, and 44-46, Fiere et al. discloses the claimed

invention except for the axes of the first and second boreholes diverging and defining an

angle β, ranging from 20° to 60°, more specifically 36° to 48° with the horizontal middle

plane, and the axes of the first and second boreholes enclosing an angle α ranging from

10° to 45°, more specifically 27° to 33° with the vertical middle plane.

Fraser teaches a plate 20 (figure 3) that is attached to a body 10 (figure 3), the

plate having diverging boreholes 36, 38, 40, and 42 (figure 2) defining an angle α with

both the horizontal and vertical middle planes (figure 3).  As shown in figure 3, the angle

α is the same with respect to both planes.  For examination purposes angles α and β

from the claims will be considered interchangeable.  Fraser teaches that the angle α can

range from 15° to 60°, and for most applications α is about 20° (paragraph 0026).

Fraser also shows the axes of the first and second fixation elements 46 and 48 (figure

3) intersect the horizontal middle plane P of the body 10 (figure 3).  Fraser teaches that

the angle α is determined by a particular situation and a patient's anatomy (paragraph

0026).

Therefore, it would have been obvious to one skilled in the art at the time the

invention was made to modify the boreholes of the Fiere et al. to diverge and be angled

with respect to the horizontal middle plane, as taught by Fraser for the purpose of

matching a patient's anatomy (paragraph 0026).  Furthermore, with respect to the

specific angles claimed, it would have been obvious to one having ordinary skill in the

art at the time the invention was made to angle the boreholes of the Fiere et al.

reference as modified by Fraser to be at an angle an angle β, ranging from 20° to 60°,

Application/Control Number: 11/199,599                                    Page 10
Art Unit: 4118

more specifically 36° to 48° with the horizontal middle plane, or an angle α ranging from

10° to 45°, more specifically 27° to 33° with the vertical middle plane, since it has been

held that where the general conditions of a claim are disclosed in the prior art,

discovering the optimum or workable ranges involves only routine skill in the art.  In re

Aller, 105 USPQ 233.

15.     Claims 5, 25, 31, 32, and 34 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Fiere et al. in view of Michelson (Pub. No. US 2003/0078668 A1).

        Regarding claims 5, 25 and 32, Fiere et al. discloses the claimed invention, but is

silent to the first and second boreholes including internal threads and to the fixation

elements including a threaded head.

        Michelson teaches a threaded borehole 638 (figure 41) for the purpose of locking

a threaded screw 642 with a threaded head 652 (figure 41) into the threaded borehole

630 (paragraph 0117).

        It would have been obvious to one skilled in the art at the time the invention was

made to modify the boreholes and fixation elements of the Fiere et al. reference to

include mating threads for the purpose of locking the screw into the borehole

(paragraph 0117).

        Regarding claims 31 and 34, Fiere et al. discloses the claimed invention except

for the first fixation element piercing/passing through the upper side and the second

fixation element piercing/passing through the underside.

Michelson teaches first and second fixation elements 342 (figure 15) that

pierce/pass through the upper and lower sides 306 and 308 of the implant (figure 15) for

the purpose of properly aligning the fixation elements 342 (paragraph 0094) .

It would have been obvious to one skilled in the art at the time the invention was

made to pass the fixation elements through the upper and lower sides of the body of the

implant of the Fiere et al. reference as taught by Michelson for the purpose of properly

aligning the fixation elements.

16.      Claims 7, 8, 9, and 43 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Fiere et al. in view of Michelson (Pub. No. US 2003/0078668 A1) and

further in view of Dixon et al. (Pub. No. US 2002/0082603 A1).

Regarding claims 7, 8, 9, and 43, Fiere et al. in view of Michelson disclose the

claimed invention except for the boreholes being tapered conically in the direction of the

underside of the three-dimensional body at a conical angle which is smaller than a

resulting angle of friction, the conicity of the boreholes ranging from 1:3.75 to 1:20.00, or

1:5 to 1:15.

Dixon et al. teaches a bone plate 12 having boreholes 13 which are conical and

angled toward the vertebral disc space (figure 3) at an angle α for the purpose of giving

the screws pull out resistance (paragraph 0036).

It would have been obvious to one skilled in the art at the time the invention was

made to modify the threaded boreholes as taught by the combination of the Fiere et al.

reference and the Michelson reference to be tapered conically in the direction of the

underside of the three dimensional body as taught by Dixon et al. for the purpose of