IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DEPUY SYNTHES PRODUCTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| v. | ) | C.A. No. 11-652-LPS |
| | ) | |
| GLOBUS MEDICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S ANSWERING BRIEF TO**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Matthew J. Becker
Jeremy C. Lowe
Edward M. Mathias
Tara R. Rahemba
AXINN, VELTROP & HARKRIDER LLP
90 State House Square, 9th Floor
Hartford, CT 06103
(860) 275-8100

Diane C. Ragosa
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200

Dated:   March 4, 2013

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENT .................................................................................... 1

RESPONSE TO GLOBUS' STATEMENT OF FACTS............................................... 2

ARGUMENT .............................................................................................................. 6

I.  THE ACCUSED PRODUCTS MEET THE "SECURING
    PLATE," "SECURING MECHANISM" AND RELATED LIMITATIONS. ................ 6

    A.  Globus' Motion Is Based on The Incorrect Assertion
        That The Securing Plate Must Be A Stand-Alone Structure. .................................. 6

    B.  The Head of The Blocking Set Screw Is
        Fastened Substantially Parallel to The Plate. ....................................................... 7

    C.  The Head of The Blocking Set Screw "Covers"
        and Is "Over" The Boreholes and Fixation Element Heads. ................................... 8

    D.  The Attachment of Globus' Securing Plate
        Meets The Elements of Claim 38 of The '207 Patent............................................ 10

    E.  Globus' Accused Products Meet The Securing Plate
        Limitations at Least under The Doctrine of Equivalents. ...................................... 11

    F.  The Coalition Large Devices Meet The Securing
        Plate and Securing Mechanism Limitations under DOE. ....................................... 13

II. THE ACCUSED PRODUCTS MEET THE HEIGHT
    LIMITATION UNDER BOTH PARTIES' CONSTRUCTIONS. ................................. 14

    A.  The Accused Products Meet Both Parties'
        Constructions of The Height Limitation. .............................................................. 15

    B.  Synthes' Construction Would Not Recapture Fraser. .............................................. 15

    C.  Synthes Did Not "Change" Its Proposed Construction of The Height Limitation. . 18

    D.  The Accused Products Meet The  Height
        Limitation under Both Proposed Constructions. .................................................... 18

    E.  Factual Issues Preclude Summary
        Judgment on The Height Limitation under DOE. ................................................... 20

III. GLOBUS IS NOT ENTITLED TO SUMMARY JUDGMENT
     ON THE '076 PATENT BASED ON THE BOREHOLE LIMITATION. .................... 21

IV.  GLOBUS IS NOT ENTITLED TO
     SUMMARY JUDGMENT  ON CLAIMS 1 AND 42
     OF THE '207 PATENT BASED ON THE ANCHORABLE LIMITATION. ............... 25

V.   GLOBUS IS NOT ENTITLED TO  SUMMARY
     JUDGMENT OF NON-INFRINGEMENT ON THE NEW PRODUCTS..................... 27

VI.  GLOBUS IS NOT ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY. ...... 28

A.    The Asserted Claims of The '076 Patent
      Are Not Invalid under 35 U.S.C. § 112. ................................................. 28

B.    The "Substantially Equal," "Generally Equal"
      and "Substantially Between" Limitations Are Not Indefinite. ............................... 28

VII.   GLOBUS IS NOT ENTITLED TO SUMMARY
       JUDGMENT ON SECONDARY CONSIDERATIONS ................................................. 30

A.    Under the Proper Legal Standard, Genuine Issues
      of Material Fact Preclude Summary Judgment of No Commercial Success. .......... 31

B.    Numerous Advantages Inherent in  Synthes'
      Claimed  Inventions Also Preclude Summary Judgment
      on Commercial Success and All Other Secondary Considerations. ....................... 32

C.    Synthes' Copying Claims Also Must Stand ............................................................. 34

VIII.  GLOBUS IS NOT ENTITLED TO  SUMMARY
       JUDGMENT OF NO WILLFUL INFRINGEMENT. .................................................. 35

A.    Legal Standard ........................................................................................................ 35

B.    Globus Has No Reasonable Defenses. .................................................................... 35

C.    Globus Knew Or Should Have Known of The Objective Risk. ............................. 37

      1. Globus' Pre-Suit Conduct Establishes Willful Infringement. ........................... 37

      2. Globus' Post-Suit Conduct Shows Willful Infringement. ................................. 40

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Acumed LLC v. Stryker Corp.,
  483 F.3d 800 (Fed. Cir. 2007).........................................................................................7

Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc.,
  No. 8:10-cv-486-T-23TGW, 2012 U.S. Dist. LEXIS 20952 (M.D. Fla. Feb. 21, 2012)........29

Advanced Display Sys. v. Kent State Univ.,
  212 F.3d 1272 (Fed. Cir. 2000)......................................................................................34

Am. Superconductor Corp. v. S & C Elec. Co.,
  Civ. A. No. 11-10033-FDS, 2012 U.S. Dist. LEXIS 167132 (D. Mass. Nov. 26, 2012)........29

Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.,
  Civ. A. No. 09-598-LPS, 2011 U.S. Dist. LEXIS 105568 (D. Del. Sept. 16, 2011).........35, 39

Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.,
  Civ. A. No. 09-598-LPS, 2011 U.S. Dist. LEXIS 18081 (D. Del. Feb. 23, 2011) .................29

Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.,
  682 F.3d 1003 (Fed. Cir. 2012)......................................................................................36

Becton Dickinson and Co. v. C.R. Bard, Inc.,
  922 F.2d 792 (Fed. Cir. 1990).........................................................................................7

Bose Corp. v. JBL, Inc.,
  274 F.3d 1354 (Fed. Cir. 2001)......................................................................................23

Boston Sci. Corp. v. Cordis Corp.,
  Civ. No. 10-315-SLR, 2011 U.S. Dist. LEXIS 46210 (D. Del. Apr. 28, 2011) .....................37

Conopco, Inc. v. May Dep't Stores Co.,
  46 F.3d 1556 (Fed. Cir. 1994)........................................................................................40

CSB-System Int'l Inc. v. SAP Am., Inc.,
  Civ. A. No. 10-2156, 2012 U.S. Dist. LEXIS 58410 (E.D. Pa. Apr. 25, 2012) ...............35, 36

Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,
  851 F.2d 1387 (Fed. Cir. 1988).................................................................................30, 31

Dolly, Inc. v. Spalding & Evenflo Cos,
  16 F.3d 394 (Fed. Cir. 1994).........................................................................................14

Enzo Biochem, Inc. v. Applera Corp.,
  599 F.3d 1325 (Fed. Cir. 2010).................................................................................29, 30

Exxon Research & Eng'g Co. v. U.S.,
   265 F.3d 1371 (Fed. Cir. 2001).................................................................................30

Fla. Power & Light Co. v. United States,
   198 F.3d 1358 (Fed. Cir. 1999).................................................................................27

Fujitsu Ltd. v. Belkin Int'l, Inc.,
   Case No.: 10-CV-03972-LHK, 2012 U.S. Dist. LEXIS 142102 (N.D. Cal. Sept. 28,
   2012) ........................................................................................................................36

Gustafson, Inc. v. Intersystems Indus. Prods, Inc.,
   897 F.2d 508 (Fed. Cir. 1990)...................................................................................39

In re Cyclobenzaprene Hydrochloride Extended-Release Capsule Patent Litig.,
   676 F.3d 1063 (Fed. Cir. 2012), cert. denied, No. 12-514 (Jan. 14, 2013).......................30, 31

In re Glatt Air Techniques, Inc.,
   630 F.3d 1026 (Fed. Cir. 2011).................................................................................33

In re Seagate,
   497 F.3d 1360 (Fed. Cir. 2007).........................................................................2, 35, 38

Innovention Toys, LLC v. MGA Entertainment, Inc.,
   No. 2:07-cv-06510-SM-ALC, Order ........................................................................38

Insituform Techs., Inc. v. Cat Contr., Inc.,
   161 F.3d 688 (Fed. Cir. 1988)...................................................................................24

Int'l Rectifier Corp. v. IXYS Corp.,
   383 F.3d 1312 (Fed. Cir. 2004).................................................................................27

Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc.,
   Civ. A. No. 08-0515, 2012 U.S. Dist. LEXIS 135839 (S.D.N.Y. Aug. 23, 2012) .................36

Linear Tech. Corp. v. Int'l Trade Comm'n,
   566 F.3d 1049 (Fed. Cir. 2009).................................................................................17

Medrad, Inc. v. MRI Devices Corp.,
   401 F.3d 1313 (Fed. Cir. 2005).................................................................................29

Medtronic, Inc. v. Daig Corp.,
   789 F.2d 903 (Fed. Cir. 1986)...................................................................................33

Modine Mfg. Co. v. United States Int'l Trade Comm'n,
   75 F.3d 1545 (Fed.Cir.1996).....................................................................................28

Nat'l Presto Indus., Inc. v. West Bend Co.,
   76 F.3d 1185 (Fed. Cir. 1996)...................................................................................38

iv

Overhead Door Corp. v. Chamberlain Group, Inc.,
    194 F.3d 1261 (Fed. Cir. 1999)..................................................................................11, 12

ProBatter Sports, LLC v. Joyner Techs., Inc.,
    518 F. Supp. 2d 1051 (N.D. Iowa 2007)..............................................................16

Sargent Mfg. Co. v. Cal-Royal Prods., Inc.,
    Civ. A. No. 3:08-cv-408 (VLB), 2012 U.S. Dist. LEXIS 23852 (D. Conn. Feb. 24,
    2012) ...........................................................................................................38

St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.,
    Civ. A. No. 04-1436-JJF-LPS, 2009 U.S. Dist. LEXIS 66359 (D. Del. July 28, 2009)..........37

State Indus., Inc. v. A.O. Smith Corp.,
    751 F.2d 1226 (Fed. Cir. 1985)........................................................................40

Tarkus Imaging, Inc. v. Adobe Systems, Inc.,
    No. 10-63-LPS, 2012 U.S. Dist. LEXIS 82477 (D. Del. June 14, 2012) ...................12, 23, 25

Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,
    279 F.3d 1357 (Fed. Cir. 2002)........................................................................28

Tomita Techs. USA, LLC v. Nintendo Co., Ltd.,
    11 Civ. 4256 (JSR), 2012 U.S. Dist. LEXIS 92196 (S.D.N.Y. June 25, 2012)...........37, 38, 39

TruePosition Inc. v. Andrew Corp.,
    611 F. Supp. 2d 400 (D. Del. 2009)...................................................................40

Turbocare Div. of Demag Delaval Turbomachinery Corp. v. GE,
    264 F.3d 1111 (Fed. Cir. 2001)........................................................................23

Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,
    520 U.S. 17 (1997)........................................................................................11

STATUTES

35 U.S.C. §112................................................................................................... passim

35 U.S.C. § 271(a) ..............................................................................................40

OTHER AUTHORITIES

D. Del. L. R. 7.1.3(c)(2)........................................................................................34

## CITATION KEY

For the Court's convenience, Exhibits A through D are attached to this Answering Brief. (Exhibits A through C are the Asserted Patents, and Exhibit D is a Declaration of Wilson C. Hayes, Ph.D., one of Plaintiff Synthes' liability experts.)  Pursuant to Local Rule 1.3(d), other citations in this Brief are included in Synthes' Appendix to its Answering Brief, and "B" refers to the specific appendix page on which the cited material may be found.

In addition, Synthes has highlighted portions of some documents in the appendix in yellow to make it easier for the Court to determine exactly what part(s) of the document support Synthes' position.

Below is a list of citation formats for expert-related documents that are used throughout the brief:

| Document | Short Cite |
|---|---|
| *Synthes' Experts* | |
| November 5, 2012 Infringement Expert Report of Wilson C. Hayes, Ph.D. Regarding Independence, Coalition and InterContinental | Hayes Op. Rep. |
| December 14, 2012 Second Expert Report of Wilson C. Hayes, Ph.D. | Hayes 2nd Rep. |
| January 4, 2013 Reply Expert Report of Wilson C. Hayes, Ph.D. Regarding Infringement | Hayes Reply Rep. |
| Deposition Transcript of Wilson C. Hayes, Ph.D. | Hayes Dep. Tr. |
| November 5, 2012 Expert Report of Roger Härtl, M.D. | Härtl Op. Rep. |
| January 4, 2013 Reply Expert Report of Roger Härtl, M.D. | Härtl Reply Rep. |
| Deposition Transcript of Roger Härtl, M.D. | Härtl Dep. Tr. |
| December 14, 2012 Expert Report of Paul Ducheyne, Ph.D. Concerning Patent Validity | Ducheyne Rep. |
| Deposition Transcript of Paul Ducheyne, Ph.D. | Ducheyne Dep. Tr. |
| December 14, 2012 Expert Report of John F. Hall, M.D. | Hall Rep. |
| January 4, 2013 Second Expert Report of John F. Hall, M.D. | Hall 2nd Rep. |
| Deposition Transcript of John F. Hall, M.D. | Hall Dep. Tr. |
| November 5, 2012 Expert Report of Richard J. Gering, Ph.D., CLP | Gering Op. Rep. |

| Document | Short Cite |
|---|---|
| December 14, 2012 Expert Report of Richard J. Gering, Ph.D., CLP | Gering 2nd Rep. |
| January 4, 2013 Rebuttal Report of Richard J. Gering, Ph.D., CLP | Gering Reb. Rep. |
| Deposition Transcript of Richard J. Gering | Gering Dep. Tr. |
| *Globus' Experts* | |
| November 5, 2012 Expert Report of Domagoj Coric, M.D. Regarding the Invalidity of U.S. Patent Nos. 7,846,207, 7,862,616 and 7,875,076 | Coric Op. Rep. |
| December 14, 2012 Rebuttal Expert Report of Domagoj Coric, M.D. Regarding Noninfringement of U.S. Patent Nos. 7,846,207, 7,862,616 and 7,875,076 by Independence, Coalition and InterContinental | Coric Reb. Rep. |
| January 4, 2013 Reply Report of Dr. Domagoj Coric Regarding the Invalidity of U.S. Patent Nos. 7,846,207, 7,862,616 and 7,875,076 | Coric Reply Rep. |
| Deposition Transcript of Domagoj Coric, M.D. | Coric Dep. Tr. |
| December 14, 2012 Expert Report of James D. Woods, Ph.D. | Woods Rep. |
| Deposition Transcript of James D. Woods, Ph.D. | Woods Dep. Tr. |

Finally, below is a list of citation formats for Globus fact witness deposition transcripts that are used throughout the brief:

| Document | Short Cite |
|---|---|
| Deposition of Jason Gray | Gray Dep. Tr. |
| Deposition of Duncan Sibson | Sibson Dep. Tr. |
| Deposition of William Rhoda, Globus' 30(b)(6) witness | Rhoda Dep. Tr. |
| Deposition of Mark Adams | Adams Dep. Tr. |
| Deposition of Sean Suh | Suh Dep. Tr. |
| Deposition of Robert Miller | Miller Dep. Tr. |

## NATURE AND STAGE OF PROCEEDINGS

Synthes agrees with Globus' statement of the nature and stage of the proceedings.

## SUMMARY OF ARGUMENT

1.      Globus' motion as to the "securing plate" limitation should be denied because Globus' non-infringement arguments depend on importing limitations into the claims that are not part of any proposed construction, including that the securing plate be a standalone structure and that the securing plate cover the uppermost surface of the fixation element heads.  The Accused Products meet all the requirements of the "securing plate" limitation as properly construed.  At minimum, fact issues remain under Synthes' doctrine of equivalents claim.

2.      The Accused Products literally infringe the Height Limitation based on the actual requirements of both parties' constructions, and Globus presents no counterargument.  Rather, Globus' non-infringement arguments are based on unclaimed features that are not requirements of either party's proposed construction.  Moreover, contrary to Globus' assertion, Synthes' construction would not recapture the prior art.

3.      The Accused Products infringe the Borehole and Anchorable Limitations under Synthes' constructions, and factual issues remain at least under the doctrine of equivalents under Globus' constructions.

4.      Globus' motion for summary judgment of non-infringement on its Redesigned Products should be denied because there is no claim against those products in this case.

5.      The Asserted Claims are not invalid under 35 U.S.C. § 112.  Globus' written description and enablement arguments are premised on adoption of Globus' unsupported constructions.  And its indefiniteness argument incorrectly assumes that a term of approximation must be construed using a quantitative bright line standard.

1

6.      Globus' Motion for Summary Judgment of no secondary considerations ignores binding Federal Circuit precedent and improperly shifts the burden of proof to Synthes.  Globus also ignores numerous disputed issues of material fact concerning the advantages afforded by Synthes' patented inventions.

7.      Globus has failed to prove the absence of disputed material fact issues on both the objective and subjective prongs of the <u>Seagate</u> standard.  Its motion for summary judgment on willful infringement should thus be denied.

## <u>RESPONSE TO GLOBUS' STATEMENT OF FACTS</u>

The facts presented in this section clarify and correct Globus' Background and Statement of Undisputed Facts.  For convenience, Synthes has adopted Globus' paragraph numbering.

1.  The Asserted Patents cover a unique type of spinal implant having a plate and body (or spacer) located between vertebrae.  There are various types of devices used in spinal fusion procedures, in addition to the type of implant described in paragraph 1 of Globus' Facts section. (<u>See, e.g.</u>, Ducheyne Rep. (B2582-93) at B2583-89, ¶¶ 24-38.)

2.  The specifications of the Asserted Patents address disadvantages of the prior art, including:  (i) migration of the bone screws that can endanger nearly anatomic structures like the aorta, and possibly cause death; and (ii) potential instability of the implant, which can hinder the fusion process.  (<u>See, e.g.</u>, '207 patent (attached as Ex. A) at col. 1 ll. 18-46.)

3.  Globus' description of the advantages of the inventions is inaccurate and incomplete. First, the structures disclosed and claimed in the Asserted Patents enable a biomechanically strong implant that does not protrude anteriorly in a manner that can endanger nearby structures. (<u>See, e.g.</u>, Ducheyne Rep. at B2591-92, ¶ 385.)  The Asserted Patents never characterize the load-bearing ability of the body under compression as an "advantage."  Moreover, other passages in the Asserted Patents disclose that the plates of the inventive implants bear some of the load.

2

(See, e.g., '207 patent (Ex. A) at col. 1 ll. 55-60.  See also id. at Fig. 4 (depicting a plate that is taller than the body).)  None of the Asserted Patents require a certain portion of the implant to bear the compressive load.  Finally, the Asserted Patents provide other advantages.  For example, compared to the two-part implants of the prior art in which a front plate is implanted as separate step, the specifications of the Asserted Patents disclose an implant that may be implanted in a single step.  ('076 patent (attached as Ex. B) at col. 1 l. 65-col. 2 l. 3.)  The inventive implant also is fixed as frontally as possible in the vertebral body at a place where good bone material is usually present.  ('207 patent (Ex. A) at col. 2 ll. 20-27.)

4.  Globus' description of the figures in the patents (Figs. 1 and 3 of the '207 and '616 patents (Exs. A and C) and Figs. 5-7 of the '076 patent (Ex. B)) fails to fully explain the structural relationships and configurations that are described in the Asserted Patents.  For example, the Asserted Patents describe:  (1) a body and plate having "generally" or "substantially" equal heights (see, e.g., '616 patent at col.6, ll. 56-64); (2) boreholes in the plate aligned with partial boreholes in the body (see, e.g., id. at col. 6, ll. 45-50); and (3) boreholes in the plate positioned between or substantially between the upper and lower planes defined by the top and bottom surfaces of the body (see, e.g., '076 patent at col. 5, ll. 6-7).

5.  The Asserted Patents describe both rigid and non-rigid connections.  ('207 patent (Ex. A) at col. 4, l. 67 to col. 5, l. 4; Joint Claim Construction Br. (D.I. 52) at 51-52, 54-56.)

6.  The "securing plate" and "securing mechanism" limitations of the Asserted Claims are not limited to item 18 of Figure 7 of the '207 patent, as Globus suggests.  (See D.I. 52 at 32-34, 39-42.)

7.  Synthes will not address Globus' re-argument of  claim construction in paragraphs 7 and 8 because the parties' claim construction positions have already been presented to the Court.

(D.I. 52.)  Nothing in the Asserted Patents links the "generally/substantially equal" height requirement in the '616 and '076 patent claims ("the Height Limitation") and the boreholes "positioned between the upper and lower planes" limitation ("the Borehole Limitation") to the loading behavior of the implant.  (<u>See</u> Coric Dep. Tr. (B2012-34) at B2015-29, 308:17-309:3; 376:4-14.)

      8.  The Height Limitation and the Borehole Limitation were not "critical" during the prosecution of the Asserted Patents.

      10.  Globus copied Synthes' SynFix<sup>®</sup> and Zero-P<sup>®</sup> products, which were on the market before the Accused Products.



The New Products are not acceptable substitutes for the Accused Products because of various disadvantages.  (<u>See</u> Härtl Op. Rep. (B2082-89) at B2086-88, ¶¶ 70-74.  <u>See also</u> Härtl Reply Rep. (B2090-102) at B2096-101, ¶¶ 34-46; Hayes Reply Rep. (B2182-99) at B2194-98, ¶¶ 103-111.)  The fact that the New Products "bear the same name as the Accused Products," does not make them "relevant to the infringement analysis."  (D.I. 149 at ¶ 10.)  Given Globus' production delay (D.I. 95) and the case schedule, Synthes elected not to accuse the New Products of infringement in this lawsuit.

11.  In addition to Globus' description of the Accused Products in its paragraph 11, the bone screws in the Accused Products are insertable through boreholes in the plate, and then also pass through partial boreholes in the body, as required by some of the Asserted Claims, to affix the implant to the vertebrae.  Like the undisputedly patented SynFix and Zero-P products, the Accused Products also have radiographic markers.

12.  Globus' description of the relationship between the fixation elements and boreholes in the Accused Products is disputed (see, e.g., Hayes Dep. Tr. (B2110-12) at B2111, 236:13-237:11), and is irrelevant to infringement of the Asserted Patents as properly construed.

13.  The boreholes are not a part of the "eyebrows" in the Accused Products.  (See Coric Dep. Tr. at B2017-18, 312:24-313:1.)  ███████████████████████████████████
████████████████████████████████████████

14.  The torsional stabilizers in certain Accused Products are extensions from the top and bottom boundaries of the plate that, when installed, displace portions of the vertebral bodies but reside between vertebrae.  (See, e.g., Hayes Op. Rep. (B2117-81) at B2130-31, ¶¶ 95-97.) Globus incorrectly characterizes these extensions as contributing to the height of the plate.

15.  The head of the blocking set screw in the Accused Products is fastened substantially parallel to the front plate (see, e.g., Independence Technique Guide at B2251), and at least partly covers the boreholes and fixation element heads when in the "Locked Position."  (Id.)

17.  ███████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████  ████████



The Asserted Patents contemplate partial boreholes surrounded by metallic material.  (See, e.g., '076 patent (Ex. B) at col. 3 ll. 44-49; '207 patent (Ex. A) at col. 4 ll. 51-54.)  Moreover, this design change in the New Products ███████████████████████

**ARGUMENT**

I.      THE ACCUSED PRODUCTS MEET THE "SECURING PLATE,"
        "SECURING MECHANISM" AND RELATED LIMITATIONS.

   A.     Globus' Motion Is Based on The Incorrect
          Assertion That The Securing Plate Must Be A Stand-Alone Structure.

The head of what Globus calls the "blocking set screw" in the Accused Products meets

all the requirements of the parties' constructions of the "securing plate" and "securing

mechanism" limitations.[1]  Globus contends without support that the *entire* blocking set screw in the Accused Products must be compared to the "securing plate" and "securing mechanism" limitations in the Asserted Patents.  (See D.I. 149 at 12.)  In doing so, Globus improperly imports into both parties' constructions the requirement that the "securing plate" or "securing mechanism" be a stand-alone structure.  There is no such requirement in the relevant patent claims or the party's proposed constructions.  See Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007).  Under a proper infringement analysis, a portion of an integral structure may satisfy a claim limitation.  See, e.g., Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 797 (Fed. Cir. 1990) ("[A]dditional structure present in [an accused] device may . . . be disregarded in an infringement analysis.").

<blockquote>

**B.      The Head of The Blocking Set Screw
Is Fastened Substantially Parallel to The Plate.**

</blockquote>

The head of the blocking set screw in the Accused Products is a "plate"[2] that is "fastened substantially parallel" to the front plate.  (See, e.g., '207 patent (Ex. A) at col. 6 ll. 55-56.)  ███

████████████████████████████████████████████████████████████  the planar dimension of the head of the set screw is substantially parallel to the planar dimension of the front plate, and the shaft of the blocking set screw fastens the head of the blocking set screw to the front plate.  Therefore, the securing plate (the head of the blocking set screw) is "fastened

---

[1] The terms relating to the "securing plate" and "securing mechanism" limitations are terms 1, 15-16, 23-26 and 32 in the parties' Joint Claim Construction Statement (D.I. 53, Ex. A).

[2] Globus' expert concedes that the head of the blocking set screw is a "plate" under both parties' proposed constructions.  ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████  Thus, Globus' argument that "even ignoring the screw shaft," the blocking set screw in the Accused Products is not a "plate" (D.I. 149 at 15) is frivolous and unsupported.

substantially parallel to the front plate." (<u>See also</u> D.I. 149 at 13; ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮



     Globus states that "[n]o reasonable juror could conclude that the heads of the blocking set

screws" are parallel to the front plate, but fails to support its contention. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Globus' expert never opined that the *head* of the blocking set screw is not parallel to

the front plate. (Coric Reb. Rep. (B2213-32) at B2225-28, ¶¶ 133, 136-137, 139; D.I. 149 at 13.)

At a minimum, there is a disputed fact issue.

     C.    The Head of The Blocking Set Screw
               "Covers" and Is "Over" The Boreholes and Fixation Element Heads.

     Globus erroneously ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. (D.I. 149 at 14.)[3]  In fact,

Globus ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] Synthes' proposed construction of "the first and second boreholes of the front plate and the first and second heads are *covered at least partly by the securing plate*" in claims 1 and 42 of the '207 patent is "the securing plate partly or entirely covers the first and second boreholes of the front plate and the first and second heads of the fixation elements." (D.I. 53, Ex. A, term 23.) Globus' proposed construction of this term is "at least partly underneath and concealed by the rear surface of the securing plate." (<u>Id.</u>)

██████████████████████████████████████████████████████[4]   The Accused Products

thus meet Synthes' construction.  Moreover, the boreholes and fixation element heads are at least

partly underneath and concealed by the rear surface[5] of the securing plate, and the Accused

Products therefore also satisfy Globus' proposed construction.



---

[4] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[5] Globus' proposed constructions improperly require that the rear surface of the securing plate
rest against the front plate and conceal and be on top of the fixation element heads and boreholes.
(D.I. 52; D.I. 53, Ex. A.)  Even importing this "rear surface" limitation into the claims, there is at
least a factual issue ████████████████████████



Globus appears to argue that the securing plate must "cover" or be over the *uppermost surface* of the borehole and the *uppermost surface* of the fixation element head.  (D.I. 149 at 13-14; see also Coric Dep. Ex. 20 (B2361).)  This argument imports into the claim a limitation that is not required by either party's construction of "securing plate" or related terms.  The head of the fixation element is not limited to just the uppermost surface, as Globus implies.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

Accordingly, Globus fails to demonstrate that the head of the blocking set screw in each of the Accused Products does not meet the "securing plate" limitations.  To the contrary, the heads of the blocking set screws in Globus' Accused Products literally satisfy the "securing plate" and related limitations at least under Synthes' proposed constructions.

   D.    The Attachment of Globus' Securing Plate
          Meets The Elements of Claim 38 of The '207 Patent.

The movement of the head of the blocking set screw in Globus' Accused Products into the locked position satisfies the fourth step of claim 38 of the '207 patent – "attaching a securing plate with a fastening agent *over the first and second head portions of the first and second fixation elements* to the front plate . . . ."  ('207 patent (Ex. A) at col. 9 ll. 6-8 (emphasis added);

see also Härtl Reply Rep. at B2091-93, ¶¶ 10, 29-30.) ███████████████

███████████████ after implantation, the head of the blocking set screw in Globus' Accused

Products is "over" a part of the fixation element heads,[6] and the fixation element heads in

Globus' Accused Products are captured at least partly between the front plate and the securing

plate.

Globus instructs surgeons to ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ The securing

plate is not "attached . . . over" the fixation element heads until the surgeon performs this step.

Accordingly, Globus' argument that "no reasonable juror" could consider the last step of

claim 38 to be met by the surgeons who implant the Accused Products (D.I. 149 at 16) is

unsupported.

     E.    Globus' Accused Products Meet The Securing Plate
          Limitations at Least under The Doctrine of Equivalents.

Globus' doctrine of equivalents ("DOE") analysis of the "securing plate" limitation is

fatally flawed.  The correct Function-Way-Result[7] analysis establishes that the Accused Products

---

[6] Although Globus' constructions require the securing plate to be fastened "entirely on top of" the fixation element heads, and the fixation element heads to be "captured entirely within a space separating the front plate and the securing plate," as Synthes explained in the Joint Claim Construction Brief, such constructions cannot be correct because, *inter alia*, they read the preferred embodiment out of the claims.  (D.I. 52 at 69-71.)

[7] "Function-Way-Result" refers to one test recognized by courts to be useful in determining whether an element of an accused device is insubstantially different from a claim element, particularly in the mechanical arts.  See Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1270 (Fed. Cir. 1999); Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 39-40 (1997).  This test determines whether the element in the accused product performs substantially the same function in substantially the same way to achieve substantially the same result as the claim element.  See Warner-Jenkinson, 520 U.S. at 39-40.

meet the "securing plate" limitations under the doctrine or equivalents or, at a minimum, that there are factual issues in dispute.[8]

Globus concedes that the function of the "securing plate" is to inhibit screw movement. (See D.I. 149 at 17; Coric Reply Rep. (B2362-65) at B2365, ¶ 136; Coric Dep. Tr. at B2028, 357:6-14.)  Globus' analysis of the "way" prong of the Function-Way-Result test is legally incorrect, however, because Globus does not focus on the way this undisputed function is performed.  See, e.g., Overhead Door, 194 F.3d at 1270.  Globus instead addresses the "way" in which the securing plates in Globus' Accused Products are *installed* (D.I. 149 at 17), which is irrelevant.  The improper analysis of the "way" prong infects its treatment of the "result" prong of the test.  It is undisputed that the way the securing plate performs its function is by blocking the path of the fixation elements, and that the "result" is that the fixation elements are blocked from backing out of the implant.  (See, e.g., Hayes Op. Rep. at B2166-67, ¶¶ 211-212.)  It is undisputed that the head of the blocking set screw in the Accused Products produces this same result.  (Coric Dep. Tr. at B2028, 357:16-19.)  There is no dispute that the Accused Products meet the "securing plate" limitation under a legally correct DOE analysis.

At minimum, this issue "present[s] a 'battle of the experts' that is not amenable to resolution prior to the presentation of evidence, including testimony."  Tarkus Imaging, Inc. v. Adobe Systems, Inc., No. 10-63-LPS, 2012 U.S. Dist. LEXIS 82477, at *2-3 (D. Del. June 14, 2012).  (See, e.g., Hayes Op. Rep. at B2147-58, ¶¶ 138-139, 141, 143, 148-149, 151, 153, 158-159, 161, 163.  See also Coric Reb. Rep. at B2226-29, ¶¶ 135-141.)  Globus incorrectly contends

---

[8] Globus alleges that its "evidence of non-equivalence is uncontroverted."  (D.I. 149 at 17.)  This is simply untrue.  Globus cites paragraph 89 of Dr. Hayes' Reply Report for this statement, but ███████████████████████████████████████████████████████████████████████████████.  (Hayes Reply Rep. at B2192-93, ¶ 89.)

12

that Dr. Hayes' opinion regarding the "securing plate" providing the result of "acting as a physical barrier" "ignore[s] the claimed elements and impermissibly broaden[s]" the claim terms. (D.I. 149 at 17.)  But Dr. Hayes' analysis captures only those structures that prevent screw back-out by performing substantially the same function in substantially the same way as the claimed securing plate, and that meet all remaining requirements of the "securing plate" limitation such as the "fastened substantially parallel" and "covers" requirements.  Dr. Hayes does not ignore these related claim elements.  (See, e.g., Hayes Op. Rep. at B2146-54, ¶ 134; 144, 154; D.I. 149 at 17.)

For the same reasons set forth above, Globus has not demonstrated that the Accused Products do not meet the "securing mechanism" and related limitations of claim 13 of the '616 patent.  (D.I. 149 at 14-15, 16-18.)

> F.   The Coalition Large Devices Meet The Securing
>      Plate and Securing Mechanism Limitations under DOE.

Globus alleges that the Coalition Large devices cannot infringe any "securing plate" or "securing mechanism" limitation because ███████████████████████████████ ███████████████████████████████.  (D.I. 149 at 18.)  Globus never raised this argument in its non-infringement contention interrogatory responses ( Globus' Aug. 2, 2012 Resp. to Int. No. 12 (B2366-77) at B2367-75) or in any of its expert reports.  Rather, Globus supports its motion only with an untimely expert declaration.  Synthes has moved to strike this (and other) new opinions in Dr. Coric's declaration.  (See, e.g., D.I. 154, Ex. 53 at ¶ 68.)[9]

Dr. Coric's analysis is nonetheless deficient because his declaration and Globus' brief fail to provide any explanation of how the Coalition Large devices do not satisfy the "securing plate"

_____

[9] To the extent that the Court does not strike these new opinions, Synthes respectfully requests that the Court allow Synthes' expert, Dr. Wilson C. Hayes, to respond to them.  (See Decl. from Wilson C. Hayes, attached as Exhibit D.)

13

or "securing mechanism" elements under DOE.  (D.I. 149 at 18-19.)  As Dr. Hayes explains in

the attached declaration, ████████████████████████████████████████

█████████████████████   █████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.  See Dolly, Inc. v. Spalding & Evenflo Cos., 16 F.3d

394, 398 (Fed. Cir. 1994).

II.     THE ACCUSED PRODUCTS MEET THE
        HEIGHT LIMITATION UNDER BOTH PARTIES' CONSTRUCTIONS.

       Although Globus apparently seeks summary judgment on the Height Limitation under

both parties' constructions, Globus fails to identify a single requirement of either construction

that is allegedly missing from the Accused Products.  Rather, all of the purported non-

infringement arguments Globus advances have nothing to do with the actual requirements of the

constructions.  The undisputed facts demonstrate that Synthes is entitled to summary judgment of

literal infringement because the Accused Products literally satisfy this limitation and all others

recited by claims 1, 3 and 5 of the '616 patent under both parties' proposed constructions.

       Globus also argues that Synthes' construction is wrong (although Globus offers no

alternative proposal), alleging that it would recapture claim scope Synthes supposedly lost by

distinguishing U.S. Patent No. 6,432,106 to Fraser ("Fraser") during prosecution.  Globus further

implies that there is no room for the Height Limitation to both distinguish Fraser and cover the

Accused Products.  Globus is again incorrect.  Neither adopting Synthes' construction nor

finding that the Accused Products infringe would result in the "recapture" of subject matter

disclosed in Fraser, because Synthes' construction does not encompass Fraser and the Accused

Products differ from Fraser.

A.   The Accused Products Meet Both
     Parties' Constructions of The Height Limitation.

Globus elects to ignore the actual requirements of the parties' constructions because the

Accused Products infringe under both parties' proposals.  (Synthes' Mot. for Summ. J. of

Infringement of the '616 Patent (D.I. 139).)  As Synthes has demonstrated, both sides' experts

confirm that Synthes' construction of the Height Limitation requires simply that the heights of

the plate and body be equal enough to allow them to partly or entirely fit between adjacent

vertebral bodies.  The Accused Products undisputedly have plate and body heights that are equal

enough to allow them to fit partly or entirely between adjacent vertebral bodies (D.I. 139 at 8-

11), and Globus never contends otherwise in its motion.  Moreover, Globus proposed no

construction at all of the "substantially/generally equal" portion of the Height Limitation, and its

construction of the remaining portion of the limitation differs from Synthes' only in that it

requires the plate and body of the implant to fit *entirely* between adjacent vertebral bodies when

the implant is inserted between the adjacent vertebral bodies.  (D.I. 53, Ex. A at terms 17, 30-31.)

Because the plate and body of the Accused Products fit entirely between adjacent vertebral

bodies (D.I. 139 at 12-17), the Accused Products also meet Globus' proposed construction.

Globus similarly never challenges this conclusion in its brief.

B.   Synthes' Construction Would Not Recapture Fraser.

Globus is reduced to raising new claim construction arguments that it failed to make

during claim construction, contending that Synthes' proposed construction and coverage of the

Accused Products recaptures Fraser, which Synthes distinguished during prosecution.  Globus

further contends that Synthes somehow acknowledged this by changing its construction.  (D.I.

149 at 21-22.)  Globus is wrong on all accounts, as discussed below.  Moreover, Globus'

argument hits a dead-end, because Globus has never at any time in this case (including in its

15

motion) proposed an alternative construction[10] for the "substantially/generally equal" language and it is too late for Globus to do so now.  See, e.g., ProBatter Sports, LLC v. Joyner Techs., Inc., 518 F. Supp. 2d 1051, 1061 n.6 (N.D. Iowa 2007).

Under Synthes' construction, the Height Limitation requires that the heights of the plate and body allow them to fit partly or entirely between the adjacent vertebral bodies.  (D.I. 139.)  Synthes' construction does not "recapture" Fraser.  The plate disclosed in Fraser necessarily includes the tabs because the tabs house the boreholes and fits partly between vertebrae only because the plate bends and includes a thicker central portion that recesses into the intervertebral space.  Globus' own expert illustrated this (reproduced to the right), highlighting the portion of the plate in Fraser that is between the vertebral bodies, thus confirming that the Fraser plate does not fit even partly between the vertebrae over its full height.  (Coric Dep. Tr. at B2004-5, 91:3-92:10; Coric Dep. Ex. 12 (B2594).)  This is further confirmed by the fact that there is no



disclosure in Fraser that the upper and lower portions of the plate fit between the vertebrae.  Accordingly, the relative heights of the plate and body in Fraser do not *allow* the plate to fit partly between the vertebrae.

Dr. Coric admitted that the fact that the plate and body fit partly between vertebrae in Fraser is unrelated to the relative heights of the plate and body.  (Coric Dep. Tr. at B2006, 97:8-

---

[10] Although Globus contended during claim construction that the "substantially/generally equal" language in the Height Limitation was indefinite, Globus of course could have proposed a construction of the term in the alternative.  But it chose not to.  As a result, if the claim is not found indefinite (by clear and convincing evidence), there is no alternate construction to Synthes' in the record.

16 (Q: "If you were to make the plate in Figure 3 even taller, would it still be your opinion that part of the plate you have highlighted in Exhibit 12 fits between the vertebral bodies?" A: "Yes. I would say that part of the plate – obviously a lesser percentage of it, but part of it still fits within the vertebral bodies.").) In arguing that Synthes' construction would recapture Fraser, Globus only considers the central part of the Fraser plate height as opposed to the top to bottom height measurement (which must include the tabs) that is required by the claims (D.I. 149 at 22) and applied by Globus to its very own Accused Products. Globus' argument therefore hinges upon a misapplication of Synthes' claim construction to Fraser.

Literal satisfaction of the Height Limitation by the Accused Products does not result in a recapture of Fraser. Fraser and the Accused Products are very different. The disclosed height difference between the Fraser plate and body is ███████████████████████████████ ███████████████████████████████████████████████. The disclosed height difference in Fraser is *at minimum* 7.2 mm, given that each of two protruding tabs (one upward, one downward) that account for the height difference houses a fixation element head having a 3.6 mm diameter. (See Fraser (B2378-85) at B2383, col. 3 ll. 17-19.) In contrast, ████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████

Moreover, a narrowing of claim scope is warranted only when there has been a disclaimer, which requires a "clear and unmistakable disavowal" of claim scope during prosecution. See, e.g., Linear Tech. Corp. v. Int'l Trade Comm'n, 566 F.3d 1049, 1057-59 (Fed.

---

[11] This does not include the torsional stabilizers of the Coalition and InterContinental devices, which are not part of the front plate – they are simply extra structure – under Synthes' proposed constructions.

17

Cir. 2009).  During claim construction, Globus never contended prosecution disclaimer limited

the Height Limitation in any way that excludes the small height difference in Accused Products,

and can point to no evidence of such a disavowal now.

C.      Synthes Did Not "Change" Its Proposed Construction of The Height Limitation.

Apparently to support its late attack on Synthes' construction, Globus incorrectly argues

that Synthes has proposed a new construction of the Height Limitation that incorporates the

requirement of no anterior protrusion.  To dispel any doubt, Synthes' Motion for Summary

Judgment of Infringement of the '616 Patent (D.I. 139) unequivocally confirms that Synthes

does not propose a new construction of the Height Limitation.  Despite Globus' allegations,

Dr. Hayes did not opine on claim construction but rather simply applied the proposed

constructions proffered by the parties in his infringement analysis.  Dr. Hayes never even

referred to anterior protrusion in concluding that the Height Limitation was literally satisfied.

(Hayes Op. Rep. at B2118-2144, ¶¶ 65-125.)[12]

D.      The Accused Products Meet The
        Height Limitation under Both Proposed Constructions.

As explained above, Globus never addresses the actual requirements of the parties'

proposed constructions because the Accused Products meet both constructions.  (D.I. 139.)

Although a quantitative comparison of the plate and body heights is not required under any

proposed construction, and is not required by law (see infra at Sec. VIB), there is no dispute that

the Height Limitation does not require exact equality.  Dr. Coric admits that the plate and body

in the Asserted Patents are not exactly equal.  (Coric Dep. Tr. at B2030-34, 379:14-383:22.)

Moreover, no reasonable juror could find the ██████████ height difference of the plate and

---

[12] Not surprisingly, the deposition testimony and expert report passages that Globus relies on to allege a "new construction" by Synthes never assert that the absence of anterior protrusion is a claim limitation.  (Hayes Reply Rep. at B2184-85, ¶ 13; Hayes Dep. Tr. at B2104-2109, 146:3-151:8.)  Globus has flatly misstated Dr. Hayes' testimony to the Court.  (D.I. 149 at 21.)

spacer in the Accused Products ███████████████████████████████████████

████████████████████████████████ is outside the Height Limitation, given

Globus' and Dr. Coric's contention that the prior art Fraser device, ████████████████████

███████████████████████████ *meets* the Height Limitation.

████████████████████████████████████████████████

████████████████████████████████████████  ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ <u>See also</u>

U.S. Pat. No. 8,328,872 to Globus (B2388-B2399) at B2397, col. 4 l. 66-col. 5 l. 1 (stating that

in Figure 10, "[t]he plate [ ] height remains level to the peek tooth root so that compressive loads

are always subjected to the peek body where the graft is contained"); ████████████████████

████████████ Globus brings none of this evidence to the Court's attention in its brief.

Rather, Globus supports its non-infringement position only by again importing

nonexistent limitations into the claim constructions and by relying on irrelevant standards.

(Synthes' <u>Daubert</u> Mot. to Exclude Certain Test. of Dr. Coric (D.I. 147).)  Globus' arguments

concerning ██████████████████████████████████████████████████

████████████████████████████ are neither claimed features nor tied to any aspect of either

party's actual construction of the Height Limitation.  Globus is improperly seeking to import into

the Height Limitation additional limitations, ██████████████████████████████████

████████████████████████ in a futile attempt to avoid infringement.  Contradicting Globus'

arguments, its own expert confirmed that the only relevant determination is whether the heights

of the plate and body allow them to fit partly or entirely between vertebrae, as he concluded

(albeit incorrectly) that Fraser discloses the Height Limitation under Synthes' construction

without ever evaluating: (1) the quantitative height difference between the plate and body in Fraser; (2) "clinical significance" or "materiality" of the larger Fraser height difference; or (3) any auxiliary purposes of the Fraser plate. (Coric Dep. Tr. at B2003, 90:12-17. See also Coric Reply Rep. at B2363, ¶ 35.)

Because there is no genuine dispute that the heights of the plate and body of the Accused Products allow them fit at least partly, and in fact entirely, between the vertebrae, the Accused Products meet both parties' constructions.

E.   Factual Issues Preclude Summary
      Judgment on The Height Limitation under DOE.

Although the Court need not reach DOE because the Accused Products literally meet the Height Limitation, factual issues would nevertheless preclude summary judgment in favor of Globus under DOE as well. Globus admits that the parties' experts disagree on whether the Accused Products meet the Height Limitation under DOE (D.I. 149 at 24), and its only response to Synthes' experts' opinions is the unreasoned claim that they are inadmissible. As explained in Synthes' Brief in Opposition to Globus' Daubert Motion Regarding Drs. Härtl, Ducheyne and Hayes, Dr. Hayes has provided extensive, reliable opinions linking the function, way and result of the Height Limitation to the substantially identical function, way and result of the plate and body heights in the Accused Products. (See, e.g., Hayes Op. Rep. at B2127-76, ¶¶ 88, 106, 125, 280.)

Globus' only remaining DOE argument is legally flawed. It is based on legally irrelevant, alleged *additional* functions of the plate and of the height difference in the Accused Products, as discussed above and in Synthes' Daubert Motion regarding Dr. Coric (D.I. 147).[13]

---

[13] Dr. Coric's conclusion tha ███████████████████████████████

The undisputed function of the Height Limitation in the '616 and '076 patents is to permit the device to fit between the vertebrae.  (Hayes Op. Rep. at B2127-76, ¶¶ 88, 106, 125, 280.  <u>See also</u> Coric Dep. Tr. at B2029, 376:4-14.)



Globus' legally irrelevant analysis cannot be used to establish the absence of factual issues.

Moreover, even if Globus' irrelevant Function-Way-Result analysis were admissible, there are disputed facts.

These disputed factual issues preclude summary judgment.

III.   GLOBUS IS NOT ENTITLED TO SUMMARY JUDGMENT
       <u>ON THE '076 PATENT BASED ON THE BOREHOLE LIMITATION</u>.

Globus seeks summary judgment under both parties' constructions of the Borehole Limitation, but fails to reveal that the Accused Products undisputedly infringe under Synthes' construction, which requires that the boreholes are "positioned partly or entirely within a space separating the upper and lower planes" of the three dimensional body.  (D.I. 53, Ex. A at term 18.)

(<u>See, e.g.</u>, '076 patent (Ex. B) at col. 2 ll. 12-19; '207 patent (Ex. A) at col. 1 ll. 55-58; Hayes Reply Rep. at B2186-89, ¶¶ 16, 18, 35-38.)

21

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████   In fact, Dr. Coric has never in this litigation even contested

that the Borehole Limitation is satisfied under Synthes' construction. (Coric Reb. Rep. at

B2217-24, ¶¶ 110-121.)[14] Thus, Globus frivolously seeks summary judgment in its favor on an

issue that it has *conceded*.

Globus nonetheless argues that "[u]nder both parties' proposed claim constructions, the

boreholes in the Accused Products' front plates all extend above the upper and lower planes

defined by the spacer bodies." (D.I. 149 at 25.) Even if that is true, that is not the test for

infringement under Synthes' construction. Because the boreholes in the Accused Products are at

least partly between the planes, summary judgment for Synthes, not Globus, is warranted.

Globus' construction of the Borehole Limitation requires that the boreholes are

"positioned *entirely* within a space separating the upper and lower planes." (D.I. 53, Ex. A at

term 18.) Globus' proposed construction of "between" to mean "entirely within a space

separating" should be rejected because Synthes never narrowed the ordinary meaning of

"between" during prosecution. (D.I. 52 at 57-59, 62-64.) In fact, Globus' own expert, Dr. Coric,

recently admitted that Figure 8 of Fraser – on which Globus' argument to narrow the

construction of "between" was based (D.I. 52 at 60-61) – does not clearly depict boreholes, much

---

[14] Synthes' expert, Dr. Hayes, has demonstrated that this limitation is satisfied under Synthes'
construction. (See, e.g., Hayes Op. Rep. at B2163, ¶¶ 207-208; B2168, ¶ 233; B2173, ¶ 254;
B2177, ¶¶ 314-315.) Globus makes no attempt to (and in fact cannot) demonstrate that
Dr. Hayes' analysis is incorrect.

less where the boreholes are located with respect to the planes of the body.  (Coric Dep. Tr. at

B2001-02, 47:13-21; 54:13-16.)[15]  Thus, Dr. Coric has undercut Globus' narrow construction.

Even if Globus' construction is adopted, Globus' non-infringement position in its motion

is based only on its assertion ███████████████████████████████████████████████

███████████████████████████████████████████  But the "eyebrows" are not the

boreholes – they are a structure above the boreholes.  (Coric Dep. Tr. at B2017, 312:16-313:1.)

Globus does not determine the significance of the location of the boreholes themselves and fails

to demonstrate the absence of factual issues under its construction.

Factual issues also preclude summary judgment on infringement of the Borehole

Limitation under DOE.  See Tarkus Imaging, 2012 U.S. Dist. LEXIS 82477, at *2-3.  Globus

incorrectly contends that prosecution history estoppel bars application of DOE.  (D.I. 149 at 25.)

To the contrary, it is settled that prosecution history estoppel does not apply to amendments

made during prosecution that do not narrow claim scope.  See, e.g., Bose Corp. v. JBL, Inc., 274

F.3d 1354, 1359-60 (Fed. Cir. 2001); Turbocare Div. of Demag Delaval Turbomachinery Corp.

v. GE, 264 F.3d 1111, 1125-26 (Fed. Cir. 2001).  Synthes' addition of the Borehole Limitation

was not narrowing.  Prior to amendment, the claims required that the upper and lower surfaces of

the plate be generally on the upper and lower planes of the body, and that the plate contain

boreholes.  (See '076 Patent File History, Oct. 6, 2009 Application as Originally Filed (B2400-

40) at B2410.)  Because boreholes in the plate must necessarily be between the upper and lower

surfaces of the plate, the claim already required the boreholes to be between the upper and lower

---

[15] Globus' argument fails in any event because there was no disclaimer in prosecution of the
ordinary meaning of "between."  (See D.I. 52 at 57-59, 62-64.)

planes of the body.  Thus, the amendment simply clarified what was already required by the pending claims.[16]

Globus' DOE contentions are both legally and factually flawed.  First, its analysis under the Function-Way-Result test again focuses on the "eyebrows" above the boreholes, rather than the boreholes themselves.  A proper DOE analysis focuses on whether the Function-Way-Result of the *corresponding structure* in the accused device is substantially the same as that of the claim limitation, not some additional structure.  See, e.g., Insituform Techs., Inc. v. Cat Contr., Inc., 161 F.3d 688, 693 (Fed. Cir. 1988).  (See also D.I. 147 at 7-11.)  Second, Globus again focuses on legally irrelevant additional functions[17] performed by the Accused Products rather than on whether the boreholes in the Accused Products perform the function of the claimed boreholes.

Finally, there is at minimum a factual dispute as to whether the location of the boreholes in the Accused Products satisfies the Borehole Limitation under the Function-Way-Result test.  The relevant question is whether the boreholes in the Accused Products, ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████ are equivalent to boreholes that are oriented slightly more toward the horizontal middle of the device such that they are entirely between the planes.  Globus never addresses this question.  But, Synthes' expert, Dr. Hayes, has concluded that if a slight portion of the boreholes in the Accused Products is above the planes, the Accused Products meet the Function-Way-Result test because they perform the same

---

[16] Globus' argument that its "eyebrows" are "exactly the same as the tabs in Fraser" is simply wrong.  (D.I. 149 at 25.) ██████████████████████████████████████ ████████ In contrast, the Fraser tabs extend at least 3.6 mm above and below the body, and the entire borehole resides in this tab.

[17] Synthes has moved to exclude this incorrect DOE analysis, and incorporates herein these arguments.  (D.I. 147.)

function as that of the Borehole Limitation (to allow the device to fit in the space between vertebrae) (see, e.g., Hayes Op. Rep. at B2177-79, ¶¶ 314-317; Coric Dep. Tr. at B2015-16, 308:17-309:3), and do so in the same way to achieve the same result.  Globus has not even addressed Dr. Hayes' opinion, let alone demonstrated that no reasonable jury could agree with it.

IV.   GLOBUS IS NOT ENTITLED TO
      SUMMARY JUDGMENT ON CLAIMS 1 AND 42
      OF THE '207 PATENT BASED ON THE ANCHORABLE LIMITATION.

Globus is not entitled to summary judgment as to the Anchorable Limitation (see, e.g., '207 patent (Ex. A) at col. 6 ll. 44-46) under Globus' proposed construction because:  (1) its construction contradicts the intrinsic evidence and is incorrect; (2) Globus misapplied its own construction and again seeks to modify the parties' proposed constructions by importing even more limitations; and (3) at minimum there are issues of material fact regarding infringement under DOE.  See Tarkus Imaging, 2012 U.S. Dist. LEXIS 82477, at *2-3.

First, in its motion, Globus does not contest infringement under Synthes' proposed construction of anchorable (i.e., "capable of being constrained by" (D.I. 53, Ex. A at term 13)), but rather only under its own unduly narrow construction (i.e., "being rigidly connected to the internal walls of" (id.).  This construction finds no support in the intrinsic evidence.  (D.I. 52 at 51-52, 54-56.)  Globus misapplies its artificially narrow construction by contending ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  But nothing in the claim language or Globus' proposed construction requires there to be some feature *within* the walls of the boreholes or partial boreholes, or that requires there to be no movement of the fixation element relative to the implant.  And there is a factual dispute as to whether the fixation elements are rigidly connected to the boreholes and partial boreholes in the Accused Products.  (See, e.g., Hayes Dep. Tr. at B2111-12, 236:5-237:11

25

███████████████████████████████████████████

████████████

Even under Globus' incorrect construction, the Accused Products infringe at least under DOE, because the boreholes and partial boreholes limit movement of the fixation elements substantially the same as a rigid connection would.  (Hayes Op. Rep. at B2160-62, ¶¶ 171, 176, 181.)  Globus incorrectly contends that Synthes' application of DOE would render "anchorable" superfluous because the "boreholes" are elsewhere claimed.  This is untrue, because it is only the "anchorable within" limitation that requires the fixation elements to pass through the boreholes and partial boreholes.  ('207 patent (Ex. A), claims 1 and 42.)  Thus, the "anchorable within" limitation is not superfluous because it is this limitation that requires the fixation elements to be in the position where they are able to be constrained.

Finally, Globus' attempted application of DOE is again incorrect.  Globus ignores the Function-Way-Result of "anchorable within" in the '207 patent:  to limit movement of the fixation elements relative to the implant.  (See, e.g., Hayes Op. Rep. at B2160-62, ¶¶ 171, 176, 181.  See also '207 patent (Ex. A), claims 1 and 42.)  Globus' expert focuses on legally irrelevant additional functions of the connection between the fixation elements and boreholes in the Accused Products.  (See, e.g., Coric Reb. Rep. at B2230, ¶ 146.)  Globus fails to acknowledge that even Dr. Coric's irrelevant Function-Way-Result analysis is disputed.  (See, e.g., Hayes Op. Rep. at B2159-60, ¶¶ 170-171 (the interface between the fixation elements and the boreholes and partial boreholes "restricts the fixation elements [(function)] by closely surrounding the fixation elements, either partly or entirely [(way)], to limit the movement of the fixation elements relative to the implant [(result)].").  See also Hayes Op. Rep. at B2161-62, ¶¶ 176, 181.)  Accordingly,

even under Globus' incorrect construction, factual issues remain as to whether the relationship of

the fixation elements and boreholes in the Accused Products meet the Function-Way-Result test.

V.    GLOBUS IS NOT ENTITLED TO
      SUMMARY JUDGMENT OF NON-INFRINGEMENT ON THE NEW PRODUCTS.

       The Court should deny Globus' motion for summary judgment of non-infringement on its

so-called "New Products" because there is no claim against them in this case.  Despite beginning

██████████████████████████████████████████████████████████

███████  ██████████████████████████████████████████████████

████      Synthes had no obligation to accuse the New Products of infringement in this case.  Int'l

Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 1317-18 (Fed. Cir. 2004).  In International

Rectifier, the patentee elected not to accuse the defendant's redesigned products of infringement.

The Federal Circuit not only said that was permissible, it also rejected an infringer's attempt to

exempt its non-accused, redesigned products from an injunction because "it would have been

inappropriate for the district court to enter what would amount to a non-infringement judgment

with respect to [the redesigned] products."  Id.

       Here, without citing any supporting case law, Globus seeks an *actual* non-infringement

judgment on the New Products.  As Globus acknowledges, Synthes elected not to supplement its

complaint to accuse the New Products in this case.  (D.I. 149 at 7.)  This is little more than an

improper attempt to manufacture a res judicata argument in a future proceeding.  Fla. Power &

Light Co. v. United States, 198 F.3d 1358, 1360 (Fed. Cir. 1999) ("[T]he doctrine of res judicata

does not punish a plaintiff for exercising the option not to supplement the pleadings with an

after-acquired claim.").  The Court should deny Globus' motion.[18]

_____

[18] That the New Products are relevant to damages does not compel a different result.  To hold
that Globus is entitled to summary judgment would result in a special rule for patent cases that
effectively makes supplemental pleadings mandatory in cases where the accused infringer

VI.     GLOBUS IS NOT ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY.

A.      The Asserted Claims of The '076 Patent Are Not Invalid under 35 U.S.C. § 112.

For the reasons set forth by Synthes in the Joint Claim Construction Brief, the Court should reject Globus' enablement and written description arguments relating to "upper/lower endplate" as contrary to both the law and the intrinsic record.  (D.I. 52 at 77-78; D.I. 71, incorporated by reference.)  In proposing an unsupported construction and then arguing that adoption of this construction would result in § 112 invalidity,[19] Globus ignores controlling Federal Circuit law that "[w]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted so as to preserve their validity." Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1557 (Fed.Cir.1996); see also Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1369 (Fed. Cir. 2002).

Globus also fails to inform the Court that their own expert has now contradicted Globus' construction of "upper/lower endplates."  (Coric Dep. Tr. at B2009-11, 193:20-195:7; Coric Dep. Ex. 16 (B2447-62) at B2452.)  At deposition, Dr. Coric confirmed his agreement with



Synthes' construction by identifying the lower endplate as the endplate directly below the implant.  (Coric Dep. Tr. at B2007-11, 191:8-195:7;Coric Dep. Ex. 16 at B2452.)

B.      The "Substantially Equal," "Generally Equal" and
        "Substantially Between" Limitations Are Not Indefinite.

For the reasons Synthes provided in the Joint Claim Construction Brief, the Court should

---

redesigns its product after the complaint is filed.  Such a rule cannot be squared with International Rectifier.

[19] Globus concedes that the Asserted Claims of the '076 patent are not invalid if the Court adopts Synthes' construction.

reject Globus' argument that the "substantially/generally" terms are indefinite.  (D.I. 52 at 24-

25; 29-31, incorporated by reference).  Globus' position is based on the flawed premise that a

quantitative, numerical bright line or "standard for measuring" is required to construe terms

using the words "substantially" or "generally."  (D.I. 131 at 28-29.)  To the contrary, numerous

courts, including this Court, have construed terms of approximation such as "substantially" in

qualitative, functional terms.  For example, in Ateliers de la Haute-Garonne v. Broetje

Automation-USA Inc., Civ. A. No. 09-598-LPS, 2011 U.S. Dist. LEXIS 18081 (D. Del. Feb. 23,

2011), this Court construed the claim language "the cross sectional area of the heads

*substantially equals* the cross sectional area of the tube" to mean "the cross sectional area of the

head of the rivet is of sufficient size as compared to the cross sectional area of the hollow core

of the tube such that there is sufficient space between the rivet and the surface of the hollow core

to permit the rivet to move without difficulty from upstream to downstream as a result of the

compressed fluid."  Id. at *47-48.  See also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313,

1320 (Fed. Cir. 2005) (construing "*substantially uniform* magnetic field" to mean "substantially

uniform to obtain useful MRI images") (emphasis added).[20]  In Medrad, the Federal Circuit

flatly rejected the premise when construing claim terms, it is improper for the court "to consider

how a claimed device functions," stating that "nothing in . . . any . . . precedent of this court

supports such a proposition, which is as unsound as it is sweeping."  Medrad, 402 F.3d at

1319.[21]

---

[20]  See also Am. Superconductor Corp. v. S & C Elec. Co., Civ. A. No. 11-10033-FDS, 2012
U.S. Dist. LEXIS 167132, at *22 (D. Mass. Nov. 26, 2012);  Advanced Cartridge Techs., LLC v.
Lexmark Int'l, Inc., No. 8:10-cv-486-T-23TGW, 2012 U.S. Dist. LEXIS 20952, at *14 (M.D.
Fla. Feb. 21, 2012).

[21]  Globus relies on Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325 (Fed. Cir. 2010) to
imply that a quantitative standard is required, but the Enzo Biochem Court rejected precisely this

The Asserted Patents establish such a qualitative, functional standard by disclosing that the purpose of the claim limitations that are modified by "substantially/generally" (i.e., the Height and Borehole limitations) is to allow the plate and body to fit between adjacent vertebral bodies.  (D.I. 52 at 29-31), and Synthes' experts never, in the testimony Globus cites (D.I. 149 at 19, 29-30), admitted otherwise.  As a result, Globus has not and cannot demonstrate by clear and convincing evidence that reasonable efforts at construction are futile.  Exxon Research & Eng'g Co. v. U.S., 265 F.3d 1371, 1375 (Fed. Cir. 2001).  These claim terms are not indefinite, and the Court should reject Globus' arguments.

## VII.   GLOBUS IS NOT ENTITLED TO SUMMARY JUDGMENT ON SECONDARY CONSIDERATIONS.

Globus is not entitled to a summary finding of no secondary considerations because it cannot carry its heavy burden of proving by clear and convincing evidence the absence of a nexus back to Synthes' claimed inventions.  For commercial success, Synthes has made a prima facie case of nexus.  See Demaco Corp. v. F. Von Langsdorff Licensing Ltd., 851 F.2d 1387, 1392 (Fed. Cir. 1988).  Globus ignores this and improperly attempts to shift the burden of persuasion to Synthes.  Globus also ignores much of Synthes' nexus evidence and fails to demonstrate the absence of genuine issues of material fact surrounding Synthes' additional nexus evidence.

According to the Federal Circuit, a patentee never bears the burden of persuasion with respect to secondary considerations.  See In re Cyclobenzaprene Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1078 (Fed. Cir. 2012), cert. denied, No. 12-514 (Jan. 14, 2013).  Rather, a patentee merely bears a "burden of production," or coming forward

---

argument, holding that "the claims are not indefinite even though the construction of the term 'not interfering substantially' defines the terms without reference to a precise numerical measurement."  Id. at 1335 (citations omitted).

with evidence of secondary considerations that the challenger must prove, by clear and convincing evidence, do not defeat obviousness.  Id.  Thus, to prevail on its Motion for Partial Summary Judgment, Globus must prove by clear and convincing evidence that all secondary considerations alleged by Synthes fail as a matter of law.  This it cannot do.

> A.  Under the Proper Legal Standard, Genuine Issues of Material Fact Preclude Summary Judgment of No Commercial Success.

Because the highly commercially successful products in this case are covered by Synthes' patent claims, a nexus is presumed.

Globus' failure to address Synthes' presumed nexus dooms its Motion for Partial Summary Judgment.  While Globus is correct that commercial success requires a nexus (i.e., a factually and legally sufficient connection) between a commercially successful product and the claims, Globus badly misconstrues the operative case law.  Contrary to Globus' misplaced contention, Synthes does not "bear the burden of proving nexus."  (D.I. 149 at 30.)  In fact, the very case Globus cites in its brief – Demaco, 851 F.3d at 1392 – held that a patentee is entitled to a *prima facie* or presumed case of nexus if it comes forward with evidence showing "there is commercial success and the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."  Id.  That is precisely the undisputed situation here.  To overcome the *prima facie* case, the *party challenging* validity must prove that the success is due to other reasons, such as advertising.  Id. at 1393.  Requiring the patentee to prove that commercial success is not due to these other reasons "put[s] the shoe on the wrong foot."  Id. at 1394.

In this case, Synthes alleges commercial success based on various products covered by one or more of the three Asserted Patents, including Synthes' SynFix and Zero-P products.  Globus does not dispute the commercial success of these products.  (D.I. 149 at 30-35.)  Nor

does Globus dispute that the '616 and '076 patents cover Synthes' SynFix or Zero-P

products.  (Hayes Op. Rep. at B2180, ¶ 338-339; Coric Reply Rep. at B2364, ¶ 110.)

Accordingly, an undisputed *prima facie* nexus exists.  Globus' failure to address whether

commercial success is due to reasons other than the claimed inventions is fatal to its request for a

summary finding of no nexus.  At the very least, genuine issues of material fact  preclude

summary judgment.

     B.     Numerous Advantages Inherent in
                 Synthes' Claimed Inventions Also Preclude Summary Judgment
                 <u>on Commercial Success and All Other Secondary Considerations</u>.

Synthes' experts have collectively identified five advantages commensurate in scope with

the claimed inventions, each of which serves as an independent nexus sufficient to deny Globus'

Motion for Partial Summary Judgment.  Those advantages include:  (1) ease of insertion; (2)

radiographic imaging during surgery; (3) prevention of inadvertent screw back-out; (4)

biomechanical stability; and (5) zero profile.[22]  Globus ignores the first three advantages

entirely.  Globus' assertion that biomechanical stability and zero profile are "unclaimed" is not

legally relevant because these advantages are tied to the specific limitations of the claims.

Globus has also failed to demonstrate the absence of genuine issues of material fact

concerning the advantages of biomechanical stability and zero profile.  First, Globus argues these

advantages are "unclaimed" and thus irrelevant.  Globus fails to account for Federal Circuit

precedent holding that a nexus exists if the advantages result from practicing the patent

---

[22] Globus also engages in unnecessary arm-waving about untimely interrogatory responses.
Synthes, through its incorporation of "forthcoming expert reports," seasonably supplemented its
interrogatory responses at the time it served these reports and Globus cannot exclude Synthes'
positions on this basis.  (Synthes' Sept. 1, 2012 Supp. Resp. to Int. Nos. 6-10 (B2515-26) at
B2519-20.)  Synthes' experts addressed all of these secondary considerations in their
December 14, 2012 reports.  Because Globus' experts had ample opportunity to respond to these
opinions in their January 4, 2013 reports, there was no prejudice to Globus.

claims.  See, e.g., Medtronic, Inc. v. Daig Corp., 789 F.2d 903, 907 (Fed. Cir. 1986).  Because

Synthes' experts assert that biomechanical stability and zero profile are results of the Asserted

Claims, these features are highly relevant.  (Gering 2nd Rep. at B2511, ¶ 33; Hayes 2nd Rep. at

B2042, ¶ 25.)

Second, Globus mistakenly contends these advantages are not commensurate with the

"full scope" of Synthes' patent claims.  As discussed more fully in Synthes' Daubert opposition

regarding Dr. Richard Gering, Globus ignores Federal Circuit precedent holding that

"commensurate in scope" does not require "a patent applicant '[to] sell every conceivable

embodiment of the claims in order to rely upon evidence of commercial success.'"  In re Glatt

Air Techniques, Inc., 630 F.3d 1026, 1030 (Fed. Cir. 2011).

With respect to biomechanical stability, Globus' main commensurate in scope argument

relies upon a hypothetical product employing 'tinfoil' as the metal front plate.  (D.I. 149 at 32,

citing Hall Dep. Tr. (B2599-601) at B2600, 216:15-217:13.)  Hypothetical 'sabotaged' devices

specifically designed to avoid realizing the advantages that arise from the claimed inventions

cannot negate the nexus to commercial success.  (See, e.g., Synthes' Answering Br. to Globus'

Daubert Mot. To Exclude Certain Test. of Dr. Richard Gering at Sec. III.)  In addition, the

parties dispute whether:  (1) one or all of a metallic front plate, divergent screws and partial

boreholes are necessary to provide biomechanical stability; and (2) Synthes claims require all

three.

With respect to zero profile, the claims are commensurate in scope under Globus' own

proposed claim constructions.  According to Globus, the Asserted Claims require the claimed

implants to fit "entirely" between adjacent vertebrae.  (D.I. 52 at 64-65.)  Globus' contention

concerning agreement by the parties' experts over these claimed spatial features is wholly

unsupported.  (See Synthes' Answering Br. to Globus' Daubert Motion to Exclude Certain Test. of Drs. Härtl, Ducheyne and Hayes at Sec. II.)  A fair reading of Globus' proposed claim constructions restricts positioning in all directions and belies its position.  Here again, the parties dispute material facts.

Globus' representation to this Court that Synthes "relies exclusively" on biomechanical stability and zero profile to support nexus is wrong.  Synthes detailed its contentions regarding several additional inherent advantages commensurate in scope with the claims in its expert reports.  The combination of body and plate, as required by all Asserted Claims, facilitates insertion of the devices covered by the Asserted Claims in a single step as opposed to two.  (Hall Rep. (B2463-66) at B2464, ¶ 39.)  Further, the composition of the body (i.e., "non-metallic" and "biocompatible plastic"), as recited by the claims of the '076 and '616 patents, enables radiographic imaging before and after surgery.  (Hall Rep. at B2464-65, ¶ 40.)  Finally, the securing plate recited by all claims of the '207 patent prevents screws used to attach the device to the vertebrae from falling out.  (Gering 2nd Rep. (B2510-14) at B2513, ¶¶ 44-46.)  The Court should deny Globus' Motion based on its failure to address this additional nexus evidence.[23]

C.    Synthes' Copying Claims Also Must Stand.

Globus' brief discussion concerning copying is equally flawed.  Copying arises when accused infringers copy the claimed invention or covered product.  Advanced Display Sys. v. Kent State Univ., 212 F.3d 1272, 1285-86 (Fed. Cir. 2000).  Synthes' expert has demonstrated that Globus copied Synthes' patented products.  (Hayes 2nd Rep. at B2036-44, ¶¶ 9-31.)  To sidestep this fact, Globus relies on an improper legal standard, assessing individual features of the covered products on a piecemeal basis.  Even if Globus were somehow right on the law, it

---

[23] Globus should have addressed these additional grounds for nexus in its Opening Brief and cannot sandbag Synthes with new theories and arguments for the first time in Reply.  D. Del. L. R. 7.1.3(c)(2).

never asserts that all ten cited features are unclaimed, not commensurate in scope or known in the prior art.

VIII.   GLOBUS IS NOT ENTITLED TO
        SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT.

Globus knowingly copied Synthes' inventions and has no reasonable defense to Synthes' infringement claims. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████   This evidence, and more, will establish Globus' willfulness at trial.

A.   Legal Standard

"Willfulness is 'not an all-or-nothing trait, but one of degree,' and must be assessed based on the totality of the circumstances."  Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc., Civ. A. No. 09-598-LPS, 2011 U.S. Dist. LEXIS 105568, at *6 (D. Del. Sept. 16, 2011) (internal citations omitted).  The Court's "totality of the circumstances" review entails "objective" and "subjective" inquiries.  In re Seagate, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

B.   Globus Has No Reasonable Defenses.

Globus' arguments directed to the objective prong can be denied summarily because Globus fails to meet its burden of actually *demonstrating* that any of its defenses are reasonable; instead, it asserts in conclusory fashion that it *has* defenses and that "there is certainly no argument that these defenses are unreasonable."  (D.I. 149 at 40.)  When seeking summary judgment of no willfulness, however, "[t]he mere presentation of defenses for non-infringement and invalidity . . . does not preclude a finding of willfulness.  Rather, the issue of the reasonableness of those defenses must be resolved."  CSB-System Int'l Inc. v. SAP Am., Inc., Civ. A. No. 10-2156, 2012 U.S. Dist. LEXIS 58410, at *32 (E.D. Pa. Apr. 25, 2012).  "The onus

falls on [the movant] to *conclusively prove* that no factfinder could find such defense objectively unreasonable."[24] Id. at *18-19 (emphasis added).  Globus has utterly failed to meet this burden.

Notwithstanding Globus' failure of proof, Synthes points to its summary judgment and Daubert motions (D.I. 134, 139, 142, 147), its opposition to Globus' motions for partial summary judgment, and the Joint Claim Construction brief (D.I. 52) as proof that Globus' defenses have no merit.  As described in the sections above, there are numerous mixed questions of fact and law that warrant "allow[ing] the jury to determine the underlying facts relevant to the defense in the first instance."  Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., 682 F.3d 1003, 1008 (Fed. Cir. 2012).  Courts have denied summary judgment on this basis alone.  See Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc., Civ. A. No. 08-0515, 2012 U.S. Dist. LEXIS 135839, at *26-27 (S.D.N.Y. Aug. 23, 2012); Fujitsu Ltd. v. Belkin Int'l, Inc., Case No.: 10-CV-03972-LHK, 2012 U.S. Dist. LEXIS 142102, at *116-19 (N.D. Cal. Sept. 28, 2012).  Two of Globus' infringement defenses ████████████████████████████████ are predicated on importing into the claims limitations that are not part of either side's constructions,[25] and the remaining two defenses ██████████████████████████ hinge on accepting Globus' proposed claim constructions, which ignore ordinary meaning and the Asserted Patents'

---

[24] In CSB-System, the court rejected the accused infringer's claim that, to avoid summary judgment, the *patentee* needed to prove, by clear and convincing evidence, that "each and every one of [the infringer's] defenses is wholly unreasonable or frivolous."  Id. at *17.  The court found that the infringer's position "improperly flips the summary judgment standard on its head."  Id. at *18.

[25] Globus' reference to its early Rule 11 letter to Synthes on the '207 patent is unavailing. Globus retreated once Synthes explained the baselessness of Globus' non-infringement defense. Globus' pattern of repeatedly invoking the specter of Rule 11 without a legal basis, wasting the parties' time and money, does not establish that any of its defenses are objectively reasonable.

specifications.  Similarly, Globus' Section 112 and indefiniteness defenses are flatly inconsistent

with Federal Circuit precedent and the intrinsic record.[26]  (See supra at Sec. VI.)

    C.    <u>Globus Knew Or Should Have Known of The Objective Risk</u>.

        1.    <u>Globus' Pre-Suit Conduct Establishes Willful Infringement</u>.

Globus does not move for summary judgment under the subjective prong of <u>Seagate</u>,

purporting to move only under the objective prong.  (D.I. 149 at 36.)  Globus does address █

███████████████████████, however, which relates to the subjective prong.  <u>Tomita</u>

<u>Techs. USA, LLC v. Nintendo Co., Ltd.</u>, 11 Civ. 4256 (JSR), 2012 U.S. Dist. LEXIS 92196, at

*28-29 (S.D.N.Y. June 25, 2012).  There is substantial evidence sufficient to support a jury

finding that Globus knew or should have known of an objectively high risk of infringing

Synthes' patents, including the following:

- In 2005, Synthes filed U.S. patent application 11/199,599 that would ultimately lead to issuance of the '207 patent.  (Rhoda Dep. Ex. 20 (B2467).)  The application is the parent of an application that led to issuance of the '616 patent.  (Rhoda Dep. Ex. 17 (B2479-92) at B2479 (noting that the '616 patent is a continuation of application 11/199,599).)  Both applications (for the '207 and '616' patents) share identical specifications.  As Globus' expert admitted, the disclosure in the '207 and '616 patents is "very similar" to that of the '076 patent.  (D.I. 154, Ex. 53 at ¶ 14.)



[26] Globus' reference to the reexamination of the '076 patent does not warrant a different result. (D.I. 149 at 40.)  The PTO's grant of reexamination does not, as a matter of law, render an infringer's defenses objectively reasonable.  <u>Boston Sci. Corp. v. Cordis Corp.</u>, Civ. No. 10-315-SLR, 2011 U.S. Dist. LEXIS 46210, at *1-5 (D. Del. Apr. 28, 2011); <u>St. Clair Intellectual Prop. Consultants, Inc. v. Matsushita Elec. Indus. Co.</u>, Civ. A. No. 04-1436-JJF-LPS, 2009 U.S. Dist. LEXIS 66359, at *4-9 (D. Del. July 28, 2009).  Also, this case is distinguishable from the two cases Globus cited (D.I. 149 at 40), because the PTO to date has not directed Synthes to change the claims of the '076 patent.



In an attempt to escape the obvious inference from these facts – ███████████████

███████████████████████████████████████████████ – Globus asks the

Court to adopt a per se rule that willful infringement requires actual, pre-suit notice of an issued

patent.  A number of courts have rejected this argument.  <u>Tomita</u>, 2012 U.S. Dist. LEXIS 92196,

at *30 ("In certain circumstances, an alleged infringer can know of an 'objectively high

likelihood' of infringement even though she does not know that the relevant patent has issued.").

In <u>Sargent Mfg. Co. v. Cal-Royal Prods., Inc.</u>, Civ. A. No. 3:08-cv-408 (VLB), 2012 U.S. Dist.

LEXIS 23852 (D. Conn. Feb. 24, 2012), for example, the court held that the Federal Circuit in

<u>Seagate</u> had "soundly rejected" the contention that actual notice of a patent was a prerequisite to

willful infringement.  <u>Id.</u> at *20, 24.  <u>See also</u> <u>Nat'l Presto Indus., Inc. v. West Bend Co.</u>, 76 F.3d

1185, 1193 (Fed. Cir. 1996); <u>Innovention Toys, LLC v. MGA Entertainment, Inc.</u>, No. 2:07-cv-

06510-SM-ALC, Order (D.I. 467) at 4, 7 (E.D. La. October 15, 2012) (denying motion for

summary judgment of no willfulness without addressing defendant's argument that it had no pre-

suit knowledge of the asserted patent).  There is ample evidence to send this issue to the jury.

See Ateliers, 2011 U.S. Dist. LEXIS 105568, at *2.

Comparing Tomita to the facts of this case is particularly instructive.  In Tomita, there

was no direct evidence that the accused infringer, Nintendo, had pre-suit knowledge of the

asserted patent.  The plaintiff claimed that Nintendo was aware of a Patent Cooperation Treaty

application that led to the asserted patent.  Nintendo was not aware of the identifying numbers of

the application, however, and certainly did not have a U.S. patent application.  Id. at *24-25.

Nevertheless, the court denied Nintendo's motion for summary judgment.  Id. at *31-32, 34.  As

an independent basis for its decision, the court found that a reasonable jury could infer Nintendo

knew of the asserted patent because "Nintendo often conducted patent clearance searches and . . .

its employees knew precisely what to search for."  Id. at *32-33.  Thus, ███████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ give rise to a material factual dispute on

that issue.[27] ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████

Globus' cases do not support adopting a per se rule.  In Gustafson, Inc. v. Intersystems

Indus. Prods, Inc., the Federal Circuit stated the opposite:  that courts should look to the "totality

of the circumstances" in determining whether an infringer had adequate notice, and that "[i]n

respect of willfulness, there cannot be hard and fast per se rules."  897 F.2d 508, 510 (Fed. Cir.

1990) (citations omitted).  Globus' other cases are distinguishable because the defendants only

---

[27] There also is ample evidence that Globus copied Synthes' SynFix and Zero-P implants, which
are embodiments of the asserted '616 and '076 patents.  (See discussion of copying, supra.)  That
evidence supports reaching the same conclusion as in Tomita.  2012 U.S. Dist. LEXIS 92196, at
*31-32 (refusing to "allow even copiers to shelter themselves from liability").

knew of a "patent pending" notice, which ███████████████████████████████

█████ does not give any information about the scope of the patent being sought.  State Indus.,

Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985); Conopco, Inc. v. May Dep't

Stores Co., 46 F.3d 1556, 1562-63 (Fed. Cir. 1994).

> 2.    Globus' Post-Suit Conduct Shows Willful Infringement.

Globus' post-suit conduct provides additional support for a willfulness finding in this

case, and further renders summary judgment inappropriate.  An infringer's refusal to stop selling

its accused products after being accused of infringement may establish willfulness.  TruePosition

Inc. v. Andrew Corp., 611 F. Supp. 2d 400, 410-11 (D. Del. 2009).  ██████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ and thereby

infringes the Asserted Patents.  See 35 U.S.C. § 271(a) (making a patented invention without

authority is an act of infringement).

## CONCLUSION

For at least the foregoing reasons, this Court should deny Globus' Motions for Partial

Summary Judgment.

SHAW KELLER LLP

*/s/ David M. Fry*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
David M. Fry (No. 5486)
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Matthew J. Becker
Jeremy C. Lowe
Edward M. Mathias
Tara R. Rahemba
AXINN, VELTROP & HARKRIDER LLP
90 State House Square, 9th Floor
Hartford, CT 06103
(860) 275-8100

Diane C. Ragosa
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200

Dated:  March 4, 2013

# **EXHBIIT A**

US007846207B2

(12) **United States Patent**
    Lechmann et al.

(10) **Patent No.:      US 7,846,207 B2**
(45) **Date of Patent:         Dec. 7, 2010**

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Beat Lechmann**, Bettlach (CH);
        **Dominique Burkard**, Gretzenbach
        (CH); **Chris M. J. Cain**, Norwood (AU);
        **Claude Mathieu**, Zurich (CH)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
        (US)

( * ) Notice:   Subject to any disclaimer, the term of this
        patent is extended or adjusted under 35
        U.S.C. 154(b) by 1412 days.

(21) Appl. No.: **11/199,599**

(22) Filed:      **Aug. 8, 2005**

(65)              **Prior Publication Data**
        US 2006/0085071 A1      Apr. 20, 2006

**Related U.S. Application Data**

(63) Continuation of application No. PCT/CH03/00089,
        filed on Feb. 6, 2003.

(51) **Int. Cl.**
        *A61F 2/44*            (2006.01)
(52) **U.S. Cl.** ................................. **623/17.11**; 623/17.16
(58) **Field of Classification Search** ................... 606/63,
        606/291, 90, 293; 623/17.11, 17.15, 17.16
        See application file for complete search history.

(56)              **References Cited**

U.S. PATENT DOCUMENTS

2,621,145  A    12/1952  Sano

(Continued)

FOREIGN PATENT DOCUMENTS

CA          2317791 A1    8/1999

DE          30 42 003  A1    7/1982
DE          39 33 459  A1    4/1991

(Continued)

OTHER PUBLICATIONS

Office Notice of Reason of Rejection issued by the Japanese Patent
Office.

*Primary Examiner*—Todd E Manahan
*Assistant Examiner*—Lynnsy Schneider
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57)              **ABSTRACT**

An intervertebral implant having a three-dimensional body
(**10**) and a securing plate (**1**). The three-dimensional body
(**10**) includes an upper side (**1**) and an underside (**2**) which are
suitable for abutting the end plates of two adjacent vertebral
bodies, a left side surface (**3**) and a right side surface (**4**), a
front surface (**5**) and a rear surface (**6**), a horizontal middle
plane (**7**) between the upper side (**1**) and the underside (**2**), and
a vertical middle plane (**12**) extending from the front surface
(**5**) to the rear surface (**6**). The three-dimensional body further
includes a plurality of boreholes (**9***a*) passing through the
body (**10**), which are suitable for accommodating longitudi-
nal fixation elements (**20**). The intervertebral implant also
includes a front plate (**8**) displaceably disposed as an insert
with the front side (**5**) of the three-dimensional body, the front
plate (**8**) having a plurality of boreholes (**9**) in which the
longitudinal fixation elements (**20**) can be anchored, and
whose openings overlap with the openings of the boreholes of
the three-dimensional body (**10**). A securing plate can be
fastened essentially parallel to the front plate (**8**) at the three-
dimensional body (**10**) in such a manner that the boreholes of
the front plate (**9**) are covered at least partly by the securing
plate (**18**). By virtue of the configuration of the intervertebral
implant, a rigid, firm connection between the intervertebral
implant and the longitudinal fixation elements used to fasten
it, is possible.

**43 Claims, 6 Drawing Sheets**



**US 7,846,207 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,506 A | 1/1979 | Ulrich | |
| 4,501,269 A | 2/1985 | Bagby | |
| 4,512,038 A | 4/1985 | Alexander et al. | |
| 4,627,853 A | 12/1986 | Campbell et al. | |
| 4,678,470 A | 7/1987 | Nashef et al. | |
| 4,717,115 A | 1/1988 | Schmitz | |
| 4,858,603 A | 8/1989 | Clemow et al. | |
| 4,904,261 A | 2/1990 | Dove et al. | |
| 4,936,851 A | 6/1990 | Fox et al. | |
| 4,950,296 A | 8/1990 | McIntyre | |
| 4,961,740 A | 10/1990 | Ray et al. | |
| 4,978,350 A * | 12/1990 | Wagenknecht | 606/312 |
| 4,994,084 A | 2/1991 | Brennan | |
| 5,026,373 A | 6/1991 | Ray et al. | |
| 5,053,049 A | 10/1991 | Campbell | |
| 5,062,850 A | 11/1991 | MacMillan et al. | |
| 5,084,051 A | 1/1992 | Törmälä et al. | |
| 5,112,354 A | 5/1992 | Sires | |
| 5,192,327 A | 3/1993 | Brantigan | |
| 5,211,664 A | 5/1993 | Tepic et al. | |
| 5,281,226 A | 1/1994 | Davydov et al. | |
| 5,284,655 A | 2/1994 | Bogdansky et al. | |
| 5,298,254 A | 3/1994 | Prewett et al. | |
| 5,314,476 A | 5/1994 | Prewett et al. | |
| 5,348,788 A | 9/1994 | White | |
| 5,405,391 A | 4/1995 | Hednerson et al. | |
| 5,423,817 A | 6/1995 | Lin | |
| 5,439,684 A | 8/1995 | Prewett et al. | |
| 5,458,638 A | 10/1995 | Kuslich et al. | |
| 5,489,308 A | 2/1996 | Kuslich et al. | |
| 5,507,818 A | 4/1996 | McLaughlin | |
| 5,514,180 A | 5/1996 | Heggeness et al. | |
| 5,522,899 A | 6/1996 | Michelson | |
| 5,534,030 A | 7/1996 | Navarro et al. | |
| 5,549,679 A | 8/1996 | Kuslich | |
| 5,554,191 A | 9/1996 | Lahille et al. | |
| 5,556,430 A | 9/1996 | Gendler | |
| 5,569,308 A | 10/1996 | Sottosanti | |
| 5,571,190 A | 11/1996 | Ulrich et al. | |
| 5,571,192 A | 11/1996 | Schönhöffer | |
| 5,607,474 A | 3/1997 | Athanasiou et al. | |
| 5,609,635 A | 3/1997 | Michelson | |
| 5,609,636 A | 3/1997 | Kohrs et al. | |
| 5,609,637 A | 3/1997 | Biedermann et al. | |
| 5,676,699 A | 10/1997 | Gogolewski et al. | |
| 5,683,394 A | 11/1997 | Rinner | |
| 5,683,463 A | 11/1997 | Godefroy et al. | |
| 5,702,449 A | 12/1997 | McKay | |
| 5,702,451 A | 12/1997 | Biedermann et al. | |
| 5,702,453 A | 12/1997 | Rabbe et al. | |
| 5,702,455 A | 12/1997 | Saggar | |
| 5,728,159 A | 3/1998 | Stroever et al. | |
| 5,735,905 A | 4/1998 | Parr | |
| 5,766,253 A | 6/1998 | Brosnahan, III | |
| 5,776,194 A | 7/1998 | Mikol et al. | |
| 5,776,197 A | 7/1998 | Rabbe et al. | |
| 5,776,198 A | 7/1998 | Rabbe et al. | |
| 5,776,199 A | 7/1998 | Michelson | |
| 5,782,915 A | 7/1998 | Stone | |
| 5,785,710 A | 7/1998 | Michelson | |
| 5,800,433 A | 9/1998 | Benzel et al. | 606/61 |
| 5,865,849 A | 2/1999 | Stone | |
| 5,876,452 A | 3/1999 | Athanasiou et al. | |
| 5,885,299 A | 3/1999 | Winslow et al. | |
| 5,888,222 A | 3/1999 | Coates et al. | |
| 5,888,223 A | 3/1999 | Bray, Jr. | 623/17 |
| 5,888,224 A | 3/1999 | Beckers et al. | |
| 5,888,227 A | 3/1999 | Cottle | |
| 5,895,426 A | 4/1999 | Scarborough et al. | |
| 5,899,939 A | 5/1999 | Boyce et al. | |
| 5,902,338 A | 5/1999 | Stone | |
| 5,904,719 A | 5/1999 | Errico et al. | |
| 5,910,315 A | 6/1999 | Stevenson et al. | |
| 5,922,027 A | 7/1999 | Stone | |
| 5,944,755 A | 8/1999 | Stone | |
| 5,968,098 A | 10/1999 | Winslow | |
| 5,972,368 A | 10/1999 | McKay | |
| 5,976,187 A | 11/1999 | Richelsoph | |
| 5,980,522 A | 11/1999 | Koros et al. | |
| 5,981,828 A | 11/1999 | Nelson et al. | |
| 5,984,967 A | 11/1999 | Zdeblick et al. | |
| 5,989,289 A | 11/1999 | Coates et al. | |
| 6,013,853 A | 1/2000 | Athanasiou et al. | |
| 6,025,538 A | 2/2000 | Yaccarino, III | |
| 6,033,405 A | 3/2000 | Winslow et al. | |
| 6,033,438 A | 3/2000 | Bianchi et al. | |
| 6,039,762 A | 3/2000 | McKay | |
| 6,045,579 A | 4/2000 | Hochshuler et al. | |
| 6,045,580 A | 4/2000 | Scarborough et al. | |
| 6,080,158 A | 6/2000 | Lin | |
| 6,080,193 A | 6/2000 | Hochshuler et al. | |
| 6,090,998 A | 7/2000 | Grooms et al. | |
| 6,096,081 A | 8/2000 | Grivas et al. | |
| 6,110,482 A | 8/2000 | Khouri et al. | |
| 6,123,731 A | 9/2000 | Boyce et al. | |
| 6,129,763 A | 10/2000 | Chauvin et al. | |
| 6,143,030 A | 11/2000 | Schroder | |
| 6,143,033 A | 11/2000 | Paul et al. | |
| 6,156,070 A | 12/2000 | Incavo et al. | |
| 6,193,756 B1 | 2/2001 | Studer et al. | |
| 6,200,347 B1 | 3/2001 | Anderson et al. | |
| 6,206,922 B1 | 3/2001 | Zdeblick et al. | |
| 6,231,610 B1 | 5/2001 | Geisler | |
| 6,235,059 B1 | 5/2001 | Benezech et al. | |
| 6,241,769 B1 | 6/2001 | Nicholson et al. | |
| 6,245,108 B1 | 6/2001 | Biscup | |
| 6,258,125 B1 | 7/2001 | Paul et al. | |
| 6,261,586 B1 | 7/2001 | McKay | |
| 6,264,695 B1 | 7/2001 | Stoy | |
| 6,270,528 B1 | 8/2001 | McKay | |
| 6,322,562 B1 * | 11/2001 | Wolter | 606/62 |
| 6,342,074 B1 | 1/2002 | Simpson | |
| 6,364,880 B1 | 4/2002 | Michelson | |
| 6,423,063 B1 | 7/2002 | Bonutti | |
| 6,432,106 B1 | 8/2002 | Fraser | |
| 6,458,158 B1 | 10/2002 | Anderson et al. | |
| 6,468,311 B2 | 10/2002 | Boyd et al. | |
| 6,569,201 B2 | 5/2003 | Moumene et al. | |
| 6,638,310 B2 | 10/2003 | Lin et al. | |
| 6,645,212 B2 * | 11/2003 | Goldhorn et al. | 606/291 |
| 6,761,739 B2 | 7/2004 | Shepard | |
| 6,884,242 B2 * | 4/2005 | LeHuec et al. | 606/86 B |
| 6,972,019 B2 * | 12/2005 | Michelson | 606/86 A |
| 6,984,234 B2 | 1/2006 | Bray | 606/69 |
| 7,112,222 B2 | 9/2006 | Fraser et al. | |
| 7,172,627 B2 * | 2/2007 | Fiere et al. | 623/17.11 |
| 7,232,464 B2 | 6/2007 | Mathieu et al. | 623/17.11 |
| 2001/0001129 A1 | 5/2001 | McKay et al. | |
| 2001/0005796 A1 | 6/2001 | Zdeblick et al. | |
| 2001/0010021 A1 | 7/2001 | Boyd et al. | |
| 2001/0016777 A1 | 8/2001 | Biscup | |
| 2001/0031254 A1 | 10/2001 | Bianchi et al. | |
| 2001/0039456 A1 | 11/2001 | Boyer, II et al. | |
| 2001/0041941 A1 | 11/2001 | Boyer, II et al. | |
| 2002/0010511 A1 | 1/2002 | Michelson | |
| 2002/0022843 A1 | 2/2002 | Michelson | 606/70 |
| 2002/0029084 A1 | 3/2002 | Paul et al. | |
| 2002/0082597 A1 | 6/2002 | Fraser | |
| 2002/0082603 A1 * | 6/2002 | Dixon et al. | 606/69 |
| 2002/0091447 A1 | 7/2002 | Shimp et al. | |
| 2002/0099376 A1 | 7/2002 | Michelson | 606/61 |
| 2002/0106393 A1 | 8/2002 | Bianchi et al. | |
| 2002/0111680 A1 | 8/2002 | Michelson | |
| 2002/0147450 A1 | 10/2002 | LeHuec et al. | 606/61 |

**US 7,846,207 B2**

Page 3

| | | | |
|---|---|---|---|
| 2002/0169508 | A1 | 11/2002 | Songer et al. ............ 623/17.11 |
| 2002/0193880 | A1* | 12/2002 | Fraser ..................... 623/17.11 |
| 2003/0078668 | A1* | 4/2003 | Michelson ............... 623/17.16 |
| 2003/0125739 | A1 | 7/2003 | Bagga et al. |
| 2004/0210314 | A1 | 10/2004 | Michelson |
| 2005/0033433 | A1 | 2/2005 | Michelson |
| 2007/0219635 | A1 | 9/2007 | Mathieu et al. .......... 623/17.16 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 42 42 889 A1 | 6/1994 |
| DE | 44 09 392 A1 | 9/1995 |
| DE | 195 04 867 C1 | 2/1996 |
| DE | 299 13 200 U1 | 9/1999 |
| EP | 0505634 A1 | 9/1992 |
| EP | 0517030 A2 | 12/1992 |
| EP | 0577178 A1 | 1/1994 |
| EP | 0639351 A2 | 2/1995 |
| EP | 0505634 B1 | 8/1997 |
| EP | 0966930 | 12/1999 |
| EP | 0968692 A1 | 1/2000 |
| EP | 0906065 B1 | 1/2004 |
| FR | 2 697 996 | 5/1994 |
| FR | 2 700 947 | 8/1994 |
| FR | 2 753 368 | 3/1998 |
| GB | 2 148 122 A | 5/1985 |
| SU | 1465040 A1 | 3/1989 |
| WO | WO 88/03417 | 5/1988 |
| WO | WO 88/10100 | 12/1988 |
| WO | WO 92/01428 | 2/1992 |
| WO | WO 95/21053 | 8/1995 |

| | | |
|---|---|---|
| WO | WO 96/39988 | 12/1996 |
| WO | WO 97/20526 | 6/1997 |
| WO | WO 97/25941 | 7/1997 |
| WO | WO 97/25945 | 7/1997 |
| WO | WO 97/39693 | 10/1997 |
| WO | WO 98/17209 | 4/1998 |
| WO | WO 98/55052 | 12/1998 |
| WO | WO 98/56319 | 12/1998 |
| WO | WO 98/56433 | 12/1998 |
| WO | WO 99/29271 | 6/1999 |
| WO | WO 99/32055 | 7/1999 |
| WO | WO 99/38461 | 8/1999 |
| WO | WO 99/38463 | 8/1999 |
| WO | WO 99/56675 | 11/1999 |
| WO | WO 99/63914 | 12/1999 |
| WO | WO 00/07527 | 2/2000 |
| WO | WO 00/07528 | 2/2000 |
| WO | WO 00/30568 | 6/2000 |
| WO | WO 00/40177 | 7/2000 |
| WO | WO 00/41654 | 7/2000 |
| WO | WO 00/59412 | 10/2000 |
| WO | WO 00/66044 A1 | 11/2000 |
| WO | WO 00/66045 A1 | 11/2000 |
| WO | WO 00/74607 A1 | 12/2000 |
| WO | WO 01/08611 | 2/2001 |
| WO | WO 01/56497 A1 | 8/2001 |
| WO | WO 01/93742 A2 | 12/2001 |
| WO | WO 01/95837 A1 | 12/2001 |

* cited by examiner



Fig. 1



**Fig. 2**



**Fig. 3**



**Fig. 4**



Fig. 5                    Fig. 6



Fig. 7

US 7,846,207 B2

1

# INTERVERTEBRAL IMPLANT

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of International Patent Application No. PCT/CH2003/000089, filed Feb. 6, 2003, the entire contents of which is expressly incorporated herein by reference.

## TECHNICAL FIELD

The present invention relates generally to intervertebral implants.

## BACKGROUND OF THE INVENTION

GB-A-2 207 607 discloses an intervertebral implant, which has a horseshoe-shaped configuration with a plurality of cylindrical holes. The holes are smooth on the inside and only have a stop for the heads of the bone screws, which are to be introduced therein. A disadvantage of this arrangement is that the fastening screws, introduced therein, can be anchored only with their shaft in the bone. This does not result in a rigid connection with the horseshoe-shaped intervertebral implant. When the anchoring of the screw shaft in the bone is weakened, the intervertebral implant becomes movable with respect to the screw and the bone screws tend to migrate, endangering the blood vessels. Moreover, the loosening of the intervertebral implant can lead to a pseudoarthrosis.

U.S. Patent Publication US-A 2000/0010511 (Michelson) discloses an intervertebral implant, which, at its front surface, has two boreholes with an internal thread, into which bone screws with a threaded head can be introduced. A disadvantage of this implant is that the bone screws can become loose and are not secured against being screwed out or falling out. A further disadvantage is that the bone screws are fastened completely to the implant body itself and that therefore the latter experiences a relatively large stress.

Screws which emerge at the anterior or anterolateral edge of the vertebral body because of loosening run the risk of injuring main vessels such as the aorta and Vena cava, as well as supply vessels such as lumbar arteries and veins. Injury to these main vessels may result in internal bleeding possibly causing death within a very short time. Loosening of screws is more likely when they are not mounted angularly firmly.

## SUMMARY OF THE INVENTION

The present invention is to provide a remedy for the above-discussed disadvantages. The present invention is directed to an intervertebral implant which can enter into a permanent, rigid connection with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means. Moreover, over a separately constructed front plate, there is tension chording for the bone fixation elements, so that the implant body experiences less stress, that is, is superimposed tensions. Moreover, a securing plate enables all bone fixation elements to be secured simultaneously.

The present invention accomplishes the objective set out above with an intervertebral implant, comprising a three-dimensional body having an upper side and an under side which are suitable for abutting the end plates of two adjacent vertebral bodies. The three-dimensional body further includes a left side surface and a right side surface, a front surface and a rear surface, a horizontal middle plane between

2

the upper side and the under side, and a vertical middle plane extending from the front surface to the rear surface. The three-dimensional body further comprising a plurality of boreholes, having openings at least at or near the front surface, passing there through and being suitable for accommodating longitudinal fixation elements. The intervertebral implant further including a front plate displaceably disposed as an insert with the front side of the three-dimensional body, where the front plate includes a plurality of boreholes having openings and in which the longitudinal fixation elements can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body. The intervertebral implant has a securing plate fastened substantially parallel to the front plate in such a manner that the boreholes of the front plate are covered at least partly by the securing plate. An advantage achieved by the present invention, arises essentially from the solid connection between the intervertebral implant and the longitudinal fixation elements, used to fasten it.

Compared to the two-part implants of the state of the art, for which a front plate is implanted in a separate step, the present invention has the advantage that the implantation of the intervertebral implant may be carried out in one step and, with that, can be carried out more easily and more quickly. A further advantage is that the intervertebral implant is fixed as frontally as possible at the body of the vertebra. That is, at a place where good bone material usually is present. The result is an anterior movement limitation without a greater risk to the surrounding structures. The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements).

A method for implanting an intervertebral implant of the present invention between two adjacent vertebral bodies includes introducing the intervertebral implant, having a three-dimensional body, a front plate, and one or more boreholes, between two adjacent vertebral bodies, attaching longitudinal fixation elements with heads through the boreholes into the vertebral bodies, and attaching a securing plate by means of a fastening agent over the heads of the longitudinal fixation elements to the front plate, such that the heads of the longitudinal fixation elements are captured between the front plate and the securing plate wherein the longitudinal fixation elements are secured against being shifted relative to the intervertebral implant.

Other objectives and advantages in addition to those discussed above will become apparent to those skilled in the art during the course of the description of a preferred embodiment of the invention which follows. In the description, reference is made to accompanying drawings, which form a part thereof, and which illustrate an example of the invention. Such example, however, is not exhaustive of the various embodiments of the invention, and therefore, reference is made to the claims that follow the description for determining the scope of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an exploded drawing of the intervertebral implant,

FIG. 2 shows a longitudinal fixation element in the form of a screw,

FIG. 3 shows an elevation of the intervertebral implant of FIG. 1,

FIG. 4 shows a side view of the intervertebral implant of FIG. 1,

US 7,846,207 B2

3

FIG. **5** shows a three-dimensional detailed representation of the body of the intervertebral implant, which shows the connecting elements to the front plate of FIG. **6**,

FIG. **6** shows a three-dimensional detailed representation of the front plate of the intervertebral implant and the connecting elements to the body of FIG. **5** and

FIG. **7** shows a completely installed intervertebral implant with front plate and securing plate.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The intervertebral implant, shown in FIG. **1-7**, includes a three-dimensional body **10** in the form of a cage with an upper side **1** and an underside **2**, which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface **3** and a right side surface **4**, a front surface **5** and a back surface **6**, a horizontal middle plane **7** located between the upper side **1** and the underside **2**, a vertical middle plane **12** extending from the front surface **5** to the rear surface **6** and four boreholes **9**a, which pass through the body **10** and are suitable for accommodating longitudinal fixation elements **20**. The body **10** may be constructed as a hollow body, the mantle surfaces of which are provided with perforations **19**. The upper side **1** and/or under side **2** of the intervertebral implant may preferably be convex in shape, not planar. A convex shape to the upper side **1** and the underside **2** allows for an improved fit with the end plates of the adjacent vertebral bodies by the intervertebral implant. Further, the side surfaces **1-6** of the intervertebral implant may be essentially convex, as well.

As shown in FIG. **7**, the upper side **1** and the underside **2** of the three-dimensional body **10** are provided with structuring in the form of teeth **30**.

At the front surface of the three-dimensional body **10**, a front plate **8** may be mounted, which is disposed perpendicular to the horizontal central plane of the intervertebral implant and through which four boreholes **9** pass and in which the longitudinal fixation elements **20** can be anchored. The front plate **8**, as shown in FIGS. **5** and **6**, is constructed as an insert for the three-dimensional body **10**. The three-dimensional body **10** has a semicircular groove **27** extending parallel to the vertical middle plane **12** at the transitions of the left side surface **3** and the right side surface **4** (FIG. **5**) to the front surface **5**. Correspondingly, the front plate **8** has right and left (FIG. **6**) similarly extending and similarly dimensioned, semicircular rail **28**. As a result, the front plate can be pushed and positioned easily with its two lateral rails **28** into the corresponding grooves **27** of the body **10** during the production of the intervertebral implant.

In one embodiment, at least one of the boreholes **9** in the front plate is constructed so that a longitudinal fixation element **20**, accommodated therein, can be connected rigidly with the front plate. A rigid connection may be accomplished, for example, owing to the fact that at least one of the boreholes **9** of the front plate **8** has an internal thread. A corresponding longitudinal fixation element **20**, bone screw, with a threaded end can then be screwed together rigidly with the implant. In an alternative embodiment, the four boreholes **9** in the front plate may have an internal thread **11**, so that longitudinal fixation elements **20** can be connected rigidly with the front plate **8**.

As discussed, the front plate **8** may be disposed, preferably vertically to the horizontal central plane, so that it can be displaced vertically with respect to the three-dimensional body **10**. By these means, "stress shielding" (protection and

4

neutralization of mechanical stresses) is attained, which permits the end plates to be adapted to the intervertebral implant during the healing process.

The intervertebral implant may have a securing plate **18**, which can be fastened by means of a screw connection parallel to the front plate **8** at the front plate **8** in such a manner that the boreholes **9** of the front plate **8** are partly covered by the securing plate **18**. The securing plate **18** may have a central borehole **17** provided, preferably, with an internal thread. Corresponding thereto, the front plate **8** has a central borehole **15** for accommodating fastening means **16**. Preferably, the central borehole **15** has an internal thread **14** for accommodating a fastening means **16** in the form of a screw. The securing plate **18** may also be fastened by a bayonet catch or a click catch. By fastening the securing plate **18** to the front plate **8**, the heads **21** of the longitudinal fixation elements **20** (discussed later) are contacted by the securing plate **18**, so that they are secured against being ejected or screwed out.

Preferably, the boreholes **9**a of the three-dimensional body **10** do not pass either through the left side surface **3** or the right side surface **4** or completely through the front surface **5**. The front surface **5**, preferably, is also not crossed by the boreholes **9**a. Further, the horizontal middle plane **7** is not pierced by the boreholes **9**a. Only the axes **24** of the longitudinal fixation elements **20**, introduced therein, intersect the horizontal middle plane **7** of the body **10**. As seen from the front surface **5**, the boreholes of the three-dimensional body **10** and the front plate diverge. The axes **24** of the boreholes of the three-dimensional plate **10** and the front plate **8** enclose an angle β ranging from 20° to 60°, specifically from 36° to 48°, and more preferably an angle β of 42° with the horizontal middle plane **7** (FIG. **4**) and an angle α ranging from 10° to 45°, specifically from 27° to 33°, and more preferably an angle α of 30° with the vertical middle plane **12** (FIG. **3**). Thus, better access for introducing the screws is achieved.

In one embodiment, at least one of the boreholes **9** of the front plate **8** may taper conically towards the underside **2**, so that a bone screw, with a corresponding conical head, can be anchored rigidly therein. The conical borehole preferably has a conical angle, which is smaller than the resulting frictional angle. Advisably, the conicity of the conical borehole is 1:3.75 to 1:20.00 and preferably 1:5 to 1:15.

In another configuration, at least two of the boreholes **9** of the front plate **8** extend parallel to each other. This makes insertion of the intervertebral implant easier. In another embodiment, at least two of the boreholes **9** of the front plate **8** diverge when viewed from the front side. By these means, a region of the vertebral body, which has a better bone quality than does the center of the vertebral body, is reached by the bone screws.

To improve the anchoring of the bone screw in a plastic body of the intervertebral implant (discussed later), a metal sleeve with an internal thread (not shown) may be inserted in the boreholes of the front plate and three-dimensional body. The intervertebral implant may also consist only partially of an x-ray transparent plastic and, in the region of the boreholes consist of a metal, such as titanium or a titanium alloy. Improved guidance and anchoring of the bone screws in the intervertebral implant may be achieved. Further, the boreholes **9** may have a smooth internal wall, into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.

Depending on circumstances, two, three, four or more longitudinal fixation elements may be connected rigidly with the intervertebral implant. Preferably, at least one fixation element should pierce the upper side and at least one fixation element the underside of the intervertebral implant. The lon-

US 7,846,207 B2

5

gitudinal fixation elements **20** may have either a smooth head, so that there will not be a rigid connection with the implant or a threaded, conical or expendable end, so that there will be a rigid connection with the implant. In both cases, however, the longitudinal fixation elements **20** are secured by the securing plate against rotating out, being ejected out or falling out at a later time.

The longitudinal fixation elements **20** are preferably constructed as bone screws. As shown in FIG. **2**, the longitudinal fixation elements **20**, introduced into the boreholes **9**, have a head **21**, a tip **22**, a shaft **23** and an axis **24**. The head **21** may preferably be provided with an external thread **25**, which corresponds to the internal thread **11** of the borehole **9**, so that the heads **21** can be anchored in the boreholes **9** in a rigid manner. The shaft **23** may be provided with a thread **26**, which is self-drilling and self-cutting. The load thread angle of the thread **26** has a range of between 11° to 14°, preferably between 12° and 13°, and more preferably a load thread angle of 12.5°. The pitch angle of the thread may have a range of between 6° and 10°, preferably between 7° and 9°, and more preferably have a pitch angle of 8°. The special pitch angle produces a self-retardation in the thread, thus ensuring that the bone screw will not automatically become loose.

In the case of a second, possibly rigid type of connection, a longitudinal fixation element **20**, bone screw, may preferably be used, the head of which tapers conically towards the shaft, the conicity of the head corresponding to the conicity of the borehole of the intervertebral implant. The longitudinal fixation elements may also be constructed as threadless cylindrical pins, which are provided with a drilling tip, preferably in the form of a trocar. A further variation consist therein that the longitudinal fixation elements are constructed as spiral springs. Finally, the longitudinal fixation elements may also be constructed as single-vaned or multi-vaned spiral blades.

As shown in FIG. **7**, two longitudinal fixation elements **20** pierce the upper side **1** and two longitudinal fixation elements **20** pierce the underside **2** of the body **10**, thereby anchoring the intervertebral implant to the adjacent vertebral bodies.

The intervertebral implant may be produced from any material which is compatible with the body. Preferably, the three-dimensional body **10** may consist of a body-compatible plastic which has not been reinforced and which may be transparent to x-rays. The advantage over fiber-reinforced plastics, which are already known in implant technology, is that no reinforcing fibers are exposed. Such exposure may be disadvantageous clinically. In such a three-dimensional body **10** constructed of a plastic that has not been reinforced, the use bone screws may be preferable. As discussed previously, the external thread of the bone screw(s) may have a load thread angle range of 11° to 14°, and preferably between 12° to 13°. A comparatively slight inclination of the load flank brings about a high clamping force. As a result, radial expansion and the danger of forming cracks in the plastic are reduced. Furthermore, the external thread of the bone screw(s) may preferably have a pitch angle between 6° and 10° and preferably between 7° and 9'.

The front plate **8** may be made from materials different than the three-dimensional body **10**. The front plate **8** is preferably made from a metallic material. Titanium or titanium alloys are particularly suitable as metallic materials. The complete tension chord arrangement (front plate and screws) may also be made from implant steel or highly alloyed metallic materials, such as CoCrMo or CoCrMoC. The advantage of titanium lies in that there is good tissue compatibility and the good ingrowing behavior of bones. The advantage of highly alloyed metallic materials lies in their high-strength values, which permit filigree constructions.

6

A brief description of a surgical procedure follows in order to explain the invention further.

The intervertebral implant, in the form of a three-dimensional body **10**, is introduced between two adjacent vertebral bodies by means of a suitable instrument. Longitudinal fixation elements **20**, in the form of bone screws, securing the three-dimensional body **10** are screwed/inserted by means of a suitable aiming device through the boreholes **9** of the front plate **8** into the vertebral bodies. The front plate **8** may be displaced vertically with respect to the three-dimensional body **10**, such that the openings of the boreholes **9a** of the three-dimensional plate **10** and the boreholes **9** of the front plate **8** overlap, to obtain stress shielding. The securing plate **18** is fastened by means of the fastening agent **16** in the form of a screw over the heads **21** of the longitudinal fixation elements **20** at the front plate **8**, so that the heads **21** of the longitudinal fixation elements **20** and, with that, the screws themselves, are captured between the front plate **8** and the securing plate **18** and secured against being shifted relative to the three-dimensional body **10** (for example, by falling out or by turning out). The fastening agent **16**, in the form of a screw, preferably is provided with a thread, which is distinguished by a large self-retardation.

The invention claimed is:

**1**. An intervertebral implant for insertion into an intervertebral disc space between endplates of adjacent vertebral bodies, the implant comprising:

  a three-dimensional body having an upper side and an underside provided with teeth, the upper side and underside suitable for abutting the end plates of the adjacent vertebral bodies, the upper side defining an upper plane and the underside defining an underside plane, a left side surface and a right side surface, a front surface including first and second partial boreholes, a rear surface, a horizontal middle plane between the upper side and the underside, and a vertical middle plane extending from the front surface to the rear surface;

  a front plate mounted to the front surface of the three-dimensional body, the front plate including a first borehole and a second borehole having openings, the first borehole and the second borehole each being aligned with a respective first and second partial borehole;

  first and second fixation elements being anchorable within the first and second boreholes and the first and second partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; and

  a securing plate fastened substantially parallel to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

**2**. The intervertebral implant according to claim **1**, wherein the securing plate is fastened parallel to the front plate, by at least one of a screw connection, a bayonet catch or a click catch.

**3**. The intervertebral implant according to claim **1**, wherein the securing plate has a central borehole.

**4**. The intervertebral implant according to claim **3**, wherein the front plate has a central borehole for accommodating a fastening agent.

US 7,846,207 B2

7

**5**. The intervertebral implant according to claim **1**, wherein at least one of the first and second boreholes includes internal threads.

**6**. The intervertebral implant according to claim **5**, wherein the first and second boreholes are tapered conically in the direction of the underside of the three-dimensional body.

**7**. The intervertebral implant according to claim **6**, wherein the first and second boreholes have a conical angle, which is smaller than a resulting angle of friction.

**8**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:3.75 to 1:20.00.

**9**. The intervertebral implant according to claim **7**, wherein a conicity of the first and second boreholes range from 1:5 to 1:15.

**10**. The intervertebral implant according to claim **1**, wherein the front plate is preferably disposed vertically relative to the horizontal middle plane.

**11**. The intervertebral implant according to claim **10**, wherein the front plate is disposed in the three-dimensional body, such that it can be shifted vertically relative to the middle plane.

**12**. The intervertebral implant according to claim **1**, wherein the front plate is constructed of a material, which is different from that of the three-dimensional body and is metallic.

**13**. The intervertebral implant according to claim **1**, wherein the side surfaces are constructed convexly.

**14**. The intervertebral implant according to claim **1**, wherein at least one of the upper side and underside are not planar and are constructed convexly.

**15**. The intervertebral implant according to claim **1**, wherein the partial boreholes of the three-dimensional body do not pass completely through the front surface.

**16**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate diverge when viewed from the front surface.

**17**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 20° to 60° with the horizontal middle plane.

**18**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 10° to 45° with the vertical middle plane.

**19**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists of a reinforced plastic.

**20**. The intervertebral implant according to claim **1**, wherein the three-dimensional body consists partly of a material which is transparent to x-rays.

**21**. The intervertebral implant according to claim **1**, wherein the first and second boreholes of the front plate have a smooth inner wall, and the first and second heads of the first and second fixation elements include external threads for embedding in the smooth inner walls of the first and second boreholes.

**22**. The intervertebral implant according to claim **1**, wherein the three-dimensional body is constructed as a hollow body and includes casing surfaces which are provided with perforations.

**23**. The intervertebral implant according to claim **1**, wherein the first and second heads are in contact with the securing plate in the assembled configuration.

**24**. The intervertebral implant according to claim **23**, wherein each of the first and second fixation elements include an axis, the axes of the first and second fixation elements intersect the horizontal middle plane of the three-dimensional body.

8

**25**. The intervertebral implant according to claim **1**, wherein the first fixation element pierces the upper side and the second fixation element pierces the underside.

**26**. The intervertebral implant according to claim **1**, wherein the first and second boreholes include internal threads and the first and second heads of the first and second fixation elements are provided with an external thread, which is threadably matable with the internal threads of the first and second boreholes.

**27**. The intervertebral implant according to claim **1**, wherein the first and second heads taper conically toward the first and second shafts, respectively.

**28**. The intervertebral implant according to claim **1**, wherein the first fixation element passes through the upper side and the second fixation element passes through the underside.

**29**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as bone screws, the first and second shafts including a thread capable of self-drilling and self-cutting.

**30**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as a threadless cylindrical pins with a drill tip.

**31**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as spiral springs.

**32**. The intervertebral implant according to claim **1**, wherein the first and second fixation elements are constructed as single-vaned or multi-vaned spiral blades.

**33**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a load thread angle of 11° to 14°.

**34**. The intervertebral implant according to claim **1**, wherein the first and second shafts of the first and second fixation elements include a plurality of threads having a pitch angle ranging from 6° to 10°.

**35**. The intervertebral implant according to claim **1**, wherein axes of the first and second boreholes define an angle β, ranging from 36° to 48, with the horizontal middle plane.

**36**. The intervertebral plant according to claim **1**, wherein axes of the first and second boreholes enclose an angle α ranging from 27° to 33° with the vertical middle plane.

**37**. The intervertebral implant according to claim **1**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**38**. A method for implanting an intervertebral implant between first and second adjacent vertebral bodies, said method comprising the steps of:

  (a) introducing the intervertebral implant between the first and second adjacent vertebral bodies, the implant comprising:

    a three-dimensional body having first and second partial boreholes extending through a front surface, an upper side and an underside including teeth, the upper side defining an upper plane and the underside defining an underside plane, and

    a front plate having first and second boreholes which are aligned with the first and second partial boreholes, respectively, the first and second boreholes and first and second partial boreholes being positioned substantially between the upper and underside planes;

  (b) attaching a first fixation element having a first head portion and a first shaft portion through the first borehole of the front plate, through the first partial borehole of the three-dimensional body, and into the first vertebral body;

US 7,846,207 B2

9

(c) attaching a second fixation element having a second head portion and a second shaft portion through the second borehole of the front plate, through the second partial borehole of the three-dimensional body, and into the second vertebral body; and

(d) attaching a securing plate with a fastening agent over the first and second head portions of the first and second fixation elements to the front plate, such that the first and second head portions of the first and second fixation elements are captured between the front plate and the securing plate wherein the first and second fixation elements are secured against being shifted relative to the intervertebral implant.

**39**. The method according to claim **38**, wherein the front surface of the three-dimensional body includes a recess for receiving the front plate.

**40**. An intervertebral implant for mounting between adjacent vertebral bodies including a first vertebral body and a second vertebral body, the intervertebral implant comprising:

a body defining a horizontal middle plane, the body having an upper side including teeth for abutting the first vertebral body and an underside having teeth for abutting the second vertebral body, the upper side defining an upper plane and the underside defining an underside plane, the body further including a front surface having first and second partial boreholes;

a front plate mounted to the front surface of the body, the front plate including a first borehole and a second borehole, the first and second boreholes aligning with the first and second partial boreholes, respectively, and extending through the front plate at an angle ranging from about twenty degrees (20°) to about sixty degrees (60°) relative to the horizontal middle plane;

a first fixation element having a first head portion and a first shaft portion, the first head portion positioned in the first borehole and the first partial borehole and positioned between the upper and underside planes in an assembled configuration, the first shaft portion sized and configured to engage the first vertebral body;

a second fixation element having a second head portion and a second shaft portion, the second head portion positioned in the second borehole and the second partial borehole and positioned between the upper and under-

10

side planes in the assembled configuration, the second shaft portion sized and configured to engage the second vertebral body; and

a securing plate fastened to the front plate to at least partly cover the first and second head portions and prevent the first and second fixation elements from moving out of the first and second boreholes, respectively.

**41**. The intervertebral implant according to claim **40**, wherein the front surface of the body includes a recess for receiving the front plate.

**42**. An intervertebral implant for insertion into an intervertebral disc space between endplates of first and second vertebral bodies, the implant comprising:

a body portion including a left side surface, a right side surface, a front surface having first and second partial boreholes, a rear surface, an upper side having teeth suitable for abutting the end plate of the first vertebral body, the upper side defining an upper plane, an underside having teeth suitable for abutting the end plate of the second adjacent vertebral body, the underside defining an underside plane;

a front plate operatively coupled to the front surface of the body, the front plate including a first borehole and a second borehole having respective openings, the first and second boreholes being aligned with the first and second partial boreholes, respectively;

first and second fixation elements being anchorable within the first and second boreholes and partial boreholes, respectively, the first and second fixation elements having first and second heads and first and second shafts, respectively, the first and second heads and the first and second boreholes and partial boreholes positioned substantially between the upper and underside planes in an assembled configuration, the first and second shafts being positioned substantially on an opposite side of the upper and underside planes, respectively, in the assembled configuration; the implant further comprising a securing plate operatively connectable to the front plate in such a manner that the first and second boreholes of the front plate and the first and second heads are covered at least partly by the securing plate.

**43**. The intervertebral implant according to claim **42**, wherein the front plate is received within a recess formed in the body portion.

*   *   *   *   *

# **EXHBIIT B**

US007875076B2

(12) **United States Patent**
    Mathieu et al.

(10) **Patent No.:**       **US 7,875,076 B2**
(45) **Date of Patent:**        ***Jan. 25, 2011**

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Claude Mathieu**, Zurich (CH);
                **Christopher Marden John Cain**,
                Eastwood (AU)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA
               (US)

( * ) Notice: Subject to any disclaimer, the term of this
              patent is extended or adjusted under 35
              U.S.C. 154(b) by 0 days.

              This patent is subject to a terminal dis-
              claimer.

(21) Appl. No.: **12/574,222**

(22) Filed: **Oct. 6, 2009**

(65)           **Prior Publication Data**

     US 2010/0094421 A1      Apr. 15, 2010

         **Related U.S. Application Data**

(63) Continuation of application No. 11/751,757, filed on
     May 22, 2007, now Pat. No. 7,618,456, which is a
     continuation of application No. 10/923,534, filed on
     Aug. 19, 2004, now Pat. No. 7,232,464, which is a
     continuation of application No. PCT/CH02/00099,
     filed on Feb. 19, 2002.

(51) **Int. Cl.**
     *A61F 2/44*         (2006.01)
(52) **U.S. Cl.** ................................................... **623/17.11**
(58) **Field of Classification Search** .... 623/17.11–17.16
     See application file for complete search history.

(56)              **References Cited**

              U.S. PATENT DOCUMENTS

     2002/0082597 A1 *  6/2002  Fraser ........................ 606/61

     2005/0033433 A1 *  2/2005  Michelson ............... 623/17.11

              OTHER PUBLICATIONS

Co-Pending U.S. Appl. No. 11/199,599—Preliminary Amendment
dated Jan. 9, 2008.
Co-Pending U.S. Appl. No. 11/199,599—Non-Final Office Action
dated Apr. 1, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Interview Summary
including Draft Claim Amendments dated Sep. 24, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Amendment dated Sep. 29,
2009.
Co-Pending U.S. Appl. No. 11/199,599—Final Office Action dated
Dec. 24, 2009.
Co-Pending U.S. Appl. No. 11/199,599—Appeal Brief dated Apr.
15, 2010.

* cited by examiner

*Primary Examiner*—Bruce E Snow
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan
LLP

(57)              **ABSTRACT**

The intervertebral implant is in the form of a three-dimen-
sional structure (**10**) comprising (a) a top side (**1**) and an
underside (**2**) which are designed to rest against the end plates
of two adjacent vertebras, (b) a left side face (**3**) and a right
side face (**4**), (c) a front face (**5**) and a rear face (**6**), (d) a
horizontal center plane situated between the top side (**1**) and
the underside (**2**), (e) a vertical center plane (**8**) situated
between the left side face (**3**) and the right side face (**8**) and (f)
a plurality of boreholes (**9**) passing through the implant struc-
ture (**10**) that are designed to receive longitudinal affixation
elements (**20**), the axes (**19**) of said elements intersecting the
horizontal center plane (**7**). At least one of the boreholes (**9**) is
designed in a manner that the affixation element (**10**) received
in it can be rigidly connected to the intervertebral implant.
Said connection is implemented using a thread or by match-
ing conical surfaces.

              **16 Claims, 3 Drawing Sheets**







Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7

US 7,875,076 B2

**1**

# INTERVERTEBRAL IMPLANT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application. Ser. No. 11/751,757, now U.S. Pat. No. 7,618,456, filed May 22, 2007, which is a continuation of U.S. patent application Ser. No. 10/923,534, now U.S. Pat. No. 7,232,464, filed Aug. 19, 2004, which is a continuation of International Application No. PCT/CH02/00099, filed Feb. 19, 2002. The entire contents of these applications are expressly incorporated herein by reference thereto.

## FIELD OF THE INVENTION

The present invention relates to an intervertebral implant.

## BACKGROUND OF THE INVENTION

Such an intervertebral implant is known from the British patent document 2,207,607 A which discloses a horseshoe implant structure having a plurality of cylindrical holes. These holes are fitted with inner, smooth surfaces and comprise only one stop for the heads of the bone screws to be inserted into them. This design incurs the drawback that the inserted affixation screws may be anchored into the bone only by their shanks, a rigid connection with the horseshoe shaped intervertebral implant being lacking. As soon as the anchoring of the bone screw in the bone is weakened, the intervertebral implant becomes displaceable relative to the screw and the bone screws may then migrate while endangering the blood vessels. Moreover the loosening of the intervertebral implant may entail pseudoarthrosis.

The above cited state of the art is intended merely to elucidate the background of the present invention but it does imply that the cited state of the art had actually been made public or was publicly known at the time of this application or at the time of its priority.

## BRIEF SUMMARY OF THE INVENTION

The objective of the present invention is palliation. This invention creates an intervertebral implant which is able to rigidly connect to bone affixation means in a manner that even in the event of bone structure weakening, loosening between the intervertebral implant and the bone affixation means shall be precluded.

The above problem is solved in the present invention by an intervertebral implant exhibiting the features of claim **1**.

The advantages offered by the present invention substantially are attained by the rigid, that is by the firm connection between the intervertebral implant and the longitudinal affixing elements. Basically two different embodiment modes are available to attain said rigid connection.

In a first embodiment mode, at least one of the boreholes shall be internally threaded. In this case a matching bone screw fitted with a thread head may be rigidly screwed into the implant.

As regards a second embodiment mode, a front plate is mounted at the front surface of the three dimensional (3D) implant structure so as to be configured vertically to the horizontal center plane of the intervertebral implant, said boreholes passing through said front plate and receiving the anchored longitudinal affixation elements. Compared to the state of the art of a two-part implant, wherein a front plate is implanted in a separate operational step, the above design of

**2**

the present invention offers the advantage that the intervertebral implant shall be implanted in a single step and hence in a simple and quicker manner. The invention offers a further advantage in that the intervertebral implant shall be affixed as frontally to the vertebra as possible, namely at a place where good bone material may be expected to be. As a result anterior displacement is restricted without thereby incurring greater danger to the surrounding structures than when using a state of the art intervertebral implant. The load still is being borne by the compressed vertebral implant, not by the front plate or the affixation screws.

In yet another embodiment mode of the present invention, the front plate is displaceably configured in the 3D implant structure in order that it may move vertically relative to this 3D implant structure. "Stress shielding" is attained in this manner (namely protection from or neutralization of mechanical stresses), and as a result the end plates may gradually match the intervertebral implant during the healing process.

As regards a further embodiment, the front plate is made of a material different from that of the 3D implant structure.

As regards a further embodiment of the present invention, at least one borehole tapers conically towards its underside and as a result a bone screw fitted with a matching conical head may be rigidly anchored in said borehole. Preferably the conical borehole exhibits a cone angle smaller than the resultant angle of friction. Appropriately the borehole's conicity shall be 1:3.75 to 1:20, preferably 1:5 to 1:15.

As regards a further embodiment mode of the present invention, the intervertebral implant side faces shall all be substantially convex.

Appropriately the intervertebral implant's top and/or undersides are not planar but convex. In this manner better matching to the end plates of the adjacent vertebras may be attained.

The boreholes preferably shall not pass through the left and right intervertebral implant side faces. Preferably again no borehole shall run through the front surface.

As regards a further preferred embodiment mode of the present invention, at least two boreholes shall be mutually parallel. This features facilitates inserting the vertebral implant during implantation.

As regards another preferred embodiment mode of the present invention, at least two boreholes shall run in mutually divergent manner as seen from the front side. As a result the bone screws shall move into a vertebral region offering better bone quality than found at the vertebra's center. Appropriately the borehole axes subtend an angle of 25 degrees to 70 degrees, preferably 35 degrees to 55 degrees with the horizontal center plane. This feature offers improved access for screw insertion.

As regards a further embodiment mode of the present invention, the boreholes shall not cross the horizontal center plane.

Depending on circumstance, two, three, four or even more longitudinal affixation elements may rigidly connected to the intervertebral implant; appropriately at least one affixation element shall pass through the top side and at least one affixation element shall pass through the intervertebral implant side.

Preferably the longitudinal affixation elements shall be bone screws comprising a head and a shank, said head preferably being fitted with an external thread that matches the inner thread of the intervertebral implant's borehole. As regards a second appropriate connection, preferably a bone screw shall be used of which the head tapers conically in the

US 7,875,076 B2

3

direction of the shank, the head's conicity corresponding to that of the intervertebral implant's borehole.

Regarding a further embodiment mode, at least two longitudinal affixation elements pass through the top side and at least two longitudinal affixation elements pass through the underside. In this manner the intervertebral implant is optimally anchored into the adjacent vertebras.

Preferably the screw-shaped longitudinal affixation elements exhibit a self-boring and self-tapping external thread. The longitudinal affixation elements also may be designed as unthreaded cylindrical pins fitted with a boring tip, preferably in the form of a trocar.

In another embodiment variation, the longitudinal affixation elements are spiral springs; lastly said longitudinal affixation elements also may be designed as single or multiwing spiral blades.

In a further embodiment mode of the present invention, the longitudinal affixation element tip may be anchored in the structure of the intervertebral implant, as a result of which the head of the longitudinal affixation element may be anchored in the adjacent vertebra.

In a further embodiment mode of the present invention, the longitudinal affixation element head exhibits a widened diameter; also a support disk is provided for said head to rest against the vertebra.

The intervertebral implant may be made of any physiologically compatible material, though appropriately the implant structure shall consist of a physiologically compatible plastic, preferably an unreinforced plastic. The advantage offered by the invention over the already known, fiber-reinforced plastics used in implantology is that no reinforcing fibers will be bared—an eventuality that would be clinically disadvantageous. Appropriately bone screws consisting of non-reinforced plastic of which the external threads exhibit load bevels of 11 degrees to 14 degrees, preferably 12 degrees to 13 degrees, may be used in such an implant structure. The relatively small slope of the load bevel implements high clamping forces, as a result of which radial elongation and danger of cracking of the plastic are reduced. Appropriately the bone screws' external thread exhibits the bones at an angular pitch of 6 degrees to 10 degrees, preferably 7 degrees to 9 degrees. This particular angular pitch produces thread self-locking and prevents the bone screw from loosening on its own.

The borehole may be in the form of a metal bush fitted with an inner thread for the purpose of improving anchoring the bone screw in the plastic implant structure. The intervertebral implant also may consist partly of plastic and, in the borehole zones, of metal. This design offers improved guidance and anchoring of the bone screw in the intervertebral implant.

As regards a further preferred embodiment mode, the inside borehole walls are smooth, the thread head of a metallic, longitudinal affixation element cutting or tapping into said smooth wall.

### BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

The present invention and further embodiment modes of it are elucidated below in relation to the partly schematic representation of two illustrative embodiments.

FIG. **1** is a perspective view including a partial section of the intervertebral implant with inserted bone screws,

FIG. **2** is a front view of the intervertebral implant of FIG. **1**,

FIG. **3** is a side view of the intervertebral implant of FIG. **1**,

FIG. **4** is a top view of the intervertebral implant of FIG. **1**,

4

FIG. **5** is a front view of the intervertebral implant with a front insert, in partial section,

FIG. **6** is a vertical, longitudinal section of the intervertebral implant of FIG. **5**, and

FIG. **7** is a horizontal cross-section of the intervertebral implant of FIG. **5**.

### DETAILED DESCRIPTION OF THE INVENTION

The intervertebral implant of FIGS. **1** through **4** consists of a 3D structure **10** exhibiting both a convex top side **1** and a convex underside **2**, the two sides each being designed to rest against the end plates of two adjacent vertebras. To attain improved anchoring, the top side **1** and the underside **2** may be topographically shaped and be fitted with grooves, ribs or teeth, or their surfaces may be merely roughened.

The 3D implant structure **10** moreover comprises a left side face **3** and a right side face **4**, also a front face **5** and a rear face **6**. The implant structure **10** also may be hollow and its outer surface may comprise perforations.

The implant structure **10** comprises a plurality of boreholes **9** passing through it and receiving longitudinal affixation elements **20**. Preferably four such boreholes **9** shall be provided.

At least one of the boreholes **9** is designed in a way that the longitudinal affixation element **20** received therein may be rigidly connected to the intervertebral implant. The boreholes **9** are conical for that purpose.

Preferably the affixation elements **20** are bone screws having a head **21** and a tip **22**. The head **21** conically tapers toward the shank **23**, the conicity of the head **21** corresponding to the conicity of the borehole **9**. Moreover the four boreholes **9** may be fitted with inner threads **11**.

As regards the embodiment variation shown in FIGS. **5** through **7**, the 3D structure **10** is fitted at its front face **5** with a preferably metallic insert **8** into which the affixation elements **20** may be anchored. The insert **8** is mounted in vertically displaceable manner in the 3D structure **10**.

While the invention has been shown and described herein with reference to particular embodiments, it is to be understood that the various additions, substitutions, or modifications of form, structure, arrangement, proportions, materials, and components and otherwise, used in the practice and which are particularly adapted to specific environments and operative requirements, may be made to the described embodiments without departing from the spirit and scope of the present invention. Accordingly, it should be understood that the embodiments disclosed herein are merely illustrative of the principles of the invention. Various other modifications may be made by those skilled in the art which will embody the principles of the invention and fall within the spirit and the scope thereof.

We claim:

**1**. An intervertebral implant for insertion between an upper vertebra having an upper endplate and a lower vertebra having a lower endplate, the implant comprising:

a body having a first lateral side surface, a second lateral side surface, a posterior face, an anterior face, an upper surface and a lower surface, the upper and lower surfaces being sized and configured to contact the upper and lower endplates, respectively, of the upper and lower vertebrae, the upper surface defining an upper plane and the lower surface defining a lower plane;

a plate operatively coupled to the body, the plate having a plate top surface located generally on the upper plane and a plate lower surface located generally on the lower plane when the plate is coupled to the body so that the

US 7,875,076 B2

5

body has a first height extending between the upper surface and the lower surface and the plate has a second height extending between the plate top surface and the plate lower surface, the second height being generally equal to the first height, first and second boreholes passing through the plate, the first and second boreholes positioned between the upper and lower planes; and

first and second bone screws each having a head and a shank, the first bone screw being sized and configured to extend through the first borehole and into the upper endplate, the second bone screw being sized and configured to extend through the second borehole and into the lower endplate to anchor the intervertebral implant to the upper and lower vertebrae and the heads of the first and second bone screws positioned between the upper and lower planes.

**2**. The implant of claim **1**, wherein the implant includes a plurality of teeth.

**3**. The implant of claim **1**, wherein the plate contacts the anterior face of the body.

**4**. The implant of claim **3**, wherein the anterior face of the body includes a recess for receiving the plate.

**5**. The implant of claim **1**, wherein the plate is entirely contained between the endplates of the upper and lower vertebrae when the implant is inserted between the upper and lower vertebrae.

**6**. The implant of claim **1**, wherein the body and the plate are pre-assembled so that the body and the plate are inserted between the upper and lower vertebrae as a single unit.

**7**. The implant of claim **1**, wherein the implant includes a vertical center plane, the first and second fasteners being laterally divergent from the vertical center plane.

**8**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the plate is disposed substantially perpendicular to the horizontal center plane.

6

**9**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the plate is displaceable in a direction substantially perpendicular to the horizontal center plane.

**10**. The implant of claim **1**, wherein the body is formed from a first biocompatible material and the plate is formed from a second biocompatible material, the second biocompatible material being different than the first biocompatible material.

**11**. The implant of claim **10**, wherein the plate is made from a biocompatible metal and the body is made from a biocompatible plastic.

**12**. The implant of claim **1**, wherein the body comprises a horizontal center plane and the first and second fastener holes have an axis angled from about twenty-five degrees (25°) to about seventy degrees (70°) with respect to the horizontal center plane.

**13**. The implant of claim **12**, wherein the axis is angled from about thirty-five degrees (35°) to about fifty-five degrees (55°) with respect to the horizontal center plane.

**14**. The implant of claim **1**, wherein the plate is slidably displaceable with respect to the body.

**15**. The implant of claim **1**, wherein the first and second fasteners are bone screws and wherein the first and second fastener holes formed in the plate are internally threaded and the heads of the bone screws are externally threaded for engaging the internally threaded holes.

**16**. The implant of claim **1**, wherein the plate further comprises a horizontal center midplane, the head of the first fastener being located between the top surface of the plate and the horizontal center midplane and the head of the second fastener being located between the bottom surface of the plate and the horizontal center midplane.

*   *   *   *   *

# EXHBIIT C

US007862616B2

(12) **United States Patent**
Lechmann et al.

(10) Patent No.: **US 7,862,616 B2**
(45) Date of Patent: **\*Jan. 4, 2011**

(54) **INTERVERTEBRAL IMPLANT**

(75) Inventors: **Beat Lechmann**, Bettlach (CH); **Dominique Burkard**, Gretzenbach (CH); **Chris M. J. Cain**, Norwood (AU); **Claude Mathieu**, Zurich (CH)

(73) Assignee: **Synthes USA, LLC**, West Chester, PA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.
This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/432,088**

(22) Filed: **Apr. 29, 2009**

(65) **Prior Publication Data**
US 2009/0210064 A1      Aug. 20, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 11/199,599, filed on Aug. 8, 2005, which is a continuation of application No. PCT/CH03/00089, filed on Feb. 6, 2003.

(51) **Int. Cl.**
*A61F 2/44*          (2006.01)

(52) **U.S. Cl.** ................................. **623/17.11**; 623/17.16

(58) **Field of Classification Search** ... 623/17.11–17.16; 606/90, 293
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,621,145 A   12/1952   Sano
(Continued)

FOREIGN PATENT DOCUMENTS

CA          2317791 A1      8/1999
(Continued)

OTHER PUBLICATIONS

Office Notice of Reason of Rejection issued by the Japanese Patent Office.

*Primary Examiner*—Todd E Manahan
*Assistant Examiner*—Lynnsy Schneider
(74) *Attorney, Agent, or Firm*—Stroock & Stroock & Lavan LLP

(57)          **ABSTRACT**

An intervertebral implant having a three-dimensional body (**10**) and a securing plate (**1**). The three-dimensional body (**10**) includes an upper side (**1**) and an underside (**2**) which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface (**3**) and a right side surface (**4**), a front surface (**5**) and a rear surface (**6**), a horizontal middle plane (**7**) between the upper side (**1**) and the underside (**2**), and a vertical middle plane (**12**) extending from the front surface (**5**) to the rear surface (**6**). The three-dimensional body further includes a plurality of boreholes (**9**a) passing through the body (**10**), which are suitable for accommodating longitudinal fixation elements (**20**). The intervertebral implant also includes a front plate (**8**) displaceably disposed as an insert with the front side (**5**) of the three-dimensional body, the front plate (**8**) having a plurality of boreholes (**9**) in which the longitudinal fixation elements (**20**) can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body (**10**). A securing plate can be fastened essentially parallel to the front plate (**8**) at the three-dimensional body (**10**) in such a manner that the boreholes of the front plate (**9**) are covered at least partly by the securing plate (**18**). By virtue of the configuration of the intervertebral implant, a rigid, firm connection between the intervertebral implant and the longitudinal fixation elements used to fasten it, is possible.

**13 Claims, 6 Drawing Sheets**



**US 7,862,616 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,135,506 A | 1/1979 | Ulrich | |
| 4,501,269 A | 2/1985 | Bagby | |
| 4,512,038 A | 4/1985 | Alexander et al. | |
| 4,627,853 A | 12/1986 | Campbell et al. | |
| 4,678,470 A | 7/1987 | Nashef et al. | |
| 4,717,115 A | 1/1988 | Schmitz et al. | |
| 4,858,603 A | 8/1989 | Clemow et al. | |
| 4,904,261 A | 2/1990 | Dove et al. | |
| 4,936,851 A | 6/1990 | Fox et al. | |
| 4,950,296 A | 8/1990 | McIntyre | |
| 4,961,740 A | 10/1990 | Ray et al. | |
| 4,978,350 A | 12/1990 | Wagenknecht | 606/312 |
| 4,994,084 A | 2/1991 | Brennan | |
| 5,026,373 A | 6/1991 | Ray et al. | |
| 5,053,049 A | 10/1991 | Campbell | |
| 5,062,850 A | 11/1991 | MacMillan et al. | |
| 5,084,051 A | 1/1992 | Törmälä et al. | |
| 5,112,354 A | 5/1992 | Sires | |
| 5,192,327 A | 3/1993 | Brantigan | |
| 5,211,664 A | 5/1993 | Tepic et al. | |
| 5,281,226 A | 1/1994 | Davydov et al. | |
| 5,284,655 A | 2/1994 | Bogdansky et al. | |
| 5,290,312 A * | 3/1994 | Kojimoto et al. | 623/17.15 |
| 5,298,254 A | 3/1994 | Prewett et al. | |
| 5,314,476 A | 5/1994 | Prewett et al. | |
| 5,348,788 A | 9/1994 | White | |
| 5,397,364 A * | 3/1995 | Kozak et al. | 623/17.11 |
| 5,405,391 A * | 4/1995 | Hednerson et al. | 623/17.15 |
| 5,423,817 A | 6/1995 | Lin | |
| 5,439,684 A | 8/1995 | Prewett et al. | |
| 5,458,638 A | 10/1995 | Kuslich et al. | |
| 5,489,308 A | 2/1996 | Kuslich et al. | |
| 5,507,818 A | 4/1996 | McLaughlin | |
| 5,514,180 A | 5/1996 | Heggeness et al. | |
| 5,522,899 A | 6/1996 | Michelson | |
| 5,534,030 A | 7/1996 | Navarro et al. | |
| 5,549,679 A | 8/1996 | Kuslich | |
| 5,554,191 A | 9/1996 | Lahille et al. | |
| 5,556,430 A | 9/1996 | Gendler | |
| 5,569,308 A | 10/1996 | Sottosanti | |
| 5,571,190 A | 11/1996 | Ulrich et al. | |
| 5,571,192 A | 11/1996 | Schönhöffer | |
| 5,607,474 A | 3/1997 | Athanasiou et al. | |
| 5,609,635 A * | 3/1997 | Michelson | 623/17.16 |
| 5,609,636 A | 3/1997 | Kohrs et al. | |
| 5,609,637 A | 3/1997 | Biedermann et al. | |
| 5,676,699 A | 10/1997 | Gogolewski et al. | |
| 5,683,394 A | 11/1997 | Rinner | |
| 5,683,463 A | 11/1997 | Godefroy et al. | |
| 5,702,449 A | 12/1997 | McKay | |
| 5,702,451 A | 12/1997 | Biedermann et al. | |
| 5,702,453 A | 12/1997 | Rabbe et al. | |
| 5,702,455 A | 12/1997 | Saggar | |
| 5,728,159 A | 3/1998 | Stroever et al. | |
| 5,735,905 A | 4/1998 | Parr | |
| 5,766,253 A | 6/1998 | Brosnahan, III | |
| 5,776,194 A | 7/1998 | Mikol et al. | |
| 5,776,197 A | 7/1998 | Rabbe et al. | |
| 5,776,198 A | 7/1998 | Rabbe et al. | |
| 5,776,199 A | 7/1998 | Michelson | |
| 5,782,915 A | 7/1998 | Stone | |
| 5,785,710 A | 7/1998 | Michelson | |
| 5,800,433 A | 9/1998 | Benzel et al. | 606/61 |
| 5,861,041 A * | 1/1999 | Tienboon | 623/17.16 |
| 5,865,849 A | 2/1999 | Stone | |
| 5,876,452 A | 3/1999 | Athanasiou et al. | |
| 5,885,299 A | 3/1999 | Winslow et al. | |
| 5,888,222 A | 3/1999 | Coates et al. | |
| 5,888,223 A * | 3/1999 | Bray, Jr. | 623/17.16 |
| 5,888,224 A | 3/1999 | Beckers et al. | |
| 5,888,227 A | 3/1999 | Cottle | |
| 5,895,426 A | 4/1999 | Scarborough et al. | |
| 5,899,939 A | 5/1999 | Boyce et al. | |
| 5,902,338 A | 5/1999 | Stone | |
| 5,904,719 A | 5/1999 | Errico et al. | |
| 5,910,315 A | 6/1999 | Stevenson et al. | |
| 5,922,027 A | 7/1999 | Stone | |
| 5,944,755 A | 8/1999 | Stone | |
| 5,968,098 A | 10/1999 | Winslow | |
| 5,972,368 A | 10/1999 | McKay | |
| 5,976,187 A | 11/1999 | Richelsoph | |
| 5,980,522 A | 11/1999 | Koros et al. | |
| 5,981,828 A | 11/1999 | Nelson et al. | |
| 5,984,967 A | 11/1999 | Zdeblick et al. | |
| 5,989,289 A | 11/1999 | Coates et al. | |
| 6,013,853 A | 1/2000 | Athanasiou et al. | |
| 6,025,538 A | 2/2000 | Yaccarino, III | |
| 6,033,405 A | 3/2000 | Winslow et al. | |
| 6,033,438 A | 3/2000 | Bianchi et al. | |
| 6,039,762 A | 3/2000 | McKay | |
| 6,045,579 A | 4/2000 | Hochshuler et al. | |
| 6,045,580 A | 4/2000 | Scarborough et al. | |
| 6,066,175 A * | 5/2000 | Henderson et al. | 623/17.11 |
| 6,080,158 A | 6/2000 | Lin | |
| 6,080,193 A | 6/2000 | Hochshuler et al. | |
| 6,090,998 A | 7/2000 | Grooms et al. | |
| 6,096,080 A * | 8/2000 | Nicholson et al. | 623/17.16 |
| 6,096,081 A | 8/2000 | Grivas et al. | |
| 6,110,482 A | 8/2000 | Khouri et al. | |
| 6,123,731 A | 9/2000 | Boyce et al. | |
| 6,129,763 A | 10/2000 | Chauvin et al. | |
| 6,143,030 A | 11/2000 | Schroder | |
| 6,143,033 A | 11/2000 | Paul et al. | |
| 6,156,070 A | 12/2000 | Incavo et al. | |
| 6,193,756 B1 | 2/2001 | Studer et al. | |
| 6,200,347 B1 | 3/2001 | Anderson et al. | |
| 6,206,922 B1 * | 3/2001 | Zdeblick et al. | 623/17.11 |
| 6,231,610 B1 | 5/2001 | Geisler | |
| 6,235,059 B1 | 5/2001 | Benezech et al. | |
| 6,241,769 B1 | 6/2001 | Nicholson et al. | |
| 6,245,108 B1 | 6/2001 | Biscup | |
| 6,258,125 B1 | 7/2001 | Paul et al. | |
| 6,261,586 B1 | 7/2001 | McKay | |
| 6,264,695 B1 | 7/2001 | Stoy | |
| 6,270,528 B1 | 8/2001 | McKay | |
| 6,306,139 B1 * | 10/2001 | Fuentes | 606/70 |
| 6,342,074 B1 | 1/2002 | Simpson | |
| 6,364,880 B1 | 4/2002 | Michelson | |
| 6,423,063 B1 | 7/2002 | Bonutti | |
| 6,432,106 B1 * | 8/2002 | Fraser | 623/17.11 |
| 6,458,158 B1 | 10/2002 | Anderson et al. | |
| 6,468,311 B2 | 10/2002 | Boyd et al. | |
| 6,558,423 B1 * | 5/2003 | Michelson | 623/17.11 |
| 6,569,201 B2 | 5/2003 | Moumene et al. | |
| 6,576,017 B2 * | 6/2003 | Foley et al. | 623/17.16 |
| 6,629,998 B1 * | 10/2003 | Lin | 623/17.11 |
| 6,638,310 B2 | 10/2003 | Lin et al. | |
| 6,645,212 B2 | 11/2003 | Goldhahn et al. | 606/291 |
| 6,761,739 B2 | 7/2004 | Shepard | |
| 6,972,019 B2 | 12/2005 | Michelson | 606/86 A |
| 6,984,234 B2 | 1/2006 | Bray | 606/69 |
| 7,044,968 B1 * | 5/2006 | Yaccarino et al. | 623/16.11 |
| 7,172,627 B2 | 2/2007 | Fiere et al. | 623/17.11 |
| 7,232,463 B2 * | 6/2007 | Falahee | 623/17.11 |
| 7,232,464 B2 | 6/2007 | Mathieu et al. | 623/17.11 |
| 7,323,011 B2 * | 1/2008 | Shepard et al. | 623/17.11 |
| 7,608,107 B2 * | 10/2009 | Michelson | 623/17.15 |
| 2001/0001129 A1 | 5/2001 | McKay et al. | |
| 2001/0005796 A1 | 6/2001 | Zdeblick et al. | |
| 2001/0010021 A1 | 7/2001 | Boyd et al. | |
| 2001/0016777 A1 | 8/2001 | Biscup | |
| 2001/0031254 A1 | 10/2001 | Bianchi et al. | |
| 2001/0039456 A1 | 11/2001 | Boyer, II et al. | |
| 2001/0041941 A1 | 11/2001 | Boyer, II et al. | |

## US 7,862,616 B2

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 2002/0010511 A1* | 1/2002 | Michelson ............... 623/17.15 | | FR | 2 697 996 | 5/1994 |
| 2002/0022843 A1* | 2/2002 | Michelson ................... 606/70 | | FR | 2 700 947 | 8/1994 |
| 2002/0029084 A1 | 3/2002 | Paul et al. | | FR | 2 753 368 | 3/1998 |
| 2002/0082597 A1* | 6/2002 | Fraser .......................... 606/61 | | GB | 2 148 122 A | 5/1985 |
| 2002/0082603 A1 | 6/2002 | Dixon et al. .................. 607/69 | | SU | 1465040 A1 | 3/1989 |
| 2002/0091447 A1 | 7/2002 | Shimp et al. | | WO | WO 88/03417 | 5/1988 |
| 2002/0099376 A1* | 7/2002 | Michelson ................... 606/61 | | WO | WO 88/10100 | 12/1988 |
| 2002/0106393 A1 | 8/2002 | Bianchi et al. | | WO | WO 92/01428 | 2/1992 |
| 2002/0111680 A1 | 8/2002 | Michelson | | WO | WO 95/21053 | 8/1995 |
| 2002/0128712 A1* | 9/2002 | Michelson ............... 623/17.11 | | WO | WO 96/39988 | 12/1996 |
| 2002/0147450 A1* | 10/2002 | LeHuec et al. ................. 606/61 | | WO | WO 97/20526 | 6/1997 |
| 2002/0169508 A1* | 11/2002 | Songer et al. ............ 623/17.11 | | WO | WO 97/25941 | 7/1997 |
| 2002/0193880 A1* | 12/2002 | Fraser ..................... 623/17.11 | | WO | WO 97/25945 | 7/1997 |
| 2003/0078668 A1 | 4/2003 | Michelson ............... 623/17.16 | | WO | WO 97/39693 | 10/1997 |
| 2003/0125739 A1* | 7/2003 | Bagga et al. .................. 606/61 | | WO | WO 98/17209 | 4/1998 |
| 2003/0153975 A1* | 8/2003 | Byrd et al. ............... 623/17.11 | | WO | WO 98/55052 | 12/1998 |
| 2004/0078078 A1* | 4/2004 | Shepard ................... 623/17.11 | | WO | WO 98/56319 | 12/1998 |
| 2004/0210314 A1 | 10/2004 | Michelson | | WO | WO 98/56433 | 12/1998 |
| 2004/0254644 A1* | 12/2004 | Taylor ..................... 623/17.13 | | WO | WO 99/29271 | 6/1999 |
| 2005/0033433 A1 | 2/2005 | Michelson | | WO | WO 99/32055 | 7/1999 |
| 2005/0101960 A1* | 5/2005 | Fiere et al. ..................... 606/72 | | WO | WO 99/38461 | 8/1999 |
| 2005/0159813 A1* | 7/2005 | Molz ....................... 623/17.11 | | WO | WO 99/38963 | 8/1999 |
| 2007/0219635 A1 | 9/2007 | Mathieu et al. .......... 623/17.16 | | WO | WO 99/56675 | 11/1999 |
| | | | | WO | WO 99/63914 | 12/1999 |
| FOREIGN PATENT DOCUMENTS | | | | WO | WO 00/07527 | 2/2000 |
| | | | | WO | WO 00/07528 | 2/2000 |
| DE | 42 42 889 A1 | 6/1944 | | WO | WO 00/30568 | 6/2000 |
| DE | 30 42 003 A1 | 7/1982 | | WO | WO 00/40177 | 7/2000 |
| DE | 39 33 459 A1 | 4/1991 | | WO | WO 00/41654 | 7/2000 |
| DE | 44 09 392 A1 | 9/1995 | | WO | WO 00/59412 | 10/2000 |
| DE | 195 04 867 C1 | 2/1996 | | WO | WO 00/66044 A1 | 11/2000 |
| DE | 299 13 200 U1 | 9/1999 | | WO | WO 00/66045 A1 | 11/2000 |
| EP | 0505634 A1 | 9/1992 | | WO | WO 00/74607 A1 | 12/2000 |
| EP | 0517030 A2 | 12/1992 | | WO | WO 01/08611 | 2/2001 |
| EP | 0577178 A1 | 1/1994 | | WO | WO 01/56497 A2 | 8/2001 |
| EP | 0639351 A2 | 2/1995 | | WO | WO 01/93742 A2 | 12/2001 |
| EP | 05056341 B1 | 8/1997 | | WO | WO 01/95837 A1 | 12/2001 |
| EP | 0966930 | 12/1999 | | | | |
| EP | 0968692 A1 | 1/2000 | | * cited by examiner | | |
| EP | 0906065 B1 | 1/2004 | | | | |



Fig. 1



**Fig. 2**



**Fig. 3**



Fig. 4



Fig. 5                                    Fig. 6



**Fig. 7**

US 7,862,616 B2

1

**INTERVERTEBRAL IMPLANT**

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 11/199,599, filed Aug. 8, 2005, which is a continuation of International Patent Application No. PCT/CH2003/000089, filed Feb. 6, 2003, the entire contents of which are expressly incorporated herein by reference thereto.

### TECHNICAL FIELD

The present invention relates generally to intervertebral implants.

### BACKGROUND OF THE INVENTION

GB-A-2 207 607 discloses an intervertebral implant, which has a horseshoe-shaped configuration with a plurality of cylindrical holes. The holes are smooth on the inside and only have a stop for the heads of the bone screws, which are to be introduced therein. A disadvantage of this arrangement is that the fastening screws, introduced therein, can be anchored only with their shaft in the bone. This does not result in a rigid connection with the horseshoe-shaped intervertebral implant. When the anchoring of the screw shaft in the bone is weakened, the intervertebral implant becomes movable with respect to the screw and the bone screws tend to migrate, endangering the blood vessels. Moreover, the loosening of the intervertebral implant can lead to a pseudoarthrosis.

U.S. Patent Publication US-A 2000/0010511 (Michelson) discloses an intervertebral implant, which, at its front surface, has two boreholes with an internal thread, into which bone screws with a threaded head can be introduced. A disadvantage of this implant is that the bone screws can become loose and are not secured against being screwed out or falling out. A further disadvantage is that the bone screws are fastened completely to the implant body itself and that therefore the latter experiences a relatively large stress.

Screws which emerge at the anterior or anterolateral edge of the vertebral body because of loosening run the risk of injuring main vessels such as the aorta and Vena calva, as well as supply vessels such as lumbar arteries and veins. Injury to these main vessels may result in internal bleeding possibly causing death within a very short time. Loosening of screws is more likely when they are not mounted angularly firmly.

### SUMMARY OF THE INVENTION

The present invention is to provide a remedy for the above-discussed disadvantages. The present invention is directed to an intervertebral implant which can enter into a permanent, rigid connection with bone fixation means, so that, even if the bone structure is weakened, there is no loosening between the intervertebral implant and the bone fixation means. Moreover, over a separately constructed front plate, there is tension chording for the bone fixation elements, so that the implant body experiences less stress, that is, superimposed tensions. Moreover, a securing plate enables all bone fixation elements to be secured simultaneously.

The present invention accomplishes the objective set out above with an intervertebral implant, comprising a three-dimensional body having an upper side and an under side which are suitable for abutting the end plates of two adjacent vertebral bodies. The three-dimensional body further includes a left side surface and a right side surface, a front surface and a rear surface, a horizontal middle plane between the upper side and the under side, and a vertical middle plane extending from the front surface to the rear surface. The three-dimensional body further comprising a plurality of boreholes, having openings at least at or near the front surface, passing there through and being suitable for accommodating longitudinal fixation elements. The intervertebral implant further including a front plate displaceably disposed as an insert with the front side of the three-dimensional body, where the front plate includes a plurality of boreholes having openings and in which the longitudinal fixation elements can be anchored, and whose openings overlap with the openings of the boreholes of the three-dimensional body. The intervertebral implant has a securing plate fastened substantially parallel to the front plate in such a manner that the boreholes of the front plate are covered at least partly by the securing plate. An advantage achieved by the present invention, arises essentially from the solid connection between the intervertebral implant and the longitudinal fixation elements, used to fasten it.

Compared to the two-part implants of the state of the art, for which a front plate is implanted in a separate step, the present invention has the advantage that the implantation of the intervertebral implant may be carried out in one step and, with that, can be carried out more easily and more quickly. A further advantage is that the intervertebral implant is fixed as frontally as possible at the body of the vertebra. That is, at a place where good bone material usually is present. The result is an anterior movement limitation without a greater risk to the surrounding structures. The load is still absorbed under compression by the intervertebral implant and not by the front plate or the fixation screws (longitudinal fixation elements).

A method for implanting an intervertebral implant of the present invention between two adjacent vertebral bodies includes introducing the intervertebral implant, having a three-dimensional body, a front plate, and one or more boreholes, between two adjacent vertebral bodies, attaching longitudinal fixation elements with heads through the boreholes into the vertebral bodies, and attaching a securing plate by means of a fastening agent over the heads of the longitudinal fixation elements to the front plate, such that the heads of the longitudinal fixation elements are captured between the front plate and the securing plate wherein the longitudinal fixation elements are secured against being shifted relative to the intervertebral implant.

Other objectives and advantages in addition to those discussed above will become apparent to those skilled in the art during the course of the description of a preferred embodiment of the invention which follows. In the description, reference is made to accompanying drawings, which form a part thereof, and which illustrate an example of the invention. Such example, however, is not exhaustive of the various embodiments of the invention, and therefore, reference is made to the claims that follow the description for determining the scope of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an exploded drawing of the intervertebral implant,

FIG. **2** shows a longitudinal fixation element in the form of a screw,

FIG. **3** shows an elevation of the intervertebral implant of FIG. **1**,

FIG. **4** shows a side view of the intervertebral implant of FIG. **1**,

US 7,862,616 B2

3

FIG. **5** shows a three-dimensional detailed representation of the body of the intervertebral implant, which shows the connecting elements to the front plate of FIG. **6**,

FIG. **6** shows a three-dimensional detailed representation of the front plate of the intervertebral implant and the connecting elements to the body of FIG. **5** and

FIG. **7** shows a completely installed intervertebral implant with front plate and securing plate.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

The intervertebral implant, shown in FIG. **1-7**, includes a three-dimensional body **10** in the form of a cage with an upper side **1** and an underside **2**, which are suitable for abutting the end plates of two adjacent vertebral bodies, a left side surface **3** and a right side surface **4**, a front surface **5** and a back surface **6**, a horizontal middle plane **7** located between the upper side **1** and the underside **2**, a vertical middle plane **12** extending from the front surface **5** to the rear surface **6** and four boreholes **9a**, which pass through the body **10** and are suitable for accommodating longitudinal fixation elements **20**. The body **10** may be constructed as a hollow body, the mantle surfaces of which are provided with perforations **19**. The upper side **1** and/or under side **2** of the intervertebral implant may preferably be convex in shape, not planar. A convex shape to the upper side **1** and the underside **2** allows for an improved fit with the end plates of the adjacent vertebral bodies by the intervertebral implant. Further, the side surfaces **1-6** of the intervertebral implant may be essentially convex, as well.

As shown in FIG. **7**, the upper side **1** and the underside **2** of the three-dimensional body **10** are provided with structuring in the form of teeth **30**.

At the front surface of the three-dimensional body **10**, a front plate **8** may be mounted, which is disposed perpendicular to the horizontal central plane of the intervertebral implant and through which four boreholes **9** pass and in which the longitudinal fixation elements **20** can be anchored. The front plate **8**, as shown in FIGS. **5** and **6**, is constructed as an insert for the three-dimensional body **10**. The three-dimensional body **10** has a semicircular groove **27** extending parallel to the vertical middle plane **12** at the transitions of the left side surface **3** and the right side surface **4** (FIG. **5**) to the front surface **5**. Correspondingly, the front plate **3** has right and left (FIG. **6**) similarly extending and similarly dimensioned, semicircular rail **28**. As a result, the front plate can be pushed and positioned easily with its two lateral rails **28** into the corresponding grooves **27** of the body **10** during the production of the intervertebral implant.

In one embodiment at least one of the boreholes **9** in the front plate is constructed so that a longitudinal fixation element **20**, accommodated therein, can be connected rigidly with the front plate. A rigid connection may be accomplished, for example, owing to the fact that at least one of the boreholes **9** of the front plate **8** has an internal thread. A corresponding longitudinal fixation element **20**, bone screw, with a threaded end can then be screwed together rigidly with the implant. In an alternative embodiment, the four boreholes **9** in the front plate may have an internal thread **11**, so that longitudinal fixation elements **20** can be connected rigidly with the front plate **8**.

As discussed, the front plate **8** may be disposed, preferably vertically to the horizontal central plane, so that it can be displaced vertically with respect to the three-dimensional body **10**. By these means, "stress shielding" (protection and

4

neutralization of mechanical stresses) is attained, which permits the end plates to be adapted to the intervertebral implant during the healing process.

The intervertebral implant may have a securing plate **18**, which can be fastened by means of a screw connection parallel to the front plate **8** at the front plate **8** in such a manner that the boreholes **9** of the front plate **3** are partly covered by the securing plate **18**. The securing plate **18** may have a central borehole **17** provided, preferably, with an internal thread. Corresponding thereto, the front plate **8** has a central borehole **15** for accommodating fastening means **16**. Preferably, the central borehole **15** has an internal thread **14** for accommodating a fastening means **16** in the form of a screw. The securing plate **18** may also be fastened by a bayonet catch or a click catch. By fastening the securing plate **18** to the front plate **8**, the heads **21** of the longitudinal fixation elements **20** (discussed later) are contacted by the securing plate **18**, so that they are secured against being ejected or screwed out.

Preferably, the boreholes **9a** of the three-dimensional body **10** do not pass either through the left side surface **3** or the right side surface **4** or completely through the front surface **5**. The front surface **5**, preferably, is also not crossed by the boreholes **9a**. Further, the horizontal middle plane **7** is not pierced by the boreholes **9a**. Only the axes **24** of the longitudinal fixation elements **20**, introduced therein, intersect the horizontal middle plane **7** of the body **10**. As seen from the front surface **5**, the boreholes of the three-dimensional body **10** and the front plate diverge. The axes **24** of the boreholes of the three-dimensional plate **10** and the front plate **8** enclose an angle β ranging from 20° to 60°, specifically from 36° to 48°, and more preferably an angle β of 42° with the horizontal middle plane **7** (FIG. **4**) and an angle α ranging from 10° to 45°, specifically from 27° to 33°, and more preferably an angle α of 30° with the vertical middle plane **12** (FIG. **3**). Thus, better access for introducing the screws is achieved.

In one embodiment, at least one of the boreholes **9** of the front plate **8** may taper conically towards the underside **2**, so that a bone screw, with a corresponding conical head, can be anchored rigidly therein. The conical borehole preferably has a conical angle, which is smaller than the resulting frictional angle. Advisably, the conicity of the conical borehole is 1:3.75 to 1:20.00 and preferably 1:5 to 1:15.

In another configuration, at least two of the boreholes **9** of the front plate **8** extend parallel to each other. This makes insertion of the intervertebral implant easier. In another embodiment, at least two of the boreholes **9** of the front plate **8** diverge when viewed from the front side. By these means, a region of the vertebral body, which has a better bone quality than does the center of the vertebral body, is reached by the bone screws.

To improve the anchoring of the bone screw in a plastic body of the intervertebral implant (discussed later), a metal sleeve with an internal thread (not shown) may be inserted in the boreholes of the front plate and three-dimensional body. The intervertebral implant may also consist only partially of an x-ray transparent plastic and, in the region of the boreholes consist of a metal, such as titanium or a titanium alloy. Improved guidance and anchoring of the bone screws in the intervertebral implant may be achieved. Further, the boreholes **9** may have a smooth internal wall, into which the threaded head of a metallic, longitudinal fixation element may cut or be molded.

Depending on circumstances, two, three, four or more longitudinal fixation elements may be connected rigidly with the intervertebral implant. Preferably, at least one fixation element should pierce the upper side and at least one fixation element the underside of the intervertebral implant. The lon-

US 7,862,616 B2

5

gitudinal fixation elements **20** may have either a smooth head, so that there will not be a rigid connection with the implant or a threaded, conical or expendable end, so that there will not be a rigid connection with the implant. In both cases, however, the longitudinal fixation elements **20** are secured by the securing plate against rotating out, being ejected out or falling out at a later time.

The longitudinal fixation elements **20** are preferably constructed as bone screws. As shown in FIG. **2**, the longitudinal fixation elements **20**, introduced into the boreholes **9**, have a head **21**, a tip **22**, a shaft **23** and an axis **24**. The head **21** may preferably be provided with an external thread **25**, which corresponds to the internal thread **11** of the borehole **9**, so that the heads **21** can be anchored in the boreholes **9** in a rigid manner. The shaft **23** may be provided with a thread **26**, which is self-drilling and self-cutting. The load thread angle of the thread **26** has a range of between 11° to 14°, preferably between 12° and 13°, and more preferably a load thread angle of 12.5°. The pitch angle of the thread may have a range of between 6° and 10°, preferably between 7° and 9°, and more preferably have a pitch angle of 8°. The special pitch angle produces a self-retardation in the thread, thus ensuring that the bone screw will not automatically become loose.

In the case of a second, possibly rigid type of connection, a longitudinal fixation element **20**, bone screw, may preferably be used, the head of which tapers conically towards the shaft, the conicity of the head corresponding to the conicity of the borehole of the intervertebral implant. The longitudinal fixation elements may also be constructed as threadless cylindrical pins, which are provided with a drilling tip, preferably in the form of a trocar. A further variation consist therein that the longitudinal fixation elements are constructed as spiral springs. Finally, the longitudinal fixation elements may also be constructed as single-vaned or multi-vaned spiral blades.

As shown in FIG. **7**, two longitudinal fixation elements **20** pierce the upper side **1** and two longitudinal fixation elements **20** pierce the underside **2** of the body **10**, thereby anchoring the intervertebral implant to the adjacent vertebral bodies.

The intervertebral implant may be produced from any material which is compatible with the body. Preferably, the three-dimensional body **10** may consist of a body-compatible plastic which has not been reinforced and which may be transparent to x-rays. The advantage over fiber-reinforced plastics, which are already known in implant technology, is that no reinforcing fibers are exposed. Such exposure may be disadvantageous clinically. In such a three-dimensional body **10** constructed of a plastic that has not been reinforced, the use bone screws may be preferable. As discussed previously, the external thread of the bone screw(s) may have a load thread angle range of 11° to 14°, and preferably between 12° to 13°. A comparatively slight inclination of the load flank brings about a high clamping force. As a result, radial expansion and the danger of forming cracks in the plastic are reduced. Furthermore, the external thread of the bone screw(s) may preferably have a pitch angle between 6° and 10° and preferably between 7° and 9°.

The front plate **8** may be made from materials different than the three-dimensional body **10**. The front plate **8** is preferably made from a metallic material. Titanium or titanium alloys are particularly suitable as metallic materials. The complete tension chord arrangement (front plate and screws) may also be made from implant steel or highly alloyed metallic materials, such as CoCrMo or CoCrMoC. The advantage of titanium lies in that there is good tissue compatibility and the good ingrowing behavior of bones. The advantage of highly alloyed metallic materials lies in their high-strength values, which permit filigree constructions.

6

A brief description of a surgical procedure follows in order to explain the invention further.

The intervertebral implant, in the form of a three-dimensional body **10**, is introduced between two adjacent vertebral bodies by means of a suitable instrument. Longitudinal fixation elements **20**, in the form of bone screws, securing the three-dimensional body **10** are screwed/inserted by means of a suitable aiming device through the boreholes **9** of the front plate **8** into the vertebral body. The front plate **8** may be displaced vertically with respect to the three-dimensional body **10**, such that the openings of the boreholes **9**a of the three-dimensional plate **10** and the boreholes **9** of the front plate **8** overlap, to obtain stress shielding. The securing plate **18** is fastened by means of the fastening agent **16** in the form of a screw over the heads **21** of the longitudinal fixation elements **20** at the front plate **8**, so that the heads **21** of the longitudinal fixation elements **20** and, with that, the screws themselves, are captured between the front plate **8** and the securing plate **18** and secured against being shifted relative to the three-dimensional body **10** (for example, by falling out or by turning out). The fastening agent **16**, in the form of a screw, preferably is provided with a thread, which is distinguished by a large self-retardation.

The invention claimed is:

1. An intervertebral implant for implantation between two adjacent vertebral bodies, the implant comprising:

a plurality of bone fixation elements each including a head and a shaft, the shaft having a thread for engaging one of the adjacent vertebra;

a three dimensional body having a left side surface, a right side surface, a front surface, a back surface, an upper side and an underside, the upper side and the underside being sized and configured to contact the one of the two adjacent vertebral bodies, respectively, the three dimensional body further including at least one partial borehole in communication with the front surface and the upper side of the body and at least one partial borehole in communication with the front surface and the underside of the body;

a plate having an upper surface and a lower surface, the plate contacting the front surface of the three dimensional body, the plate including a plurality of boreholes, at least one of the plurality of boreholes formed in the plate aligning with the at least one partial borehole in communication with the upper side of the body and at least one of the plurality of boreholes formed in the plate aligning with the at least one partial borehole in communication with the underside of the body when the three dimensional body is coupled to the plate so that one of the plurality of bone fixation elements is insertable through one of the plurality of boreholes formed in the plate, through one of the plurality of partial borehole formed in the three dimensional body and into one of the adjacent vertebral bodies, respectively, wherein the three dimensional body further includes a first height as defined by the upper side and the underside and the plate includes a second height as defined by the upper and lower surfaces of the plate, the first height being substantially equal to the second height so that the three dimensional body and the plate are contained between the adjacent vertebral bodies when the implant is inserted between the adjacent vertebral bodies;

wherein the plate is made from a biocompatible metallic material and the three dimensional body is made from a biocompatible non-metallic material.

US 7,862,616 B2

7 | 8

**2**. The intervertebral implant of claim **1**, further comprising:

a semicircular groove extending parallel to a vertical middle plane at transitions of the left and right side surfaces to the front surface.

**3**. The intervertebral implant of claim **1**, wherein the three dimensional body is made from a biocompatible plastic.

**4**. The intervertebral implant of claim **1**, wherein the plurality of bone fixation elements are bone screws and the plurality of boreholes formed in the plate include internal threads, at least a portion of the heads of the bone screws being externally threaded for engaging the internal threads of the plurality of boreholes to anchor the plurality of bone screws to the plurality of boreholes in a rigid manner.

**5**. The intervertebral implant of claim **1**, wherein the three dimensional body includes at least one through hole extending from the upper side to the underside.

**6**. The intervertebral implant of claim **1**, wherein the body includes a horizontal middle plane and a vertical middle plane, the plurality of partial borehole formed in the body comprise four body partial borehole, the plurality of boreholes formed in the plate comprise four plate boreholes and the plurality of bone fixation elements comprise four bone fixation elements, two of the bone fixation elements passing through the upper side of the body and two of the bone fixation elements passing through the underside of the body, the four partial borehole formed in the body and the four boreholes formed in the plate being arranged such that the heads of the four bone fixation elements are located between the upper side and an underside in an assembled configuration.

**7**. The intervertebral implant of claim **6**, wherein the two of bone fixation elements passing through the upper side diverge with respect to one another and the two bone fixation elements passing through the underside diverge with respect to one another.

**8**. The intervertebral implant of claim **1**, wherein the plate may be pushed and placed easily with respect to the front surface of the body.

**9**. The intervertebral implant of claim **1**, further comprising:

a securing plate fastenable to the plate, the securing plate at least partially covering each of the plurality of boreholes formed in the plate so that, once implanted, the head of the bone fixation elements are located between the plate and the securing plate.

**10**. The intervertebral implant of claim **9**, wherein the plate includes an internally threaded central borehole for receiving a central screw for fastening the securing plate to the plate.

**11**. The intervertebral implant of claim **1**, wherein the body is convex in shape.

**12**. The intervertebral implant of claim **1**, wherein the body includes a horizontal middle plane and a vertical middle plane, the plurality of partial borehole formed in the body and the plurality of boreholes formed in the plate define borehole axes, the borehole axes defining a first angle $\beta$ relative to the horizontal middle plane and a second angle $\alpha$ relative to the vertical middle plane, the first angle ranging from twenty to sixty degrees (20-60°) and the second angle ranging from ten to forty-five degrees (10-45).

**13**. The intervertebral implant of claim **1**, further comprising:

a securing mechanism operatively engaging the plate, the securing mechanism at least partially covering each of the plurality of boreholes formed in the plate to inhibit the bone fixation elements from falling out.

*   *   *   *   *

# <u>EXHBIIT D</u>

REDACTED